Pages 1 - 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

|  |  |  |
|---|---|---|
| X.AI Corp., a Nevada corporation, and X.AI LLC, a Nevada limited liability company, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 25-07292 RFL** |
| | ) | |
| XUECHEN LI, an individual, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

San Francisco, California
Tuesday, September 2, 2025

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via videoconference)

For Plaintiffs:

        WINSTON & STRAWN
        333 South Grand Avenue
        Los Angeles, California  90071
        BY:  **ALEXANDER H. COTE, ATTORNEY AT LAW**

        WINSTON & STRAWN
        255 Shoreline Drive - Suite 520
        Redwood City, California  94065
        BY:  **KATHI VIDAL, ATTORNEY AT LAW**
             **CARSON SWOPE, ATTORNEY AT LAW**

For Defendant:

        BERLINER COHEN
        10 Almaden Blvd - 11th Floor
        San Jose, California  95113
        BY:  **CHRISTIAN E. PICONE, ATTORNEY AT LAW**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
        U.S. District Court - Official Reporter

1    **Tuesday - September 2, 2025**                    **2:15 p.m.**

2                        **P R O C E E D I N G S**

3                            **---oOo---**

4        **THE CLERK:**  Court is now in session.  The Honorable

5    Rita F. Lin is presiding.

6        Calling civil action 25-7292, X.AI Corp, et al. versus Li.

7        Counsel, please state your appearances for the record

8    beginning with Counsel for the Plaintiffs.

9        **MS. VIDAL:**  I appear to have not a great connection.

10   You're breaking up on me, but I am presuming you are asking me

11   to hear our appearances.  Are you hearing me okay?

12                        (No response.)

13       **MS. VIDAL:**  Okay.  Thank you very much.  This is Kathy

14   Vidal on behalf of Plaintiff X.AI.  I have with me on the call

15   Alex Cote and Carson Swope.  They have not entered appearances

16   but will be entering appearances.

17       I also have client representatives on the video; Adam

18   Mehes, who is the senior director of legal, and also on video

19   but not shown here Lily Lin, who is head of legal affairs at

20   X.AI.  Thank you, Your Honor.

21                        (Pause in proceedings.)

22       **MR. PICONE:**  Good afternoon, Your Honor, Christian

23   Picone from Berliner Cohen making a special appearance for

24   Defendant.

25       **THE COURT:**  Good afternoon to all of you.  Thanks for

1   the late start.  I had a hearing prior to this and wanted to

2   make sure I had an opportunity to review the filing that had

3   just been made by Defendant in the matter, which I have now

4   taken a look at.

5       Let me just start by telling you where I think we are at,

6   and I can give you my tentative ruling; and then I can give

7   each of you an opportunity to let me know if there is anything

8   additional or -- that you want me to know or any additional

9   evidence that you want to present on the issue.

10      So, just purely in terms of the procedural posture, I

11  understand that Defendant is considering a -- and is planning

12  to move to stay the litigation pending the criminal

13  investigation, which I understand is in an investigative stage

14  at this point and there have been no charges filed, but the

15  concern is that obviously if a search warrant has been

16  executed, that it's likely that he will be exercising his Fifth

17  Amendment rights and those rights could potentially be

18  compromised.

19      Did we just lose Ms. Vidal?  Let's just take a pause for a

20  minute and make sure we can have Ms. Vidal back.

21          **THE CLERK:**  Yes, Your Honor, I'm looking.

22                  (Pause in proceedings.)

23          **THE CLERK:**  Mr. Carson Swope would like to be

24  admitted.  I believe she mentioned his name.  May I promote

25  him?

1    **THE COURT:**  You may.  Let's just go off the record for

2    a minute while we try to track down Ms. Vidal.

3    (Pause in proceedings.)

4    **THE CLERK:**  Okay.  Here we go.

5    **MS. VIDAL:**  Thank you, Your Honor, I appreciate your

6    patience.  I was having major audio issues, so I have borrowed

7    my colleague's laptop and we are all set now.  I am afraid that

8    I --

9    **THE CLERK:**  Sorry.

10   **THE COURT:**  We are back on the record.  We had gone

11   off the record for a minute.  I see we are all back.  Ms. Vidal

12   is here with us now as well as Mr. Picone, Mr. Mehes and

13   Mr. Cote, and we are going to continue.  And I understand

14   Mr. Swope is next to Ms. Vidal now and is participating as

15   well.

16   So, let me just start at the beginning again to make sure

17   that Ms. Vidal is up to speed.  As I was saying earlier, I have

18   had an opportunity to review Defendant's papers and the request

19   to potentially stay the matter as a criminal investigation goes

20   forward potentially.

21   I understand that the procedural posture from the papers

22   is that there was a search warrant executed but -- by the FBI

23   of Mr. Li's devices and his house potentially, but that there

24   have been no charges filed at this time.

25   Although we are early in that process, I can understand

1   why Mr. Li might want to be asserting his Fifth Amendment

2   rights in response to discovery and could see the arguments

3   potentially for staying the case.

4       I don't think that those arguments counsel against the

5   issuance of temporary injunctive relief, but I could see them

6   counseling against the Court ordering responses to the

7   discovery at this early -- that is requested at this early

8   juncture.  I'm open to hearing from the parties more about that

9   possibility if you have suggestions, but I thought it might

10   make sense for me to also tell you just generally what my

11   tentative ruling is.  Then I can hear a little more from

12   you-all.

13       Just from a pure question of the *Winter*'s factors, the

14   likelihood of success on the merits and serious questions, it

15   does seem to me that X.AI has presented evidence of a serious

16   question and likely success on the merits as to the DTSA, the

17   trade secret misappropriation claim, on an acquisition theory.

18   At least some of this information appears to be source code

19   that is likely a trade secret.  It is not public.  It is

20   protected by all sorts of policies, security procedures,

21   training.

22       Mr. Li is alleged to have signed the confidentiality

23   agreement and a termination certificate acknowledging those

24   obligations.  He appears to have admitted intentionally

25   uploading X.AI's data to his account; deleting system logs;

1  raining files to cover his tracks.  There is strong

2  circumstantial evidence of threatened damage to X.AI when he

3  uploaded this information to his personal accounts in late

4  July.

5      It doesn't appear that this was something that was related

6  to his role as an engineer or would normally be required as

7  part of his job.

8      He appears to then have signed an offer letter from Open

9  AI, an X.AI competitor, shortly after that on August 1st and

10  was scheduled to start work there August 19th.

11      When he was asked for information, he appeared to have

12  initially cooperated providing passwords but then went and

13  changed those passwords; claimed that he had forgotten them;

14  didn't give a complete list of the accounts.

15      So, all of that I think is an indication that X.AI is

16  likely to succeed on the DTSA claim.  I wouldn't need to reach

17  the remaining claims.  Only one claim is necessary in order to

18  enter injunctive relief.

19      I do think there is a showing of irreparable harm here.

20  Likely misappropriation for the claims stated, obviously there

21  is a presumption of harm in those circumstances; but also X.AI

22  has presented information that shows that this is -- was likely

23  slated to go to a competitor and just because now the

24  Government has some of the devices in their possession, does

25  not mean there is no danger that stuff uploaded to the Cloud or

1  other accounts or other devices that the Government may not

2  have in its possession do not pose an ongoing danger.

3      So, I do think that -- particularly in light of Mr. Li's

4  lack of forthrightness about which accounts he had and what the

5  passwords were, there is still a live concern about irreparable

6  harm that would support entry of temporary relief; and I think

7  the balance of equities and public interest are served by a TRO

8  for those reasons also.

9      I do think in light of the new information, there are

10  reasons to pare back the relief that X.AI sought.  Just going

11  through the proposed order, I do think it makes sense for any

12  devices that have not already been surrendered to be

13  surrendered to X.AI and access provided to online storage

14  repositories.

15      It does seem to me that it would make sense to require

16  return to X.AI if the confidential information -- if he has it

17  still in his possession -- obviously if the FBI has seized it

18  or something like that, it is not in his possession, it is not

19  in his control to turn over; but I think the requirements that

20  he provide a written statement identifying locations that he

21  not modify -- I'm sorry -- or provide passwords and all that

22  information, it's hard for me to imagine how he could do that

23  while preserving his Fifth Amendment rights during further

24  investigation.  It does not seem to me necessary to order that

25  at this juncture if he is turning over access to all of the --

1  all of the -- all of the accounts and all of that.

2     So, that is -- that is one wrinkle that I'm trying to work

3  through.  I'm curious to hear from you-all how you think we can

4  accomplish that while also respecting his Fifth Amendment

5  rights.  I'm conscious of even just turning over access can

6  itself raise Fifth Amendment issues.  So, I'm open to hearing

7  if the parties have a solution with respect to that.

8          **MS. VIDAL:**  Thank you, Your Honor.

9          **MR. PICONE:**  Thank you, Your Honor.  Would you -- who

10  would you like to hear from first?

11          **THE COURT:**  Let me just also go through a couple other

12  things that I think are potentially implicated in the order.

13     I saw that in paragraph 2 the order also requires that he

14  be prohibited from deleting any number of items.  I don't see

15  an issue with that given the pendency of the criminal

16  investigation and prohibited from continuing to possess X.AI

17  confidential information.  I think that makes sense too.

18     I do have some concern about the requirement that he turn

19  over the devices and that access the devices and Cloud

20  repositories that he has developed since the August 19th search

21  warrant, I think the allegation -- the claim in the Defense

22  papers is that he has a new cell phone and a new e-mail address

23  that are for communicating with his Counsel.  And obviously, I

24  don't think it makes sense to order that that be turned over to

25  X.AI.

1    So, it -- I don't think it makes sense for the Court to

2    order that as to devices that postdated August 19th; but for

3    anything predating August 19th, I could see why it makes sense

4    to require that to be turned over.

5    And then lastly, I see that there is a request that he be

6    enjoined from having communications with competitors of X.AI or

7    taking on a job in that area.  I see from Defense Counsel's

8    submission that it seems unlikely that he would be doing that

9    anyway.  I could see the argument, though, for X.AI in terms of

10   how that would cause irreparable harm if he were to do it.

11   So, my tentative would be to enjoin him in that way

12   because it's not going to harm him in any way, and it would

13   prevent the harm to X.AI.  So, I think the balance of equities,

14   the public interest, irreparable harm all point in the

15   direction of entering those provisions.

16   Let me hear from Mr. Picone first and then I can hear from

17   Ms. Vidal.

18       **MR. PICONE:**  Thank you, Your Honor.  Your Honor, I

19   would like to correct one bit of information that I think

20   should guide you going forward.

21   The FBI did not take the two computers or the phone from

22   my client.  Those were voluntarily handed over to Plaintiffs.

23   And as far as we know, they are still in Plaintiff's

24   possession.  And that sort of creates this catch-22 -- and

25   I guess -- so, I don't waste everyone's time -- if Ms. Vidal

1   can just confirm that they still have the devices, I can go on

2   with the argument.  If they have turned them over, then I would

3   move on.

4           **THE COURT:**  Let me check in with Ms. Vidal on that.

5           **MS. VIDAL:**  We no longer have those devices.  The FBI

6   has them.

7           **MR. PICONE:**  Okay.

8           **THE COURT:**  You may continue.

9           **MR. PICONE:**  Yes.  And so, what's important about that

10  is they have -- they had the devices on the 14th and then the

11  15th.  And as is outlined in Mr. Hyland's declaration, he

12  explained exactly how they could go and obtain the information

13  for the ███ account to reassert it -- and I would remind the

14  Court, he didn't -- my client receives the -- the Ms. Wang

15  letter on April 11th.  He deletes -- he changes his password

16  and deletes an e-mail account on the 12th.

17      He meets with Mr. Poliverino; hires him on the 13th.

18  Mr. Hyland comes in, I believe, some time on the 15th or 16th

19  after the second interview, and my client voluntarily came in;

20  answered questions.  When was accused of hiding things, we

21  provided full disclosure.  This is how you can fix this.  Yes,

22  he shouldn't have deleted or changed his password on the 12th;

23  but, you know, this is what he does.  He doesn't memorize them.

24  He has them available.  You have -- you, Plaintiff, can

25  authenticate them.

1    So, we are now in a position where Plaintiff had the

2    ability for over a week to access this information to discover

3    what our position is, is that it is sitting in the Cloud and

4    has not moved.  They had the computer on the 14th.  They imaged

5    them -- and I believe -- and Counsel will correct me if I'm

6    wrong -- they took two images of all three devices.  And so, I

7    would imagine while they don't have the originals -- they are

8    now with the FBI -- they can certainly search and check on the

9    images and be able to tell the Court:  We have looked; it has

10   not moved or we have looked and it has moved, okay, which would

11   be far more serious.

12       Our position is it has not moved, and they are -- they

13   have the ability to determine this.  And so, I think the

14   Court -- I understand the Court is going to issue some type of

15   TRO, all right, but I think what the Court should -- I would

16   propose that based on the evidence that we have submitted, my

17   client has been completely cooperative.  Has made some mistakes

18   prior to getting counsel.  Has made no mistakes since getting

19   counsel and is in such a catch-22 that he cannot because they

20   have -- the Plaintiff has turned this over to the FBI, he

21   cannot be cooperative anymore and sit there and say "let's go

22   fix this."

23       And so, in many ways, Plaintiff -- and I'm not

24   down-playing that my client downloaded -- the allegation is

25   that he downloaded it, but Plaintiff had a great opportunity to

1  determine that this was much ado about nothing and chose not

2  to.  And so, now, we are in this position of having a TRO

3  issued, and I would suggest --

4          **THE COURT:**  Let me just ask you for a minute, my

5  concern is last about the devices that have been turned over to

6  Plaintiff and now are in the FBI's possession because your

7  client doesn't have those anymore.  And so, I don't think that

8  there's necessarily a danger that he is going to move anything

9  off the devices that are in the FBI's possession obviously.

10     The question is whether there is information that is on

11 other devices and accounts that neither Plaintiff nor the FBI

12 has.  And my concern is that because he didn't give a complete

13 list of his e-mail accounts -- and I understand there may be

14 other explanations for that -- but because he was incomplete in

15 that listing and it appears that he was not entirely forthright

16 about the password change situation, that there may be

17 additional devices and accounts in which case I do need to --

18 him -- to the extent that those exist, to turn them over to

19 Plaintiff and to provide access to them.

20     Do you have a concern about that piece?

21          **MR. PICONE:**  Well, Your Honor, remember, there was --

22 I do; okay.  Remember there was a search warrant and the FBI

23 obtained -- I'm not even sure what they obtained but they --

24 they searched his car.  They searched his hotel room.  I

25 suspect they have since searched his house because the only

1    access to his house was through his phone.  And so, my client

2    is actually locked out of his house.

3        So, the problem I see, Your Honor, is there is no sort of

4    parameter of -- so, what computers?  What devices?  Was it a

5    device that he used last in 2022?  And I'm not being -- I'm

6    trying not to be difficult but --

7            **THE COURT:**  Let me just ask you:  If I were to limit

8    it to devices that are -- and accounts that are in his

9    possession, custody and control now and tell him that he has to

10   provide access and turn those over, what is the problem with

11   that?

12           **MR. PICONE:**  Well, Your Honor, there is still the

13   Fifth Amendment issue here.  All right.  And so, there is a

14   Fifth Amendment issue that my client conceivably would be then

15   producing the evidence to convict him.  And I have -- I have no

16   issue with the Court ordering -- I think you had mentioned

17   paragraph 2 -- you know, and that he can't even access

18   anything.

19       The problem -- again -- and I hate to use this again --

20   the catch-22 is my client can't provide -- even if he wanted to

21   or didn't have a Fifth Amendment, he can't provide access to,

22   say, Cloud storage because he doesn't know the password.  The

23   password is stored on the phone.  The phone is now with the

24   FBI.

25       So, if you compel him to answer or provide this list, it

1   will be deficient; and then a couple weeks, we will get a --

2   hit with a motion for contempt because -- and it is the same

3   problem that we ran into with Mr. Hyland when he said he is

4   going from memory.

5       And if he could see his phone, he can tell you more.

6   Plaintiff said:  "No, no, no, we don't want him" -- and, again,

7   I understand -- "We don't want him to see the phone."

8       So, we are -- we are in, you know, this conundrum of my

9   client is damned if he gives -- tells you "here is everything I

10  have" and he is damned because he can't remember it because

11  he -- his access to it is through his phone which he no longer

12  has access -- he doesn't have.

13      So, possession, custody and control, you know, that --

14  those are three words that mean a lot more than what my client

15  can do right now.  That's my concern.

16      **THE COURT:**  I understand the Fifth Amendment concern

17  about turning over passwords and saying, "These are the

18  accounts I have.  These are the devices I have that haven't yet

19  been seized."

20      The question I have, though, is obviously this is a civil

21  case and the Fifth Amendment prohibits the use of that

22  information for criminal prosecution.

23      So, if I were to require him to turn over that information

24  in order to avoid irreparable harm to X.AI, I can understand

25  potentially that that information that he turned over would be

1   inadmissible against him in a criminal case; that he handed

2   this to X.AI would not be able to be used in his criminal case.

3   They would have to do their own process if they wanted to get

4   something from him, and it would have to not be tainted by

5   whatever he gave to X.AI.

6       Why can't I order him to just turn over the physical

7   devices that he has in his possession, custody or control to

8   X.AI so they can make sure it doesn't have confidential

9   information about that --

10          **MR. PICONE:**  Again --

11          **THE COURT:**  -- without allowing it to be used in a

12   criminal prosecution?  I mean, that's up to another judge at a

13   later time handling any prosecution that goes forward.

14          **MR. PICONE:**  Well, I think the same problem that would

15   come up as came up in us turning over his two computers and his

16   phone, Plaintiff -- you know, however reason, whether

17   voluntarily or through a search warrant -- handed it over to

18   the FBI.  So, all we are doing is creating a middleman,

19   Your Honor, not necessarily precluding -- allowing my client to

20   exercise his Fifth Amendment.

21       But one of the other things, Your Honor, there's no

22   parameters of when.  You know, if a device was accessed in 2022

23   but hasn't been accessed since 2024, is that something he is to

24   turn over?  And again, I -- this sort of lack of "just give us

25   everything you ever possessed," seems to be too overbroad.

1    **THE COURT:**  Yeah, I can understand limiting it to --

2    since the time that he started working for X.AI, which is

3    February 26, 2024, it sounds like.

4    **MR. PICONE:**  Right.

5    **THE COURT:**  Any other -- anything else you want to

6    flag for me for my initial tentative?

7    **MR. PICONE:**  Yes, Your Honor.  One concern is your

8    reference -- I think -- I want to make sure there is a

9    difference between devices -- and, again, I'm -- I'm late to

10   this game, Your Honor.  I, you know, was hired over the

11   weekend, and technically I haven't been completely hired yet;

12   and, you know, my understanding is my client has a new e-mail

13   account -- new ███ account specifically for communication and

14   a phone; and I believe that phone and account was created after

15   the search warrant, but it might not have been.

16       And so, my concern is that is a phone that he has been

17   using to communicate with myself, the other counsel and Dan

18   Olmos, who is criminal counsel.  And I want to make sure that

19   that phone is not to be disclosed or turned over.  And

20   I believe it was picked up after the 19th.  But if it wasn't, I

21   still don't want it to because that has communication that

22   is -- you know, goes to the heart of the attorney-client

23   privilege.

24       And so -- and then second, you had made reference to Cloud

25   storage.  My client has no access to those because he doesn't

1   have his phone.  And so, I am -- I am reluctant to have to try

2   to turn that over because there is no way for him to give a

3   complete, you know, understanding of it.  And there is -- and

4   again, I don't want to be -- I don't want him in a situation

5   where he is now being accused of not being honest or not being

6   forthright, leaving things out, when he is just going by

7   memory.

8         **THE COURT:**  So, is it -- let me just make sure I'm

9   understanding correctly.  Are you representing that he is

10  saying that if he has a Cloud storage account, all of his Cloud

11  storage accounts would be detailed in the phone that Plaintiffs

12  already have an image of?

13        **MR. PICONE:**  That is -- that is my understanding,

14  Your Honor, because he -- he has -- and it is alluded to in

15  Plaintiff's papers but it's, I think, thoroughly vetted in our

16  papers -- a two-factor authentication.  That phone is part of

17  the two-factor authentication.  And, you know -- you know, you

18  can almost see -- you can feel Hyland's frustration going

19  through that.  This is what we need.  He needs -- you know, you

20  can gain access to the ███ account and these other accounts

21  for the two-factor authentication.  It is through the phone.

22  And if it is not through the phone, it is through his ████

23  account, which, again, is on that phone.

24        And so, my concern is that he fails to produce something

25  because he is doing it by memory and, you know, without --

1    without his device that --

2         **THE COURT:**  I just want to clarify something.  You

3    were saying that he uses the phone as the two-factor

4    authentication device, but that is different from saying that

5    "if you want to see which Cloud storage accounts I have you

6    would go onto my phone and look at the apps that are on my

7    phone and the e-mail accounts that are on my phone.  All of the

8    Cloud storage accounts that I have are in the phone I already

9    turned over."

10        If that is the case, that's obviously -- and if he is able

11   to attest to that, I think that that could cut through a lot of

12   the conundrum that we are in.  So, that's why I'm asking

13   whether it is your representation that the Cloud storage

14   accounts that Plaintiffs are looking for would all be on that

15   phone.

16        **MR. PICONE:**  Your Honor, that I don't know because,

17   for example, there was reference to a ▮▮▮ account -- ▮▮▮▮▮▮▮.

18   Again, it was -- we don't know.  ▮▮▮▮▮▮▮, I believe he ▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  So, that's why that

20   account might be there.  Whether it exists or not, my client

21   doesn't necessarily know.  And, again, he could be able to

22   drill down on that if he had his phone, which, you know, stores

23   everything he needs to access things.

24        **THE COURT:**  So, you are saying he can't detail what

25   Cloud storage accounts he has even though many of these are

1   accessible from outside the phone because the phone is the

2   two-factor authentication device that has been set for all of

3   those accounts?

4          **MR. PICONE:**  It's either that or it stores his

5   password.  He doesn't -- you know, he doesn't have a

6   handwritten list of "here are my passwords."  They are there.

7   And, Your Honor, I appreciate --

8          **THE COURT:**  So, he should not have any Cloud storage

9   accounts with passwords other than those listed on his phone

10  password settings?

11         **MR. PICONE:**  That is my understanding, Your Honor,

12  and/or the two computers that the Plaintiff has images of and

13  no longer has possession of those.  And, Your Honor, that --

14  this is the problem -- you know, this is the problem.  He is

15  going by memory.  He went by memory when talking to Plaintiffs;

16  and the moment Plaintiffs found something else, it was sort of

17  "aha, you are lying to us" or "you are not being truthful;" and

18  the response was no, he doesn't remember because this -- you

19  have the device that gives him access to these things.

20         **THE COURT:**  I understand your point.  So, is it -- is

21  it your contention that he would have any problem or is it --

22  would you have any objection to him attesting that all of the

23  passwords for all of his Cloud storage accounts are on his

24  phone that Plaintiffs have downloaded?

25         **MR. PICONE:**  Your Honor, the problem I have -- I --

1   the problem I see there is a criminal defense attorney stepping

2   in saying he is not -- he is not swearing under oath to

3   anything right now.  That's my -- that's my sort of problem.

4       And so, in an attempt to work around that, I would suggest

5   that at the very --

6       **THE COURT:**  Well, see if he asserts that and then we

7   can cross that bridge when we get there potentially.

8       **MR. PICONE:**  What I would attest to the Court -- and

9   he will agree to this -- he is not going to access anything

10  that has X.AI data, period.  I mean --

11      **THE COURT:**  Well, would he be -- is there a reason he

12  needs to access any of his Cloud storage accounts, period,

13  right now other than --

14      **MR. PICONE:**  Outside of the --

15      **THE COURT:**  -- the one newly created to communicate

16  with Counsel?

17      **MR. PICONE:**  No.  And if I do, I can come back to

18  court.

19      **THE COURT:**  Okay.  Thank you.  I know that -- I see

20  Ms. Vidal's hand raised.  I'm going to give an opportunity for

21  you to respond.  I just want to make sure I get through

22  everything Mr. Picone had to tell me.  Is that -- did we

23  finish?

24      **MR. PICONE:**  Yes, Your Honor.  My concern is, you

25  know, the scope of the devices and Cloud storage which I think

1  creates this conundrum; and I appreciate the Court allowing me

2  to make that argument.

3        **THE COURT:**  Ms. Vidal.

4        **MS. VIDAL:**  Thank you, Your Honor.  I will say I rose

5  my hand not to interject and respond but to just caution

6  Mr. Picone not to disclose the whereabouts of the confidential

7  information.  We are talking about X.AI's entire source code

8  that now exists somewhere on the web that somebody could try

9  and hack.  And so, we purposefully sealed certain portions of

10  our brief.  We have already written to Mr. Picone and asked him

11  to pull down what he has publicly filed, which actually

12  reinserted into the public the locations and potential

13  locations of X.AI's confidential information.  So, I just

14  wanted to caution him to not raise in this public hearing any

15  of those potential locations.

16        **MR. PICONE:**  Your Honor, if I may interject, Counsel,

17  if you want to send me what you think I should pull down, do

18  so.  I will withdraw it and re-file it under seal.

19        **MS. VIDAL:**  Thank you.

20        **MR. PICONE:**  It's not my intention to interfere with

21  that.

22        **MS. VIDAL:**  Thank you.  I very much appreciate that.

23  In terms of response, I just want to re-set on a couple of

24  things.

25      First, I just want to make clear for the record that the

1    cell phone and the two laptops were seized involuntarily by the

2    FBI pursuant to a search warrant.  So, those -- I just wanted

3    to set the record clear on that.

4        I also want to make clear that before even filing the TRO,

5    X.AI had discussions with the Attorney General -- with the U.S.

6    Attorney's Office.  And the U.S. Attorney's Office and

7    Government essentially represented that X.AI should do whatever

8    they need to do to protect their company.  So, there's no

9    concern -- they had no concern about X.AI filing this TRO.  So,

10   any of those concerns, I think, can go by the wayside.

11       I will also say that in general and in our experience

12   unless the Government wants a stay of a civil action in a case

13   such as this, usually courts don't grant stays.  Now, I realize

14   the stay is for another day; and I very much appreciate

15   Your Honor recognizing that the temporary relief is so critical

16   in this matter.

17       In terms of the relief -- where Your Honor was going in

18   the beginning in terms of the relief that X.AI needs is really

19   the relief that's required here.

20       We are, again, talking about all of X.AI's source code,

21   the entire code base.  This is something that if it exists out

22   there -- which we have every belief that it does; that it has

23   not been pulled down.  We have seen no evidence that it has

24   been pulled down -- it cannot only cause harm to X.AI by virtue

25   of how Defendant might use it, but it is now stored in a way

1    that is not as secure as X.AI was keeping it and could be

2    hacked by nefarious actors.  So, we are talking about a major

3    threat here that we really hope this Court allows X.AI to

4    discover where that information is and pull it down.

5        In terms of the three devices, we have gone through with

6    an expert forensic analysis of the devices.  It's ongoing but

7    we have been able to conclude that there are no passwords on

8    those devices.

9        In fact, when Mr. Li changed his password, he also changed

10   the setting that doesn't have your phone remember the password.

11   So, he intentionally not only changed the password, he changed

12   the settings on the phone so that the phone could not remember

13   the password.  He then accessed that device after changing his

14   password.  So, there's some question about the representation

15   that he has forgotten the password.

16       I will say in addition to that, there's no -- the

17   passwords are not on either of the two computer devices.  They

18   are not on the phone.  The only way that X.AI can get access --

19   there are two ways.  One is through the Defendant cooperating.

20   These are his accounts that he should be able to get access to

21   with the Defendant cooperating so that X.AI can get access to

22   all of his accounts that he has accessed.  And I agree with

23   putting a boundary on it.  I will say the February 26th date is

24   an estimate.  I would say since he started work at X.AI -- and

25   we can figure out what that date is because that's an

1  approximate date -- but any of his accounts or devices that he

2  has accessed since that point.

3       We don't know even as to his new phone and his new system

4  whether he moved the information from his old system to the new

5  system.  We do have reason to believe based on forensics that

6  not only did he upload to the initial account -- and I won't

7  say which one because that's under seal -- but then he also

8  uploaded X.AI confidential information and source code to yet

9  another Cloud account.

10      So, the only way that X.AI can be sure that all of its

11 confidential information and source code is safe and secure is

12 to get access through an expert.  Can have a protective order

13 in place.  We can take care of ensuring that any of

14 Mr. Picone's concerns are taken care of.

15      In terms of the right to plead the Fifth, that does not

16 stop a civil action.  Mr. Li is free to plead the Fifth.  He

17 cannot not sit for a deposition.  He can plead the Fifth in the

18 deposition and adverse inferences can be drawn against him, but

19 the fact that there's an ongoing criminal investigation does

20 not provide the type of protections that Mr. Picone is

21 representing they provide.

22      And I'm happy to answer any other questions Your Honor

23 has.  And I will say the second way that X.AI can get access to

24 the accounts is through third-party discovery, and X.AI will be

25 requesting that.

1    Your Honor, I would -- instead of troubling this Court

2    with multiple motions for expedited third-party discovery, I

3    would request that the Court order a 26(f) conference as soon

4    as tomorrow so that the parties may proceed with that

5    third-party discovery in conjunction with getting the

6    Defendant's cooperation and accessing the accounts.

7        THE COURT:  One question I have for Plaintiff is in

8    terms of the -- in terms of what I do with his Fifth Amendment

9    privilege at this juncture, one possibility would be for me to

10   enter the order but also set a deadline for him to assert his

11   Fifth Amendment privilege prevents him from being able to

12   comply with the orders.

13       What is your -- I have not confronted this situation

14   before, and it would be helpful for me to have briefing or case

15   law from the parties that explains your view of what the Court

16   should do in that situation.

17       It does seem to me that, you know, the Fifth Amendment

18   obviously prohibits the use of that information against him in

19   a criminal prosecution but doesn't bar civil suits.  At the

20   same time, I think -- I don't think it is the case that the

21   Court's only stay civil actions at the request of the

22   prosecution in the case.  There are legitimate reasons why

23   courts do that in order to make sure that the criminal process

24   is fair for defendants too.  And I can see many reasons to do

25   that in this instance.

1    So, maybe one thing I'm thinking about is entering an

2    order as I otherwise would but providing a window for Defendant

3    to assert which items he cannot comply with based on the Fifth

4    Amendment and having a follow-up hearing at the preliminary

5    injunction stage in terms of what the request is from the Court

6    on that and briefing on that.

7        What do you think about that and do you have a preview for

8    me of what the -- how you would propose to deal with the Fifth

9    Amendment issues?

10       **MS. VIDAL:**  I appreciate that, Your Honor.  And I

11   didn't mean to overstate when the Court would grant a stay.  I

12   was expressing in our experience that's what we have seen in

13   the past.  Certainly Your Honor may stay the case if Your Honor

14   so chooses.

15       In terms of the actual relief, there is relief that could

16   be granted now that clearly would not implicate any potential

17   Fifth Amendment.  For example, Mr. Li not using X.AI's trade

18   secrets.  Mr. Li not accessing his online accounts.  There's a

19   lot in there that I think Your Honor could go through.  Happy

20   to submit a brief on that today if you would like, but there is

21   a lot in there that could not possibly implicate Fifth

22   Amendment.  I think the Fifth Amendment concerns were more

23   around the access to the devices, the forensic analysis.

24       I think all the other relief including not going to Open

25   AI or a competitor, all of that is clearly outside of the Fifth

1    Amendment.

2        In terms of the Fifth Amendment itself, Your Honor, I have

3    to say I also, likewise, have not dealt with this particular

4    issue before.  I have a different understanding of the Fifth

5    Amendment than what's been communicated here, but I would not

6    want to speak out of turn.  So, I think briefing on that issue

7    would make the most sense.

8        I will note that there is an urgency especially since the

9    Defendant has filed the potential locations of this information

10   in the public record.  Even if that is pulled down, there's now

11   a -- even more of an urgency for X.AI to find that information

12   and make sure that it's pulled off of the Cloud.

13       And so, I would ask that whatever schedule this Court

14   sets, that it be immediate so that X.AI can access the

15   information and pull it down as soon as physically and humanly

16   possible.

17       **THE COURT:**  Let me allow Mr. Picone to respond to

18   that.  Why don't I just order -- I can see -- I can order all

19   of the relief including the written statement and all of the --

20   sitting for a deposition, providing passwords, and all of that

21   and then -- but also recognize that if Mr. Li wishes to assert

22   his Fifth Amendment privilege, he may detail in -- you know,

23   today is Tuesday -- he may detail by the end of the day

24   tomorrow which items he cannot comply with due to the Fifth

25   Amendment.  And then at that time you-all could give me

1  briefing on -- both sides could simultaneously brief the issue

2  as to his ability to comply despite the Fifth Amendment and

3  then I can rule on that on the papers.

4      And we can all -- at the same time set this for a

5  preliminary injunction hearing.  I can do that by written

6  order, but I would be happy to run the schedule by you-all.  I

7  was thinking of setting the hearing on September 11th at

8  2:30 and giving Defendants until September 5th to respond;

9  Plaintiffs until September 9th to reply and requiring you-all

10 to let me know if you intend to have live witnesses or anything

11 like that by September 9th.

12     I can also set a longer timeline if you-all think it would

13 make sense for me to enter that initial order and then give

14 you-all some time to work together and see if you can figure

15 out a sensible solution to the situation.  I'm open to hearing

16 from you-all about both of those options.

17     Let me give Mr. Picone the floor again, and then I can

18 hear from Ms. Vidal.

19     **MR. PICONE:**  Thank you, Your Honor.  Again, I'm not

20 opposed to using access in employment.  That's not a Fifth

21 Amendment issue.  I have -- remember, I'm specially appearing;

22 and we are trying to find counsel in the trade secret world

23 that can come in and represent him.  That is not me.  All

24 right.  And so, I appreciate the necessity of a quick

25 turnaround but that -- that won't work.  I need a longer time

1   period because -- you know, remember, we were communicating

2   with Plaintiffs.  I believe the last communication was the 19th

3   or the 20th with Mr. Hyland, and then Plaintiff goes radio

4   silent until the 27th and then the next day they filed a

5   complaint.  So, they have had ample time to work this up.  I

6   have not.  And that is a -- a significant problem here that

7   puts Mr. Li in a difficult position.

8        **THE COURT:**  I understand this that -- I haven't met

9   you, Mr. Picone, so I don't know your area of expertise; but I

10  am assuming from what you are saying is that your area of

11  expertise is criminal defense and not civil trade secret

12  litigation.  It seems to me the question of which of these

13  answers he can give and which he needs to assert the Fifth

14  Amendment as to would be one that's squarely within the

15  criminal defense attorney's expertise.

16       So, help me understand why it is that you need more time

17  on that issue.  Civil counsel can always take it back and then

18  you wouldn't have the adverse inference because you would have

19  provided the discovery.  So, if you over assert the Fifth

20  Amendment privilege -- as long as there is a legitimate basis

21  for it -- I don't think that that's necessarily a problem.

22       **MR. PICONE:**  Well, Your Honor, you want me to file an

23  opposition on the 5th.  Your proposed schedule is a hearing on

24  the 9th.  I reply on the 5th.

25       **THE COURT:**  A hearing on the 11th.  You would respond

1  on the 5th.

2      **MR. PICONE:**  Yes, right.  I would like more time than

3  that, again, so that my client can obtain civil counsel so that

4  they can identify these issues.  Your Honor, I do both criminal

5  and civil.  I don't -- you know, I -- not this type of trade

6  secrets, not even close.

7      **THE COURT:**  I don't -- in terms of the preliminary

8  injunction hearing, I'm happy to have that on a more extended

9  timeframe.  It's when I'm talking about which claims -- which

10  of the elements of the order will he be asserting he cannot

11  comply with because of the Fifth Amendment, that is a more

12  narrow timeline; and I have that on a more narrow basis.  But

13  if you are all open to stipulating to good cause -- and I think

14  there would be good cause in order to obtain the counsel he

15  wants to, in order to impose preliminary injunction -- I'm

16  happy to put the preliminary injunction hearing out further

17  even into the end of September or early October to let him hire

18  counsel; get their arms around the situation and be able to

19  brief this properly.  I'm open to doing that.

20      **MR. PICONE:**  I appreciate that, Your Honor.  And with

21  that understanding yes, I think within a short period of time

22  by the 5th, I can be able to spend some time with my client and

23  be able to tell the Court and Opposing Counsel, this is where

24  he is going to assert the Fifth Amendment this is where he is

25  not.  And quite frankly, you know --

PUBLIC VERSION

1      **THE COURT:** I was thinking the 3rd. That's, like,

2 tomorrow. If you talk to your client and tell me by the end of

3 the day tomorrow which of the elements in the order that I'm

4 going to issue today he cannot comply with because of the Fifth

5 Amendment. That's my question to you.

6      **MR. PICONE:** If you want me to do it by tomorrow,

7 Your Honor, I will get it done by tomorrow.

8      **THE COURT:** All right. Thank you. Ms. Vidal, what do

9 you think about putting out the hearing further out to allow

10 that -- both sides to put in the evidence and brief this

11 properly and maybe potentially to work on a sensible solution

12 on your own?

13      **MS. VIDAL:** Your Honor, we are fine with that

14 timeline. We appreciate the urgency with which you're taking

15 this and the timing for tomorrow. As long as the TRO is

16 entered and stays in place until the preliminary injunction

17 hearing, we have no concern about that hearing being put off a

18 few weeks.

19     The only other thing I would ask this Court to do is to

20 issue the -- a ruling on the Rule 26(f) conference so that we

21 can confer tomorrow, and that will allow us to serve discovery

22 on third parties.

23      **THE COURT:** Okay. I think I need to make that

24 determination in conjunction with the Fifth Amendment assertion

25 and the briefing on the Fifth Amendment issue. So, I guess the

1    thing I left out of this is getting briefing from you-all on

2    the Fifth Amendment issue and how I should consider that in

3    terms of whatever he asserts the privilege to when he makes

4    that filing on the 3rd.

5         So, I can put that on for you-all to give me that

6    information on Monday, September 8th, if you-all would file

7    simultaneous briefs telling me what you think I should do about

8    the Fifth Amendment issue and giving me the authorities you

9    have on that.  Is that a reasonable timeline, Mr. Picone?

10             **MR. PICONE:**  Yes, Your Honor, Monday will work for me.

11             **THE COURT:**  And Ms. Vidal.

12             **MS. VIDAL:**  That timing works on our end, Your Honor.

13   Thank you.

14             **THE COURT:**  Great.  Let me just run through some of my

15   notes I had about the requested relief.

16                      (Pause in proceedings.)

17             **THE COURT:**  I didn't have anything else on my end.  Do

18   the parties have anything else you wanted to flag for me?  I

19   have on my list that I will just likely enter a written order

20   after I get your arguments on the Fifth Amendment issue, and

21   then I will also set a Rule 26(f) conference date if I think

22   that's appropriate after I get that information from you-all in

23   one day.

24        Anything else you would like to raise with me?  Otherwise,

25   I will plan to issue the temporary restraining order later

1   today.

2       **MS. VIDAL:**  Your Honor, I would only ask for one

3   additional thing and that's if we could get the filing that

4   Mr. Picone filed today pulled down until we can have a chance

5   to discuss with them what is confidential in those materials.

6       **THE COURT:**  We will have the Court lock the filing so

7   that it can't be accessed.

8       **MR. PICONE:**  Thank you, Your Honor.

9       **MS. VIDAL:**  Thank you.

10      **MR. PICONE:**  And I will -- Counsel, send me what you

11  think -- if you want to do page or line numbers and that you

12  think needs to be redacted, and I will re-file under seal.

13      **MS. VIDAL:**  Thank you, Mr. Picone.

14      **MR. PICONE:**  Just as soon as you provide that to me, I

15  will get on it.  It's not my intent to publish this.

16      **MS. VIDAL:**  Thank you.

17      **THE COURT:**  I will put the preliminary injunction on

18  for a hearing on the -- let's see -- I have a lot on

19  calendar -- I will put it on the October 7th.  Just please plan

20  to have that date booked at 10:00 a.m.  I will put it on for a

21  hearing then, and I will put that in the order that I put out.

22      **MS. VIDAL:**  Thank you, Your Honor.

23      **THE COURT:**  Thank you.  Be well.

24      **MR. PICONE:**  Thank you, Your Honor.

25      **THE CLERK:**  Court is adjourned.

1        (Proceedings adjourned at 3:07 p.m.)

2                        ---oOo---

3

4

5               **CERTIFICATE OF REPORTER**

6        I certify that the foregoing is a correct transcript

7   from the record of proceedings in the above-entitled matter.

8

9   DATE:   September 3, 2025

10

11

12

13   _____

14        Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
        United States District Court – Official Reporter

15

16

17

18

19

20

21

22

23

24

25