# EXHIBIT W

KATHI VIDAL (State Bar No. 194971)
kvidal@winston.com
MATTHEW R. MCCULLOUGH (State Bar No. 301330)
mrmccullough@winston.com
CARSON SWOPE (State Bar No. 353352)
cswope@winston.com
**WINSTON & STRAWN LLP**
255 Shoreline Drive, Suite 520
Redwood City, CA 94065
Telephone: (650) 858-6500
Facsimile: (650) 858-6550

LEELLE B. SLIFER (admitted *pro hac vice*)
lslifer@winston.com
JONATHAN HUNG (admitted *pro hac vice*)
johung@winston.com
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Telephone: (214) 453-6500
Facsimile: (214) 453-6400

Attorneys for Plaintiffs X.AI CORP. and X.AI LLC

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X.AI CORP. and X.AI LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> OPENAI, INC., OPENAI GLOBAL, LLC, and OPENAI OPCO, LLC, <br><br> Defendants. | **Case No. 3:25-cv-08133-RFL** <br><br> **PLAINTIFFS' FIRST AMENDED COMPLAINT FOR:** <br><br> **(1) MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836 ET SEQ.); AND** <br><br> **(2) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200 ET SEQ.)** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs X.AI Corp. and X.AI LLC (collectively, "xAI"), for their First Amended Complaint against Defendants OpenAI, Inc., OpenAI Global, LLC, and OpenAI OpCo, LLC (collectively, "OpenAI"), state as follows:

**INTRODUCTION**

1.      The desire to win the artificial intelligence ("AI") race has driven OpenAI to cross the line of fair play. OpenAI violated California and federal law by inducing former xAI employees, including Xuechen Li, Jimmy Fraiture, and a senior finance executive, to steal and share xAI's trade secrets. By hook or by crook, OpenAI clearly will do anything to ensure its market position is not threatened by a better innovator, including plundering and misappropriating the technical advancements, source code, and business plans of xAI.

2.      What began with OpenAI's suspicious hiring of Xuechen Li—an early xAI engineer who admitted to stealing the company's entire code base—has now revealed a broader and deeply troubling pattern of trade secret misappropriation, unfair competition, and intentional interference with economic relationships by OpenAI. OpenAI's conduct, in response to xAI's innovations to its Grok model, reflects not an isolated lapse, but a strategic campaign to undermine xAI and gain unlawful advantage in the race to build the best artificial intelligence models.

3.      Unbeknownst to xAI at the time, when Li's theft of xAI's code base and failure to return it prompted xAI to file *X.AI Corp. et al. v. Li*, Case No. 3:25-cv-07292 (Aug. 28, 2025) (Lin, J.), at least two other parallel OpenAI efforts were afoot. Another early xAI engineer—Jimmy Fraiture—was also harvesting xAI's source code and airdropping it to his personal devices to take to OpenAI, where he now works. Meanwhile, a senior finance executive brought another piece of the puzzle to OpenAI—xAI's "secret sauce" of rapid data center deployment—with no intention to abide by his legal obligations to xAI.

4.      Upon his departure, the senior finance executive refused to sign his Termination Certification to confirm he would return and protect xAI's trade secrets and Confidential Information. And when xAI confronted the senior finance executive about his breaches of his confidentiality obligations, he responded with a crass comment leaving little doubt as to his intentions:

1

5.     As the California Court of Appeal aptly observed, ". . . [U]nfair or fraudulent business practices may run the gamut of human ingenuity and chicanery." *People ex rel. Mosk v. Nat'l Rsch. Co. of Cal.*, 201 Cal. App. 2d 765, 772 (1962). That observation captures the essence of OpenAI's conduct here—a calculated effort to gain unfair advantage through misappropriation and manipulation.

6.     As detailed in xAI's complaint against Li, AI is the defining technology of the modern era. Its development stands to reshape economies and society. Other than the advent of the internet, the extent of AI's potential influence on daily life has no analog in recent history.

7.     xAI began offering AI products in late 2023 with generative AI technology, including a chatbot powered by its Grok Large Language Model ("LLM"). Beyond Grok's performance as a chatbot, xAI has demonstrated unmatched operational speed in constructing data centers of unprecedented computing power. xAI's recently released Grok 4 is the culmination of years of research and development, and billions of dollars in investments. Such technological and business innovations are the result of xAI's talented employees, superior engineering, and accumulated expertise. Grok is a preeminent frontier model, representing the cutting edge of AI research and

development and pushing the boundaries of what AI can do across multiple domains. Competing alongside OpenAI's ChatGPT and Google's Gemini, xAI's newest release—Grok 4—is one of the most, if not the most, advanced and powerful generative AI systems in the world, leading industry benchmarks in reasoning and pretraining capabilities. Within 18 months, xAI's Grok overtook OpenAI's models in certain performance metrics, and it has remained a top performer in the frontier model space.

8.    xAI is known for innovation. It offers features more innovative and imaginative than those offered by its competitors, including OpenAI.

9.    OpenAI, on the other hand, has raised substantial sums of money since approximately seven years prior to xAI's formation and quickly rose to dominance among generative AI companies simply by being the "first mover" with the release of its consumer accessible service, ChatGPT, in 2022. Threatened by the innovativeness and creativity of xAI's code (developed in part, and later stolen, by Li and Fraiture) and the unprecedented rapidity with which xAI is able to deploy data centers with the massive computational resources to train and run AI (known to the senior finance executive only through his tenure at xAI), OpenAI has engaged in unfair and illegal business practices by specifically targeting xAI employees and using them to steal xAI Confidential Information and trade secrets.

10.   Threatened by xAI's innovations, OpenAI is not merely soliciting or hiring a competitor's employees. OpenAI is waging a coordinated, unfair, and unlawful campaign: OpenAI is targeting those individuals with knowledge of xAI's key technologies and business plans—including xAI's source code and its operational advantages in launching data centers—where OpenAI faces a competitive threat, then inducing those employees to breach their confidentiality and other obligations to xAI through unlawful means.

11.   For example, OpenAI used the same recruiter at the same time to specifically target both Li and Fraiture—two of xAI's earliest engineering hires—based on their access to and detailed knowledge of xAI's innovative source code and to induce them to steal xAI Confidential Information. Li and Fraiture, in the midst of being recruited by OpenAI and induced with job offers including significant compensation, both stole xAI's source code and other confidential material, and copied it

1    to their personal computers and/or cloud accounts for use at OpenAI. Tellingly, xAI has uncovered

2    highly suggestive, encrypted communications between Li and OpenAI's recruiter that coincided with

3    Li's theft of xAI's trade secrets.

4         12.    OpenAI also specifically targeted an xAI senior finance executive, who had been

5    working at xAI for only a few months, based on what he knew about xAI's industry-leading data center

6    operations, which he admitted was "the secret sauce of xAI." The senior finance executive only learned

7    of that "secret sauce" through his work with xAI's trade secrets, as he had no prior experience with

8    data centers or the AI industry at all. He jumped ship from his senior finance role at xAI to a new (and

9    less prestigious) role at OpenAI working on spending strategy for OpenAI's data center operations.

10   The senior finance executive has, on multiple occasions, expressed a flagrant disregard for his

11   confidentiality obligations to xAI, including through the crude sexual expletives he sent to xAI's

12   counsel when confronted about his theft of company trade secrets.

13        13.    At least two other former xAI employees—Hieu Pham and Ethan Knight—have

14   admitted to maintaining confidential xAI information on their personal devices and, while employed

15   by OpenAI and represented by OpenAI's counsel, shared that information with a third party without

16   xAI's approval under unknown security conditions.  Through that same counsel, Pham and Knight

17   have refused to provide access to their devices and accounts to confirm that xAI information has been

18   deleted, and have refused to even provide access to the information they already shared with a third

19   party unless xAI agrees to let them further disclose that information to OpenAI's counsel.

20        14.    Yet another OpenAI employee—Uday Ruddarraju—has been caught attempting to

21   access a confidential file relating to an xAI employee's hiring package, including compensation and

22   strategy details, using his personal Gmail account to attempt to access the document from an internal,

23   corporate Google Drive link on September 26—after this litigation was filed and over two months

24   after Ruddarraju had left xAI.  The fact that Ruddarraju had access to the link to this file confirms that

25   he improperly kept xAI confidential information which he has now used while employed by OpenAI.

26        15.    One employee stealing source code might have been a coincidence.  But two employees

27   stealing source code around the same time while in communication with the same OpenAI recruiter,

28   a financial officer flagrantly disregarding his confidentiality obligations, two other employees keeping

and sharing xAI information with third-parties (while employed by OpenAI and represented by OpenAI's counsel), and yet another employee using an internal document link he never should have kept to attempt to access internal xAI files while employed at OpenAI and after this lawsuit was filed is an alarming pattern. It has become clear that OpenAI is determined to preserve its hegemony at any cost, and not based solely upon the merits of its own accomplishments. OpenAI has no qualms with manipulating former xAI employees to steal the technical advancements, source code, and business plans of xAI for OpenAI's benefit. These actions have harmed not only xAI and the incentive to develop innovative technologies, but also the competitive landscape of the entire generative AI industry as well as the consumers who rely on fair competition between AI companies and the models they create.

### NATURE OF THE ACTION

16.     This is an action for willful and malicious misappropriation of xAI's Confidential Information and trade secrets under 18 U.S.C. § 1836 *et seq.* by OpenAI, intentional interference with prospective economic relations, and unfair competition under Cal Bus. & Prof. Code § 17200 *et seq.*

### PARTIES

17.     X.AI LLC is a Nevada limited liability company and wholly owned subsidiary of X.AI Corp.

18.     Defendant OpenAI, Inc. is a registered nonprofit organization incorporated under the laws of Delaware, with a place of business in San Francisco, California.

19.     Defendant OpenAI Global, LLC is a limited liability company formed under the laws of Delaware, with a place of business in San Francisco, California.

20.     Defendant OpenAI OpCo, LLC is a limited liability company formed under the laws of Delaware, with a place of business in San Francisco, California.

### JURISDICTION AND VENUE

21.     Jurisdiction is proper in this district pursuant to 28 U.S.C. § 1331 because xAI asserts claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* This Court has supplemental jurisdiction over xAI's additional claims because they form part of the same case or controversy. 28 U.S.C. § 1367(a).

22.     This Court has personal jurisdiction over OpenAI, because each OpenAI Defendant entity lists its principal place of business as 1455 3rd St., San Francisco, CA 94158 in its most recent filings with the California Secretary of State.

23.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because OpenAI resides in this district, and because OpenAI poached multiple employees at issue in this case who worked for xAI in this district, meaning that a substantial part of the events or omissions giving rise to xAI's claims occurred in this district.

## GENERAL ALLEGATIONS

### The Ascent of Artificial Intelligence

24.     The rise of widely publicly available generative AI products is one of the most transformative technological shifts of the 21st century. Generative AI refers to systems that can create new content—text, images, music, code, and more—by learning patterns from massive datasets. Unlike traditional AI, which classifies or predicts, giving rote or stilted responses, generative AI produces outputs that are similar to what would be expected when a human responds in a conversation.

25.     The advent of modern AI is often credited to the rapid rise and popularization of large language models (LLMs), a class of AI systems designed to understand and generate human-like text and other outputs. However, LLMs represent but one of the groundbreaking advancements in artificial intelligence. Generative AI has seen extremely rapid development in other areas in recent years, particularly in the fields of image generation, video generation, speech generation, and multimodal generation—the simultaneous generation of multiple output modalities at once.

26.     These generative AI models are built upon sophisticated architectures that enable the models to generate content that demonstrates human-like semantic and conceptual understanding, but at speeds far exceeding human capability. Such generative AI models have become a foundational technology across industries, powering virtual assistants, educational platforms, creative tools, and enterprise automation systems. Their ability to scale across domains and adapt to user needs has made them indispensable in modern digital infrastructure.

27.     The development of such generative AI models requires extraordinary financial and technical resources. Building a state-of-the-art model involves data acquisition and processing,

PLAINTIFFS' FIRST AMENDED COMPLAINT
CASE NO. 3:25-CV-08133-RFL

computational infrastructure, and expert talent. Immense capital investment is necessary to curate high-quality datasets, operate thousands of high-performance graphical processing units (or GPUs), and employ top-tier AI researchers.

28. Generative AI models have delivered immense value to individuals and society at large. They enhance productivity by, among other things, automating routine tasks, improving access to education through personalized tutoring, supporting healthcare professionals with diagnostic assistance, and empowering creators with tools for content generation. These models are transforming how we communicate and interact, while their scalability allows organizations to process and generate vast amounts of content with unparalleled efficiency. The societal benefits of generative AI are profound, and the next steps in advancing generative AI depend greatly on the protection of intellectual property and trade secrets that underpin its development.

29. OpenAI released its first generative AI chatbot product, ChatGPT, in November 2022, which marked the beginning of widespread public access to conversational generative AI tools. ChatGPT uses versions of its generative pre-trained transformer (hence, "Chat<u>GPT</u>") models—such as GPT-3.5, GPT-4, and GPT-o3—as its underlying LLMs.

30. Since ChatGPT's public debut in late 2022, generative AI—particularly in the form of conversational chatbots capable of back-and-forth messaging streams—has rapidly become a fixture in daily life. By August 2024, nearly 40% of U.S. adults aged 18 to 64 reported using generative AI tools, either at work or at home. This widespread adoption occurred at a faster pace than that of the personal computer or the internet, making generative AI one of the most swiftly embraced technologies in modern history.

31. During this same period, and leveraging on its first-mover position, OpenAI's ChatGPT has quickly reached over 180 million users globally by mid-2025.

**<u>xAI and Its Groundbreaking Technology</u>**

32. xAI began offering AI products in November 2023 and, through extensive investment in human capital and technology, has become one of the most innovative generative AI companies. xAI's vision is to advance human comprehension and capabilities through its advanced AI, including xAI's generative AI model, Grok.

33.     Grok is a conversational generative AI developed by xAI that is capable of many functions, including (a) performing natural language processing tasks, including answering questions, retrieving information, writing creatively, and assisting with coding, (b) interpreting, editing, and generating images or videos in various styles from fanciful to photorealistic, and also (c) generating natural language audio responses in response to oral prompts from a user.

34.     Grok is a preeminent frontier model, representing the cutting edge of AI research and development and pushing the boundaries of what AI can do across multiple domains. Competing alongside OpenAI's GPT models and Google's Gemini, xAI's newest release—Grok 4—is one of the most, if not *the* most, intelligent generative AI systems, leading certain industry benchmarks in reasoning and pretraining capabilities.

35.     Grok 4 is the culmination of years of research and development, and billions of dollars in investments. These efforts have required the collaboration of highly skilled teams of engineers, scientists, and other professionals, all working to advance the state of the art in AI.

36.     Experts predict that the value of AI technology will exceed hundreds of billions of dollars this year, and over a trillion dollars by decade's end. Moreover, advanced AI models can cost billions of dollars to develop. Thus, maintaining the utmost secrecy in the development of AI models is of critical importance.

37.     xAI's strategy to succeed is based on innovation. In less than two years it has delivered arguably the most intelligent AI model in the world, including features more innovative and imaginative than those offered by its competitors, including OpenAI. xAI's innovation is protected by xAI's Confidential Information and trade secrets.

**xAI Protects Its Confidential Information and Trade Secrets**

38.     Trade secrets protect nearly all of xAI's developments—model weights, training data, tuning methods, know-how, and more. With xAI's daily innovative advancements, its ability to rely on trade secrets protection is critical not only to its competitive position but for its ongoing operations and protection of its investments in its technology.

39.     To foster innovation, and protect its confidential and proprietary information, including its trade secrets, xAI has implemented a variety of industry standard—and industry leading—practices,

such as: routinely conducting security awareness training for all employees; conducting background checks on employees and contractors who may access xAI data; conducting secure development and data handling training for employees with access to sensitive data, after which such employees must complete an assessment to demonstrate understanding; employing a team dedicated to information security; adopting the NIST 800-171 Rev.3 framework as a baseline for internal security standards; achieving SOC 2, Type II compliance; securing endpoints, including employee devices, with ongoing patch maintenance and full disk encryption; and maintaining a formal written information security policy, among other practices.

40.     In addition, as a condition of employment, xAI requires each employee to enter into an Employee Confidential Information and Invention Assignment Agreement such as those attached here as Exhibits 1–3. The agreements (1) prohibit xAI employees from disclosing, using, or publishing all confidential knowledge, data, or information ("Confidential Information") belonging to xAI during and after their employment; (2) require xAI employees to acknowledge that the employment creates a relationship of confidence and trust with respect to xAI's Confidential Information, which xAI has a protectable interest therein; (3) require xAI employees to return all Confidential Information to xAI and permanently delete any Confidential Information on their personal devices upon termination of their employment; and (4) require xAI employees to maintain xAI's confidentiality during and after their employment. *See, e.g.*, Exhibit 1.

41.     The employees' agreements with xAI further require that employees certify their return of Confidential Information upon leaving the company. *See, e.g.*, Exhibit 1 ¶ 8 (requiring employee to sign a "termination statement if required to do so by [xAI]").[1] By signing the termination statement ("Termination Certification") of the form seen in Exhibit 4, employees verify that they have complied with all the agreement's terms. Exhibit 4 at 1. The Termination Certification also requires departing employees to certify that they have undertaken a diligent search for all xAI documents and returned them to the company. *Id.* It provides that "if [the employee has] used any personal computer, server,

---

[1] There are some variations in the form of the agreements, but the substance of the requirement to sign a termination statement if required to do so by xAI is consistent across the documents that xAI employees sign as a condition of their employment.

or e-mail system to receive, store, review, prepare or transmit any … Confidential Information, [the employee] agree[s] to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems." *Id.*

**Threatened by Grok, OpenAI Resorts to Poaching Specific xAI Employees to Access the xAI Confidential Information Most Needed by OpenAI to Unscrupulously Abscond with xAI's Innovative Technology, Negate xAI's Competitive Threat, and Maintain OpenAI's Market Share**

42.    Grok's innovative technology has the potential—if combined with sufficient scale—to disrupt the status quo. But OpenAI has enacted a strategy to benefit itself from xAI's own innovations and to maintain the status quo.

43.    Facing a highly innovative product beating its own in objective benchmarks, and seeing xAI's innovations in developing datacenters with much higher operational efficiency, OpenAI realized it had to act.

44.    OpenAI has thus resorted to the repeated and relentless poaching of xAI employees with access to the xAI Confidential Information most critical to xAI's technical and operational innovations and using those employees to steal xAI's Confidential Information. This includes stealing xAI's source code—responsible for the training and development of Grok models as well as the infrastructure used to deploy Grok—and stealing xAI's business plans, data center deployment strategy, and related partner deals that are key to understanding xAI's operational efficiency in launching new data centers.

45.    OpenAI's targeted scheme to poach specific employees with access to the precise xAI Confidential Information most crucial to xAI's business, and to use those employees to steal xAI's Confidential Information, throws fair competition out the window for the sake of stifling its next closest competitor to preserve OpenAI's hegemony at any cost. This scheme transcends any notions of ordinary employee mobility. OpenAI's brazen conduct is nothing more than a calculated, anticompetitive campaign of stealing xAI's Confidential Information and proprietary business

1  knowledge that not only harms xAI, but undermines the integrity of innovation and competition in the
2  marketplace and thereby also harms consumers of AI.

3  **OpenAI Poaches Xuechen Li to Access xAI Source Code**

4      46.    Xuechen Li joined xAI on or about February 26, 2024, and worked in Northern
5  California. Li was among the company's first 20 engineers to be hired by xAI. An accomplished
6  researcher in the AI community, Li earned a Ph.D. in Computer Science from Stanford University in
7  2024 and has authored numerous AI-related articles published in various scholarly journals.

8      47.    Li's responsibilities included developing and training Grok. In this role, Li had access
9  to and responsibility for components across the entirety of xAI's technology stack.

10     48.    To support his job responsibilities, xAI granted Li restricted and controlled access to
11 its confidential documents and proprietary information, including source code. xAI provided this
12 access only for the purpose of enabling Li to perform his job duties.

13     49.    As a condition for his employment and access to xAI's Confidential Information and
14 trade secrets, xAI required Li to sign an Employee Confidential Information and Invention Assignment
15 Agreement, which he executed on February 26, 2024. *See* Exhibit 1.

16     50.    Li's Employee Confidential Information and Invention Assignment Agreement
17 imposes clear obligations upon him, as an xAI employee, regarding xAI's Confidential Information,
18 including that it:

19     (a)    Requires that Li acknowledge that the employment "creates a relationship of
20         confidence and trust" with respect to xAI's Confidential Information, which the
21         company "has a protectable interest therein" (Exhibit 1 ¶ 1.1);

22     (b)    Requires Li to maintain xAI's confidentiality "during and after [the employee's]
23         employment," and prohibits disclosure, use, or publication of Confidential Information
24         unless required for the employee's work or expressly authorized by an officer of xAI
25         (*id.*);

26     (c)    Requires Li, upon termination, to return "any and all" materials containing or
27         disclosing Confidential Information, including documents, notes, and devices, along

28

with all copies, and "any other material containing or disclosing … Confidential Information." (*id*. ¶ 8);

(d)     Requires Li to provide xAI with a computer-usable copy of any Confidential Information stored on personal devices or systems and to "permanently delete and expunge" such information from those systems (*id*.);

(e)     Requires Li to "agree to provide [xAI] access to [the employee's] system as reasonably requested to verify that the necessary copying and/or deletion is completed" (*id*.); and

(f)     Requires Li to "agree to: (a) provide [xAI] any and all information needed to access any [xAI] property or information returned or required to be returned … , including without limitation any login, password, and account information." *Id*. ¶ 8.

51.     By signing the agreement, Li also agreed that, prior to leaving the company, he would complete and sign xAI's "termination statement if required to do so by [xAI]." *Id*.

52.     As with many of its employees ultimately poached by OpenAI, xAI wanted to retain Li as a productive and successful employee who would continue to contribute to xAI's business. Indeed, in recognition of the prospective future contributions that xAI expected to receive from Li's work, xAI awarded Li substantial equity as part of his compensation package and provided liquidity to Li, allowing Li, on an exceptional basis, to sell millions of dollars of his equity in June and July 2025.

53.     Unbeknownst to xAI, OpenAI was in contact with Li at the same time that xAI was spending millions investing in xAI's future working relationship with Li. OpenAI's contact with Li was part of a larger strategy to pilfer xAI employees with intimate knowledge of xAI's most valued Confidential Information and trade secrets.

54.     OpenAI's contact with Li began at least as early as July 2025.

55.     On information and belief, Li made a presentation to OpenAI for an interview on July 13, 2025, containing xAI's Confidential Information. On information and belief, as described further below, Li attempted to delete (or did delete) this presentation from his personal cloud account on August 13 after xAI had uncovered his theft of trade secrets, in an attempt to cover up the subject matter of his discussions with OpenAI.

56.     Li later admitted, in a handwritten confession prepared while represented by counsel, that he had taken, in addition to xAI's source code, a *slide deck* specifically pertaining to xAI's highly sensitive and confidential AI model training and tuning methods, which constitute trade secrets.  This presentation is conspicuously and unmistakably marked as "Confidential."

57.     Apparently unsatisfied with the information Li shared on July 13, OpenAI did not make an offer at the time and instead strung Li along until after Li had taken a copy of xAI's entire source code base.

58.     On July 23, OpenAI Research Talent Advisor Tifa Chen sent a message request to Li via the encrypted messaging application Signal. On July 24, Chen sent Li a message on Signal indicating that a link to, on information and belief, a cloud storage location was sent to Li.

59.     The very next day, July 25, Li uploaded the ***entire xAI source code base*** to a personal cloud account. Li then deleted his browser history and system logs to hide evidence of his misdeeds. Indeed, Li later admitted to deleting the system logs to try to cover his tracks.

60.     At 11:20 a.m. on July 25, Li downloaded from his personal cloud account the entire exfiltrated set of xAI source code onto his personal laptop.

61.     At 3:28 p.m. on July 25—four hours after Li's successful pilfering of xAI's source code—Chen expressed disbelief, sending Li a message on Signal that equated to "no way!"

62.     Two minutes later, at 3:30 p.m., upon information and belief Chen had a virtual meeting with Li.

63.     Two days later, Li again downloaded xAI Confidential Information to his personal laptop at 11:21 a.m. on July 27.

64.     The next day, on July 28 at 6:07 p.m., Chen communicated OpenAI's offer of multiple millions of dollars. This huge bounty was OpenAI's quid to Li's quo—the xAI source code and presentation he pilfered from xAI—and was part of OpenAI's larger scheme to obtain access to critical xAI trade secret information to neutralize xAI while providing an unfair advantage to OpenAI to the detriment of consumers.

65.     By August 1, Li had signed his offer letter with OpenAI. Li now turned to attempting to hide evidence of his theft, all while under this agreement with OpenAI.

13

66.     Li's theft of xAI Confidential Information and misappropriation of trade secrets—which occurred as Li was regularly and actively communicating with OpenAI via encrypted chats and nondescriptly titled meetings—is beyond dispute. Li, with his attorney present, admitted in a handwritten document he provided to xAI that he misappropriated xAI's source code and presentation on xAI's highly valued training and tuning techniques.

67.     During interviews with xAI discussing his theft, however, Li hid OpenAI's involvement, failing to mention that he had accepted an offer to work for them, let alone any of his clandestine conversations with Chen. Indeed, when asked directly where he was going to work upon departing xAI, Li demurred, stating (falsely) that he believed it would violate a nondisclosure agreement to reveal the name of his future employer.

68.     Li signed the Termination Certification required by his agreements with xAI on August 1, 2025. *See* Exhibit 4. In this statement, as xAI would later learn, he falsely certified he had returned "all Company documents … and any materials of any kind which contain or embody any confidential or proprietary information." *Id.* at 1. He also reiterated his agreement to "hold in confidence and not disclose, use or publish any of the Company's Confidential Information"—an agreement he had already violated, and which he attempted to cover up. *Id.*

69.     As for the critical main cloud account where Li uploaded xAI's entire source code base and other Confidential Information, Li's efforts to obfuscate became increasingly evident. On August 11, Li changed the password to his main personal cloud account where he had uploaded xAI's Confidential Information.

70.     Li's native iPhone iOS password manager application further reflected that the password associated with his main personal cloud account was "[l]ast updated" the following day, on August 12.

71.     Forensic artifacts show that Li was continuing to access that same main personal cloud account of his through August 14.

72.     Specifically, on August 12, Li searched for and visited URLs about file recovery relating to the cloud service where he had stored xAI Confidential Information. Late that night, at 10:24 p.m., Li then downloaded yet another copy of the xAI Confidential Information he had

1  exfiltrated to his personal cloud account to his personal laptop. Immediately following this, at 10:28

2  p.m., he once again accessed his personal cloud account—specifically, on information and belief, the

3  folder that he had been using to store xAI Confidential Information.

4      73.    The next morning, at 8:08 a.m. on August 13, Li accessed the Trash folder in his

5  personal cloud account. The Trash folder is where a user must go to permanently delete files in that

6  account. Li then accessed the Trash folder again at 9:40 a.m., 9:42 a.m., and 10:19 a.m.

7      74.    At 10:24 a.m. on August 13, Li accessed the slides that, on information and belief, he

8  presented to OpenAI on July 13. He again followed this up with a visit to the Trash folder at 10:50

9  a.m.

10      75.    However, on August 18, when, with Li's authorization, xAI attempted to use the

11  password stored in the password manager application of Li's iPhone to attempt to access Li's main

12  personal cloud account—in order to remove the volume of xAI's source code and other Confidential

13  Information stored therein—the password did not work.

14      76.    And yet, when asked on that very same day, August 18, Li suddenly claimed that he

15  could not remember the password to his main personal cloud account, even though he had just changed

16  it on August 11, and even though he was accessing the same account just *four days earlier*.

17      77.    Therefore, Li either (1) manually updated the password listed in the password manager

18  app on August 12 with a fake one that could not grant access to his cloud account, or (2) changed the

19  password *yet again* after August 12, but did not update the password in the app. This, combined with

20  the fact that Li was successfully accessing the account days later by entering a different, newer

21  password not reflected in the app, shows a deliberate pattern of obfuscation. Li's story about

22  "forgetting" his password—a story he maintains to this day, forcing xAI to go through a laborious and

23  costly account recovery process which has still not resulted in xAI's recovery of its trade secrets—is

24  so implausible on several fronts that Li must have been trying to hide his misconduct and impede

25  xAI's recovery of its trade secrets. Indeed, as noted above, after being confronted with xAI's logs

26  conclusively showing his theft and attempts to cover his tracks, Li has since confessed to xAI

27  interviewers that he stole xAI's entire codebase and sought to conceal it.

28

78.     On August 11, Li added a new device to the encrypted messaging app Signal that he had been using to communicate with Chen.

79.     Li intended to start officially at OpenAI on August 19, but because by then xAI had uncovered his theft of xAI's source code and other Confidential Information, Li claims he informed OpenAI that he had to delay his official start date.

80.     Pursuant to the legal action xAI took against Li in *X.AI Corp. et al. v. Li*, Case No. 3:25-cv-07292 (August 28, 2025) (Lin, J.), Li was then temporarily restrained, on September 2, "from having any role or responsibility at OpenAI … until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted." Exhibit 6 ¶ 3. OpenAI later confirmed that it was Li who stopped communicating with OpenAI and that OpenAI only revoked his offer after xAI obtained a temporary restraining order against Li working at OpenAI.

81.     Despite representing to the Court that he "has been completely cooperative" and "voluntarily handed over" the devices in question, and despite being subject to a TRO that requires Li to "otherwise cooperate with xAI as necessary to provide xAI access to such accounts and devices," Li continues to try to hide evidence of his wrongdoing and his communications with OpenAI. On September 23—after OpenAI's counsel began representing OpenAI and responding relating to both Li and other former xAI employees—Li attempted to revoke access to his devices and accounts that he had previously authorized xAI to access "until xAI has confirmed that it has located and deleted all Confidential Information from the Account and Devices."

82.     Practically speaking, Li stole xAI's **entire codebase**, the value of which cannot be understated—especially to OpenAI, which stands to gain the most from its misappropriation as a company facing a competitive threat from xAI's Grok.

83.     Further, xAI has since come to learn that, while Li had xAI's *entire codebase* stored in his personal cloud storage account, Li *also* had his personal ChatGPT account **directly connected** to his personal cloud storage account, set up as a connected "Source" in OpenAI's ChatGPT.  In connecting these two services, Li was required to agree that OpenAI's ChatGPT can "[s]ee and download all your [personal cloud storage account] files." Thus, OpenAI had a means to access Li's files, which included the stolen copy of xAI's entire source code, through its ChatGPT service.

84.     Upon information and belief, OpenAI induced, encouraged, and/or rewarded Li to provide it access to xAI source code and other trade secrets, including through this ChatGPT connection to Li's personal cloud storage account.

85.     Upon information and belief, OpenAI targeted Li because of his access to xAI Confidential Information and trade secrets, including the entire source code base, and directed, endorsed, financially rewarded, and/or otherwise encouraged Li to steal xAI's Confidential Information and trade secrets for OpenAI to obtain and use this information to neutralize xAI.

86.     Upon information and belief, OpenAI directed, endorsed, financially rewarded, and/or otherwise encouraged Li to delete evidence of his wrongdoing after signing his formal offer. Li's actions—undertaken in the less than three-week time period between signing his offer and his expected start date—are attributable to OpenAI under agency principles and/or through vicarious liability.

**OpenAI Poaches Jimmy Fraiture to Further Access xAI Source Code**

87.     Jimmy Fraiture joined xAI on or about April 22, 2024—just months after xAI launched. Fraiture was the second engineering hire in xAI's London operation and was among the company's initial group of approximately 50 engineers.

88.     Fraiture was a senior, capable, and highly trusted engineer. As the leader of xAI's production inference team, Fraiture was responsible for maintaining and developing inference clusters ("ICs") that provide critical functions to xAI's customers using Grok.

89.     The code that Fraiture and his team at xAI were responsible for is unique to xAI for a number of reasons, one being its superior reliability as compared to xAI's competitors for serving production traffic. If OpenAI obtained access to this code, it could immediately enhance the stability and scalability of its own production systems and negate this technological innovation of xAI.

90.     To support his job responsibilities, xAI granted Fraiture restricted and controlled access to its confidential documents and proprietary information, including confidential source code. xAI provided this access only for the purpose of enabling Fraiture to perform his job duties.

91.     As a condition for his employment and access to xAI's Confidential Information and trade secrets, xAI also required Fraiture to sign an Employee Confidential Information and Invention Assignment Agreement, which he executed on March 4, 2025. Exhibit 2. Fraiture's employment

agreement further required him to provide a "signed statement confirming that you have complied" with the provision requiring "return to the Company all property … including all written or electronic material … belonging to any Group Company."

92.     As with Li, xAI wanted to retain Fraiture as a productive and successful employee who would continue to contribute to xAI's business. Indeed, in recognition of the prospective future contributions that xAI expected to receive from Fraiture's work, xAI awarded Fraiture substantial stock options and shares as part of his compensation package and provided liquidity to Fraiture by facilitating the sale of millions of dollars worth of his xAI shares in July 2025.

93.     Unbeknownst to xAI, OpenAI had been in contact with Fraiture since early July as part of its ongoing efforts to target xAI employees with access to specific xAI Confidential Information that was directly related to xAI's innovative technology, such as the infrastructure code for which Fraiture and his team were responsible.

94.     At least as early as July 17, 2025, Chen—the very same recruiter who was in regular contact with Li—set a calendar invite to meet with Fraiture.

95.     On information and belief, Chen and Fraiture communicated via Signal as well, although xAI does not have access to those communications.

96.     Fraiture then scheduled a visit to OpenAI on July 24 and in advance of this visit—while still employed at xAI—signed a non-disclosure agreement with OpenAI on July 22, despite having agreed to "not, without [xAI London Ltd.'s] express written consent, directly or indirectly engage in any … business activity which is directly or indirectly competitive with, or would otherwise conflict with, your employment by the Company."

97.     On July 29, Fraiture received a formal employment offer from OpenAI. On information and belief, Fraiture had accepted this offer by July 30. On September 2, Fraiture began employment with OpenAI. On information and belief, Fraiture's offer from OpenAI included substantial compensation to reward him for and/or induce him to share and/or use xAI Confidential Information to benefit OpenAI.

98.     Just two days after receiving the offer from OpenAI, on July 31, Fraiture betrayed the trust and faith xAI had placed in him by copying xAI source code and trade secrets from his xAI-

18

1  issued laptop to his personal device by using the AirDrop feature to wirelessly transmit compressed

2  source code files. xAI's records show that he used the AirDrop feature to transfer, or attempt to

3  transfer, xAI Confidential Information at least five times on July 31. Fraiture admitted that he

4  maintained a copy of this confidential xAI source code on his personal (non-xAI-issued) laptop until

5  at least August 28.

6       99.    Fraiture stole the majority of xAI's code for which he and his team at xAI were

7  responsible, which as explained above uniquely relates to xAI's innovative technology for serving

8  production traffic.

9       100.   Fraiture further stole extensive infrastructure and training code that was written by

10  other persons and teams at xAI. These parts of the xAI code base are extremely sensitive and enable

11  xAI to train its generative AI models such as Grok-3 and Grok-4—a key component of xAI's success,

12  which represented a competitive threat to OpenAI.

13      101.   Fraiture also stole personal experimental folders of four of xAI's co-founders and a

14  further six xAI employees. These personal experimentation folders are used to work on new and

15  experimental code and therefore reflect insights into xAI's potential future innovations, research

16  directions, and/or novel techniques not yet deployed but that may reflect future competitive threats to

17  OpenAI. Fraiture did not contribute to the experimental code the co-founders and other employees

18  were personally experimenting with, and he accessed their experimental code for the sole purpose of

19  stealing it.

20      102.   Fraiture also stole a video recording of a lengthy internal, xAI "All-Hands" meeting, in

21  which xAI founder Elon Musk conveyed significant confidential nonpublic information in relation to

22  xAI's future plans and immediate targets, product roadmap, commercial contract terms, and other

23  confidential and sensitive information. This video included information relating to xAI's strategic

24  priorities and confidential business practices, which are a competitive differentiator between xAI and

25  OpenAI. Recognizing the value of its contents, Fraiture secretly exfiltrated it to his personal device

26  hours later.

27      103.   Much like Li, after having accepted his offer with OpenAI, Fraiture turned to deleting

28  evidence of his wrongdoing. In an August 29 meeting with xAI's Insider Threat team, Fraiture lied

1  and claimed that he had tried but failed to transfer xAI source code to his personal device and that he

2  had never transferred the code. Fraiture later admitted that this statement was untrue and that he had

3  in fact copied xAI source code to his personal computer and left it there for a few weeks before

4  claiming to have deleted the evidence from his personal device.

5      104.    Within his first week of starting at OpenAI, Fraiture came to OpenAI's offices in

6  California, where recruiter Tifa Chen—who also spearheaded communications with Li—is based.

7      105.    Upon information and belief, OpenAI targeted Fraiture because of his access to xAI

8  Confidential Information and trade secrets, including the source code base, and directed, endorsed,

9  financially rewarded, and/or otherwise encouraged Fraiture to steal xAI's Confidential Information

10  and trade secrets for OpenAI to obtain and use this information to neutralize xAI. Fraiture stole this

11  information after having signed a non-disclosure agreement signed in anticipation of future

12  employment with OpenAI, and thus his actions are attributable to OpenAI under agency principles

13  and/or through vicarious liability.

14      106.    Upon information and belief, OpenAI directed, endorsed, financially rewarded, and/or

15  otherwise encouraged Fraiture to delete evidence of his wrongdoing after signing his formal offer.

16  Fraiture's actions—undertaken while Fraiture was on garden leave, but still employed by xAI, after

17  signing his OpenAI offer—are attributable to OpenAI under agency principles and/or through

18  vicarious liability.

19      107.    On information and belief, OpenAI continues, remarkably, to employ Fraiture even

20  after being notified that he stole voluminous quantities of xAI source code. OpenAI has therefore

21  ratified his conduct and continued to financially reward him with employment after learning of his

22  misappropriation.

23  **OpenAI's Poaching of Li, Fraiture, and Other xAI Employees Reflects a Deliberate Scheme to**

24  **Target Specific xAI Confidential Information**

25      108.    OpenAI's actions with respect to both Fraiture and Li—occurring at roughly the same

26  time through communications with the exact same OpenAI recruiter, Tifa Chen—reflect a deliberate

27  and intentional strategy to gain access to xAI Confidential Information by illegal and anticompetitive

28  means. xAI's source code was so vital to OpenAI that it hatched at least two identical plans half a

world apart just to make sure that OpenAI would get what it so desperately wanted if one of its schemes fell through.

109. But OpenAI's unlawful and unfair campaign was not limited to these two employees. OpenAI has targeted and continues to target other xAI employees with access to the specific xAI Confidential Information related to xAI's and Grok's most significant technological innovations that OpenAI is now employing in order to provide itself unfair advantages that are derived from xAI's research and innovation.

110. As yet another example, OpenAI recently targeted a senior finance executive at xAI.

111. To support his job responsibilities, xAI granted the senior finance executive restricted and controlled access to its confidential documents and proprietary information, including competitively sensitive information about xAI's computing costs and contractual terms. xAI provided this access only for the purpose of enabling him to perform his job duties.

112. As a condition for his employment and access to xAI's Confidential Information and trade secrets, xAI also required the senior finance executive to sign an Employee Confidential Information and Invention Assignment Agreement, which he executed on April 8, 2025. Exhibit 3. This agreement required him to sign a "termination statement" upon the end of his employment to ensure return and protection of xAI Confidential Information. *Id.* ¶ 8. Despite agreeing to this requirement, the senior finance executive has refused to sign his Termination Certification. Exhibit 5. Indeed, when confronted about his refusal, he simply lied, claiming that he never received the certification, even though xAI's records clearly document that he did.

113. In his role, the senior finance executive had access to key xAI Confidential Information and trade secrets regarding xAI's finances, partner deals, and data center operations, the efficiency of which xAI has invested significantly into optimizing. For example, xAI has developed chip installation techniques that are significantly faster than existing methods.

114. The senior finance executive himself acknowledged that xAI's data center operations are its "secret sauce," explaining: "The secret sauce of xAI? The data center team. Their speed and precision blew me away. I would NEVER want to compete against them."

115.   Despite claiming that he would never want to compete against xAI's data center teams, recently, after only a few months at his job at xAI, the senior finance executive quit and began employment with OpenAI soon after in a lesser role as "business finance operator" reporting to the CFO and working on spending strategy for data centers.

116.   On information and belief, OpenAI offered the senior finance executive a job based entirely on his knowledge of xAI Confidential Information. Indeed, the senior finance executive had zero knowledge of or experience working with data centers for AI before working at xAI. Yet after working only a few months at xAI, he was hired by OpenAI for a data center-focused role. On information and belief, OpenAI offered him a data center-focused position to induce him to share xAI Confidential Information with OpenAI and/or use that information on OpenAI's behalf.

117.   Upon information and belief, the senior finance executive quit his job at xAI and accepted this demotion as part of a corrupt bargain to use and exploit xAI's Confidential Information for the benefit of OpenAI.

118.   In the senior finance executive, OpenAI found a kindred spirit who simply did not care about xAI's legitimate interests in protecting its trade secrets. When xAI reached out to the senior finance executive—whose confidentiality agreement required him to work with xAI regarding the return of xAI Confidential Information—specifically regarding confidentiality concerns, he responded with a crude and disdainful sexual remark:

| | |
|---|---|
| **From:** | |
| **Sent:** | Sun, 27 Jul 2025 08:53:18 -0700 |
| **To:** | Alex Spiro |
| **Subject:** | Re: Breach of xai confidentiality |

**[EXTERNAL EMAIL from** ~~████~~ **]**

> **This message needs your attention**
> • This is a personal email address.
> • This is their first email to your company.

Suck my dick

Sent from Gmail Mobile

On Sun, Jul 27, 2025 at 7:06 AM Alex Spiro <alexspiro@quinnemanuel.com> wrote:
> We have learned of several breaches by you of xai's confidentiality obligations. As you are aware, you are bound by those obligations after your departure from the company.
> We treat breaches of confidentiality seriously for the protection of the employees, company and mission.
> Please cease and desist all further breaches of this agreement or you will leave us no choice but to pursue legal action. For now, we reserve all rights and waive none and will continue to monitor.
> I hope and expect this will be my final communication to you on this matter.
> Alex Spiro

119.     When xAI's HR team reached out again to talk with the senior finance executive, including because he refused to sign a termination statement confirming his compliance with his confidentiality obligations to xAI, he responded again with profanity:



120.     This is thus not a case of mere "inevitable disclosure." A finance executive (1) with zero data center experience prior to working at xAI; (2) after only a few months on the job at xAI learning its data center "secret sauce," accepted a demotion to go work at OpenAI in a data center-focused role; (3) refused to sign a certification that he did not take confidential information to OpenAI; and (4) when confronted about his theft, expressed brazen defiance by telling xAI to "suck [his] dick" in response.

121.     OpenAI's efforts to target specific xAI Confidential Information are also reflected in OpenAI's recent hiring spree of former xAI employees who worked on xAI data center solutions or

the development of Grok 4, including Uday Ruddarraju, Sreekanth Pothanis, Mike Dalton, Hieu Pham, and Ethan Knight. As with all the other xAI employees discussed above, OpenAI did not merely hire them because it needed additional manpower but instead targeted these employees based on their access to particular xAI Confidential Information. For example, Ruddarraju and Pothanis were involved in xAI's Supercompute Division, with access to sensitive xAI Confidential Information regarding deployment of the very same NVIDIA GPUs used in xAI's data centers that OpenAI wants to heavily rely upon for its business.[2] Deployment of these GPUs is an important part of xAI's data center operations, which, as noted above, are widely recognized in the industry as a key competitive differentiator.

122.    On information and belief, at least Rudarraju, Knight, and Pham have, like both Li and Fraiture, actually maintained and used xAI Confidential Information and trade secrets while employed by OpenAI.

123.    Knight, Pham, and Rudarraju all made significant contributions to xAI during their tenure—each having more than a year of experience working at xAI, where they acquired detailed knowledge about xAI's operations and technology, including its Confidential Information and trade secrets.  On information and belief, OpenAI targeted these employees to acquire that xAI Confidential Information and its trade secrets.

124.    To support their job responsibilities, xAI granted Knight, Pham, and Ruddarraju restricted and controlled access to xAI's confidential documents and proprietary information, including source code and, in the case of Ruddarraju, information pertaining to prospective key hires relating to xAI's model training networks. xAI provided this access only for the purpose of enabling them to perform their job duties.

125.    As a condition for their employment and access to xAI's Confidential Information and trade secrets, xAI required Knight, Pham, and Ruddarraju, to each sign an Employee Confidential Information and Invention Assignment Agreement. Each of them signed an executed this Agreement.

---

[2] Gyana Swain, *Oracle to Spend $40B on Nvidia Chips for OpenAI Data Center in Texas*, NETWORK WORLD (May 26, 2025), https://www.networkworld.com/article/3995015/oracle-to-spend-40b-on-nvidia-chips-for-openai-data-center-in-texas.html.

126.    In the same time window as OpenAI was targeting the acquisition of xAI trade secrets from Li, Fraiture, and the finance executive, Ruddarraju and Knight left xAI in July 2025 and Pham left xAI in August 2025, and all began working for OpenAI by August.

127.    Since their departure, Knight and Pham have admitted to keeping copies of xAI related work chats and information on their personal devices.  Knight and Pham, while employed by OpenAI and represented by OpenAI's counsel, have refused requests to identify the specific information they kept and have refused to turn over their devices to xAI (or its independent forensic vendor) to allow xAI to identify this information and confirm its deletion.  Pham did so despite falsely certifying that he had deleted such information upon his departure from xAI.

128.    Instead, while represented by OpenAI's counsel, Knight and Pham have shared copies of their xAI information with a third-party not authorized by xAI under unknown security conditions. Knight and Pham, through OpenAI's counsel, initially refused to provide access to their devices to confirm that all xAI information has been deleted, and Knight, through OpenAI's counsel, continues to refuse to provide access to all xAI information they already shared with a third party unless xAI agrees to let him further share that information with OpenAI's counsel first.

129.    Knight and Pham's unauthorized disclosure, refusal to allow access to their devices to confirm deletion of xAI information, and refusal to provide complete access to the information already shared with a third party violate their Employee Confidential Information and Invention Assignment Agreement.  These steps were all undertaken while Knight and Pham were employed by OpenAI and represented by OpenAI's counsel, and thus OpenAI is vicariously liable for this conduct, which it has also ratified through its attorneys.

130.    According to xAI system logs, Ruddarraju, on September 26, 2025—while he was employed by OpenAI and after this lawsuit was filed—used his personal Gmail account to attempt to access a confidential, internal xAI document containing information pertaining to candidates that xAI is considering for hiring relating to xAI's core objectives of datacenter optimization, and which included potential compensation details for offers to specific prospective hires. Ruddarraju thus improperly kept access to this link to highly confidential information after his departure from xAI and then brazenly attempted to access it even after this lawsuit had been filed.  These steps were all

1  undertaken while Ruddarraju was employed by OpenAI, and thus OpenAI is vicariously liable for this

2  conduct.

3       131.    OpenAI's unlawful, unfair, and continuing effort to acquire xAI trade secrets and

4  unfairly compete with xAI using xAI's trade secrets is demonstrated through the alarming number of

5  employees who have admitted to keeping xAI Confidential Information—including source code,

6  datacenter information relating to xAI's critical competitive advantages, and confidential information

7  about prospective employees—all in a short time period, with multiple of the xAI employees

8  communicating with the same OpenAI employee (Tifa Chen) close in time to the acts of

9  misappropriation. The acts of misappropriation, including at least Knight's and Pham's disclosure of

10 xAI information to a third-party and Ruddarraju's access of an internal document link, occurred while

11 those employees were employed by OpenAI (and, for Knight and Pham, while represented by

12 OpenAI's counsel), and OpenAI is therefore liable for these acts of misappropriation.

13      132.    In sum, in just a few months, OpenAI poached no fewer than eight xAI employees as

14 part of a deliberate, unlawful, and unfair scheme to gain access to specific xAI Confidential

15 Information that OpenAI needed to harm xAI and benefit itself. Two of those employees have admitted

16 to stealing xAI's trade secrets (in one case, the most valuable portions of xAI's code base, and in the

17 other case, literally the entire code base) on their way out the door to OpenAI, and xAI has obtained

18 highly suggestive, secret communications between one of those employees and an OpenAI employee

19 that coincided precisely in time with the exfiltration. A third employee, who was hired by OpenAI for

20 a role specifically targeted at the most sensitive and valuable aspect of his tenure at xAI, responded

21 with profanity in response to a specific admonition not to share xAI's Confidential Information and

22 refused to sign an attestation that he did not do so. Two more employees  shared xAI information with

23 an unauthorized third-party while working at OpenAI and represented by OpenAI's counsel.  Yet

24 another used a stolen internal document link, while employed by OpenAI and after this suit was filed,

25 to attempt to further access xAI confidential internal documents relating to an employee and strategy

26 for xAI's data centers. In short, at least six of the eight xAI employees targeted by OpenAI in the past

27 few months attempted to or actually did take xAI Confidential Information on their way out the door

28 to take to OpenAI, and at least three of them have used or disclosed such information while they were

employed at OpenAI.  This is an alarming pattern that can only lead to one conclusion: OpenAI has turned to these unscrupulous and illegal tactics to fend off a highly innovative challenger in xAI.

## FIRST CAUSE OF ACTION

### (Trade Secrets Misappropriation: 18 U.S.C. § 1836 *et seq*.)

133.    xAI realleges and incorporates by reference Paragraphs 1 through 133 as though fully set forth herein.

134.    The Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), allows an "owner of a trade secret that is misappropriated" to "bring a civil action [if] the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

135.    18 U.S.C. § 1836(b)(3)(A)(i) provides that "a court may grant an injunction to prevent any actual or threatened misappropriation."

136.    The DTSA defines a trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" that "(A) the owner thereof has taken reasonable measures to keep ... secret; and (B) ... derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

137.    The DTSA defines misappropriation to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret of another without express or implied consent by a person" who "used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5). "Improper means" include theft, misrepresentation, and "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6).

138.    xAI dedicated and continues to dedicate substantial time and resources toward developing its trade secrets.

139.    At all relevant times, xAI has made reasonable efforts to ensure its trade secrets remain confidential, proprietary, secret, and available for xAI's commercial use only, including as alleged above in Paragraphs 38–41, which are incorporated herein by reference.

140.    The xAI trade secrets Li and Fraiture misappropriated included, without limitation, cutting-edge AI technologies that differentiate xAI's models and operation from those of other generative AI companies. Li and Fraiture had no legitimate reason to possess xAI's trade secrets outside the context of their work at xAI or on any of their personal devices and/or accounts. To the contrary, they, by their own admission, wrongfully placed xAI's trade secrets onto their personal devices and/or accounts.

141.    The xAI trade secrets the senior finance executive had in his possession and, upon information and belief, misappropriated, included, without limitation, detailed knowledge of xAI's industry-leading data center operations, which he admitted was "the secret sauce of xAI." The senior finance executive refused to even agree, upon his departure, to return xAI's trade secrets and keep xAI's trade secrets confidential, instead responding with a crass comment leaving little doubt as to his, and OpenAI's, intentions.

142.    On information and belief, the xAI information Knight and Pham improperly maintained after their departure from xAI includes xAI trade secrets relating to the technical operation and training of xAI's Grok, which both Knight and Pham worked on at xAI.  They have since shared that information—while employed by OpenAI and represented by OpenAI's counsel—with an unauthorized third-party under unknown conditions.

143.    On information and belief, the xAI information Ruddarraju improperly maintained after his departure from xAI includes confidential internal information relating to xAI's employees and strategy relating to its data center and training operations.  Ruddarraju has attempted to use such information while employed by OpenAI and after this lawsuit was filed.

144.    Upon information and belief, Li, Fraiture, and the senior finance executive, Pham, Knight, and Ruddarraju stole or otherwise misappropriated xAI's Confidential Information and trade secrets at the behest and for the benefit of OpenAI, including after they had signed agreements with OpenAI such as their employment offers or Fraiture's non-disclosure agreement made in anticipation

of future employment, such that Li, Fraiture, and the senior finance executive were acting as agents for OpenAI, and OpenAI is vicariously liable for their conduct.

145.   Further, Pham, Knight, and Ruddarraju improperly disclosed or used the xAI Confidential Information they improperly kept after they had begun employment OpenAI, and OpenAI is vicariously liable for their conduct.

146.   Upon information and belief, OpenAI also directed, instructed, financially rewarded, and/or otherwise encouraged Li, Fraiture, and the senior finance executive, Pham, Knight, and Ruddarraju to steal or otherwise misappropriate xAI's Confidential Information and trade secrets.

147.   Upon information and belief, Li actually shared xAI Confidential Information and trade secrets with OpenAI at least during an apparent interview presentation that took place on July 13, 2025.

148.   Li's and Fraiture's conduct, and on information and belief the senior finance executive's, Pham's, Knight's, and Ruddarraju's conduct, on behalf of OpenAI amounted to misappropriation because they acquired xAI's trade secrets by improper means.

149.   Upon information and belief, OpenAI itself acquired these trade secrets through improper means, including from Li, Fraiture, the senior finance executive, Pham, Knight, and/or Ruddarraju. Li and Fraiture's theft of xAI's Confidential Information and trade secrets was contemporaneous with their communications with the very same OpenAI recruiter Tifa Chen regarding employment—sometimes occurring within minutes of communications with OpenAI. Chen was acting within the scope of her employment at OpenAI in the course of her communications with Li and Fraiture, and OpenAI is vicariously liable for her actions and any subsequent acquisition of trade secrets from Li and/or Fraiture.

150.   Many of OpenAI's communications with at least Li occurred over the encrypted messaging application Signal, which also has the capability of permanently deleting all messages. The content, timing, and use of such communications reflects a willful and intentional decision by OpenAI to seek to acquire trade secrets through illegal and improper means.

151.   OpenAI's offer of substantial financial compensation to Li, and on information and belief to Fraiture and the senior finance executive, Pham, Knight, and Ruddarraju, reflects an attempt

to induce, encourage, and/or reward the theft and other misappropriation of trade secrets and therefore further constitute improper means used by OpenAI to acquire xAI's trade secrets.

152.    The trade secrets Li, Fraiture, and/or upon information and belief the senior finance executive, Pham, Knight, and Ruddarraju misappropriated relate to Grok, xAI's advanced AI model, and xAI's data center operations. xAI customers, including customers located throughout the U.S., access Grok through the internet, including by using web browsers (grok.com), mobile phone apps, and by API access. Internet traffic serving some of these customers and data centers crosses state boundaries. Grok and xAI's data centers are thus a product or service used or intended for use in interstate commerce.

153.    These trade secrets have independent economic value to AI providers like xAI. The trade secrets are the result of the culmination of billions of dollars of investment and multiple years of AI development and training.

154.    OpenAI can easily weaponize these misappropriated trade secrets to, at a minimum, improve competing products such as ChatGPT with Grok's more innovative and imaginative features that make Grok one of the most, if not the most, intelligent generative AI chatbots, to undermine xAI's product roadmap, and to disrupt xAI's market expansion strategy.

155.    The trade secrets OpenAI misappropriated could save it billions in R&D dollars and years of engineering effort, handing it an unfair and significant advantage in the AI race.

156.    The trade secrets OpenAI misappropriated could enable it to improve its data center deployments to match the speed of xAI's deployments, which are widely recognized in the industry as a key innovation by xAI.

157.    xAI has suffered and will continue to suffer injury because of OpenAI's misappropriation of trade secrets, including diminished value of its trade secrets, loss of its competitive advantage, loss of business, and harm to its reputation and goodwill.

158.    Additionally, because OpenAI has committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of xAI's rights, xAI is entitled to recover punitive damages from OpenAI, in an amount according to proof at trial.

159. Li and Fraiture both deleted evidence of their wrongdoing after having signed formal employment offers with OpenAI. This deletion evidences bad faith, and because it was performed in concert with OpenAI and while under contract for future employment with OpenAI acting as agents or putative employees of OpenAI, OpenAI is further liable for this bad-faith conduct, which further entitles xAI to recover punitive damages.

## SECOND CAUSE OF ACTION

### (Unfair Competition: Cal. Bus. & Prof. Code § 17200 *et seq.*)

160. xAI realleges and incorporates by reference Paragraphs 1 through 159 as though fully set forth herein.

161. Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") prohibits unfair competition, meaning "any unlawful, unfair or fraudulent business act or practice."

162. OpenAI has engaged in conduct that is both unlawful and unfair.

163. OpenAI's conduct is unlawful at least because it violates the Defend Trade Secrets Act and has caused harm to xAI as alleged in the First Cause of Action, which is incorporated by reference herein.

164. OpenAI's conduct is separately unlawful because it tortiously interfered with xAI's economic relationships with its employees, including by inducing them to breach their duty of loyalty owed to xAI, as alleged in the Second Cause of Action, which is incorporated by reference herein.

165. An "unfair" act or practice is "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Nationwide Biweekly Admin., Inc. v. Superior Ct.*, 9 Cal. 5th 279, 302 (2020).

166. OpenAI's conduct is unfair because it is intended to destroy legitimate competition in the AI industry by neutralizing xAI's innovations that provide competitive differentiation from rivals and thus allow OpenAI to maintain its position in the AI industry. OpenAI has corrupted the competitive process—where companies improve their products based on their own skill, hard work, and know-how—to provide itself unfair advantages *based on the innovations of xAI*, which discourages future innovations.

167.     But for OpenAI's conduct, rival AI companies, including xAI, would be able to compete against OpenAI by developing superior technology and/or operations—without fear of losing those innovations to rivals—providing customers with additional and better choices for AI models. If OpenAI is permitted to use improper means to acquire and then incorporate xAI's competitive differentiators into its own products, that would reduce incentives for other rivals to compete, and result in fewer choices for consumers.

168.     xAI has further suffered competitive harm because it is being forced to unfairly compete against its own trade secrets as a result of OpenAI's unfair and unlawful practices. The acquisition of xAI's trade secrets by a competitor reduces the value of those trade secrets, reducing the competitive advantages of xAI and Grok, which will reduce xAI's revenue and the value of its business.

## **PRAYER FOR RELIEF**

xAI prays for the following relief:

(a)     Restitution and disgorgement of any ill-gotten Confidential Information and trade secrets in Defendants' possession acquired through the wrongful acts described above;

(b)     A money judgment against Defendants for that amount of ordinary damages, trebled damages, punitive damages, and/or restitution, in an amount to be determined at trial;

(c)     Pre- and post-judgment interest;

(d)     Costs of the suit, including reasonable attorneys' fees and expenses;

(e)     Temporary, preliminary, and/or permanent injunctive relief barring OpenAI's unlawful and unfair competition and anticompetitive practices, including the conduct described above and any other similar wrongful acts, requiring the return of any xAI Confidential Information, requiring the removal of any xAI Confidential Information from OpenAI's products and systems, requiring the destruction of any OpenAI technology or AI models developed using xAI Confidential Information, and any other measures necessary to remediate any harm caused to xAI or competition and to restore a level field of competition in the AI industry; and

(f)     Such other relief as the Court deems equitable and proper.

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this First Amended

3    Complaint.

4

5    Dated: October 27, 2025                    **WINSTON & STRAWN LLP**

6                                               By: */s/ Kathi Vidal*

7                                               KATHI VIDAL (State Bar No. 194971)
                                                kvidal@winston.com
8                                               MATTHEW R. MCCULLOUGH (State Bar
                                                No. 301330)
9                                               mrmccullough@winston.com
                                                CARSON SWOPE (State Bar No. 353352)
10                                              cswope@winston.com
                                                **WINSTON & STRAWN LLP**
11                                              255 Shoreline Drive, Suite 520
                                                Redwood City, CA 94065
12                                              Telephone: (650) 858-6500
                                                Facsimile: (650) 858-6550
13
                                                LEELLE B. SLIFER (admitted *pro hac vice*)
14                                              lslifer@winston.com
                                                JONATHAN HUNG (admitted *pro hac vice*)
15                                              johung@winston.com
                                                **WINSTON & STRAWN LLP**
16                                              2121 N. Pearl Street, Suite 900
                                                Dallas, TX 75201
17                                              Telephone: (214) 453-6500
                                                Facsimile: (214) 453-6400
18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

**EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT**

As a condition of my becoming employed (or my continued employment) by **X.AI Corp.**, a Nevada corporation, or any of its current or future subsidiaries, parents, affiliates, successors or assigns (collectively, the "**Company**"), which I acknowledge to be good and valuable consideration for my obligations hereunder, I hereby enter into this Employee Confidential Information and Invention Assignment Agreement (the "**Agreement**") and agree as follows:

1. **Confidential Information Protections.**

   1.1.  **Recognition of Company's Rights; Nondisclosure.** I understand and acknowledge that my employment by Company creates a relationship of confidence and trust with respect to Company's Confidential Information (as defined below) and that Company has a protectable interest therein. At all times during and after my employment, I will hold in confidence and will not disclose, use, or publish any of Company's Confidential Information, except as such disclosure, use or publication may be required in connection with my work for Company, or unless an officer of Company expressly authorizes such disclosure. I will obtain Company's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that discloses and/or incorporates any Confidential Information. I hereby assign to Company any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of Company and its assigns. I will take all reasonable precautions to prevent the inadvertent accidental disclosure of Confidential Information. Notwithstanding the foregoing, pursuant to 18 U.S.C. Section 1833(b), I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

   1.2.  **Confidential Information.** The term "**Confidential Information**" shall mean any and all confidential knowledge, data or information of Company. By way of illustration but not limitation, "Confidential Information" includes (a) trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Intellectual Property Rights (as defined below) therein (collectively, "**Inventions**"), including all Company Inventions (as defined below); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non-public information relating to business partners; (e) non-public information regarding Company personnel, consultant lists, employee lists, compensation and employee and consultant skills that have not been disclosed by the individuals themselves; (f) information regarding stockholders, affiliates of stockholders and sponsors of Company; and (g) any other non-public information that a competitor of Company could use to Company's competitive disadvantage.

   1.3.  **Permitted Communications and Activities.** Notwithstanding the foregoing, Company agrees that I am free to use information that I knew prior to my employment with Company or that is, at the time of use, generally known in the trade or industry through no breach of this Agreement or act or omission by me. I understand that nothing in this Agreement prevents me from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that I have

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

reason to believe is unlawful. Company further agrees that this Agreement does not limit my right to discuss my compensation or the compensation of others in a manner consistent with each employee's right to privacy, to disclose other terms and conditions of my employment, to report possible information about reasonably suspected violations of law or regulation to the Equal Employment Opportunity Commission, the United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or any other federal, state or local government or law enforcement agency (unless subject to the attorney-client privilege), or public body or other third parties, to disclose information about suspected violations of the law to persons in the Company who have authority to address the violation, to engage in any communications or other activity protected by Section 7 of the National Labor Relations Act, to engage in political speech or activities in my own personal capacity, or to make other disclosures expressly protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes and any applicable statutes that protect political speech or activities.

1.4.  **Third Party Information**. I understand, in addition, that Company has received and, in the future, will receive from third parties their confidential and/or proprietary knowledge, data or information ("**Third Party Information**") subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use Third Party Information, except in connection with my work for Company, or unless expressly authorized by an officer of Company in writing.

1.5.  **Term of Nondisclosure Restrictions**. I understand that Confidential Information and Third Party Information is never to be used or disclosed by me, except as expressly provided in this Section 1, and I agree that the restrictions in Section 1 are intended to continue indefinitely, even after my employment by Company ends. If a temporal limitation on my obligation not to use or disclose such information is required under applicable law, and the Agreement or its restriction(s) cannot otherwise be enforced, I agree and Company agrees that the two year period after the date my employment ends will be the temporal limitation relevant to the contested restriction; provided, however, that my obligation not to disclose or use trade secrets that are protected without time limitation under applicable law shall continue indefinitely.

1.6.  **No Improper Use of Information of Prior Employers and Others.** During my employment by Company, I will not improperly use or disclose confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

2.  **Assignments of Inventions.**

2.1.  **Definitions**. As used in this Agreement, the term "**Intellectual Property Rights**" means all trade secrets, Copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country; the term "Copyright" means the exclusive legal right to reproduce, perform, display, distribute and make derivative works of a work of authorship (as a literary, musical, or artistic work) recognized by the laws of any jurisdiction or country; and the term "**Moral Rights**" means all paternity, integrity, disclosure, withdrawal, special and any other similar rights recognized by the laws of any jurisdiction or country.

2.2.  **California Labor Code Section 2870(a) Notice**. I acknowledge that California Labor Code section 2870(a) (the "**Specific Inventions Law**") provides that I cannot be required to assign to Company any Invention that I develop entirely on my own time without using Company's equipment, supplies, facilities or trade secret information, except for Inventions that either (a) relate at the time of conception or reduction to practice to Company's business, or actual or demonstrably anticipated research or development, or (b) result from any work performed by me for Company (the "**Non-Assignable Inventions**"). To the extent that a provision in this Agreement purports to require me to assign an Invention otherwise excluded in this Section 2.2 to Company, the provision is against the public policy of the state of California and is

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

unenforceable.  This limited exclusion does not apply to any patent or Invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or Invention to be in the United States.

2.3.  **Excluded Inventions**. Attached hereto as Exhibit A is a list describing all existing Inventions, if any, that (a) are owned by me or in which I have an interest and were made or acquired by me prior to my date of first employment by Company, and (b) may relate to Company's business or actual or demonstrably anticipated research or development, and (c) are not to be assigned to Company ("**Excluded Inventions**"). If no such list is attached, I agree that no Inventions that would be classified as Excluded Inventions exist as of the date of this Agreement. I acknowledge and agree that if I use any Excluded Inventions and/or Non-Assignable Inventions in the scope of my employment, or if I include any Excluded Inventions and/or Non-Assignable Inventions in any product or service of Company, or if my rights in any Excluded Inventions and/or any Non-Assignable Inventions may block or interfere with, or may otherwise be required for, the exercise by Company of any rights assigned to Company under this Agreement, (i) I will immediately notify Company in writing and (ii) unless Company and I agree otherwise in writing, I hereby grant to Company, in such circumstances (whether or not I give Company notice as required above), a non-exclusive, perpetual, transferable, fully-paid, royalty-free, irrevocable, worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium, whether now known or later developed, make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights in, such Excluded Inventions or Non-Assignable Inventions.  To the extent that any third parties have any rights in or to any Excluded Inventions or any such Non-Assignable Inventions, I hereby represent and warrant that such third party or parties have validly and irrevocably granted to me the right to grant the license stated above.

2.4.  **Assignment of Company Inventions**. Inventions assigned to Company in this subsection or to a third party as directed by Company pursuant to Section 2.6 are referred to in this Agreement as "**Company Inventions**." Except for Excluded Inventions and Non-Assignable Inventions, I hereby assign to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, developed, prepared, produced, authored, edited, amended, reduced to practice, or learned or set out in any tangible medium of expression or otherwise created, in whole or in part, by me, either alone or with others, during my employment by Company, and all printed, physical, and electronic copies, and other tangible embodiments of Inventions.  To the extent required by applicable Copyright laws, I agree to assign in the future (when any copyrightable Inventions are first fixed in a tangible medium of expression) my Copyright rights in and to such Inventions. Any assignment of Company Inventions (and all Intellectual Property Rights with respect thereto) hereunder includes an assignment of all Moral Rights.  To the extent such Moral Rights cannot be assigned to Company and to the extent the following is allowed by the laws in any country where Moral Rights exist, I hereby unconditionally and irrevocably waive the enforcement of such Moral Rights, and all claims and causes of action of any kind against Company or related to Company's customers, with respect to such rights. I further acknowledge and agree that neither my successors-in-interest nor legal heirs retain any Moral Rights in any Company Inventions (and any Intellectual Property Rights with respect thereto).

2.5.  **Obligation to Keep Company Informed**. During the period of my employment, I will promptly and fully disclose to Company in writing all Inventions authored, conceived, or reduced to practice by me, either alone or jointly with others.  At the time of each such disclosure, I will advise Company in writing of any Inventions that I believe constitute Non-Assignable Inventions; and I will at that time provide to Company in writing all evidence necessary to substantiate that belief.  Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to Company pursuant to this Agreement relating to Non-Assignable Inventions.  I will preserve the confidentiality of any Invention that does not fully qualify for protection under the Specific Inventions Law.

2.6.  **Government or Third Party**. I agree that, as directed by Company, I will assign to a third party, including without limitation the United States, all my right, title, and interest in and to any particular Company Invention.

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

2.7. **Ownership of Work Product**. I agree that Company will exclusively own all work product that is made by me (solely or jointly with others) within the scope of my employment, and I hereby irrevocably and unconditionally assign to Company all right, title and interest worldwide in and to such work product. I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by Copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101). I understand and agree that I have no right to publish on, submit for publishing, or use for any publication any work product protected by this Section, except as necessary to perform services for Company.

2.8. **Enforcement of Intellectual Property Rights and Assistance.** I will assist Company in every proper way to obtain, and from time to time enforce, United States and foreign Intellectual Property Rights and Moral Rights relating to Company Inventions in any and all countries. To that end, I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Intellectual Property Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Intellectual Property Rights to Company or its designee, including the United States or any third party designated by Company. My obligation to assist Company with respect to Intellectual Property Rights relating to such Company Inventions in any and all countries will continue beyond the termination of my employment, but Company will compensate me at a reasonable rate after my termination for the time actually spent by me at Company's request on such assistance. In the event Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in this paragraph, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and on my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this Agreement with the same legal force and effect as if executed by me. I hereby waive and quitclaim to Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Intellectual Property Rights assigned under this Agreement to Company.

2.9. **Incorporation of Software Code**. I agree that I will not incorporate into any Inventions, including Company software, or otherwise deliver to Company any software code licensed under the GNU General Public License or Lesser General Public License or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company, except in strict compliance with Company's policies regarding the use of such software.

3. **Records.** I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Confidential Information developed by me and all Company Inventions made by me during the period of my employment at Company, which records will be available to and remain the sole property of Company at all times.

4. **Duty of Loyalty During Employment**. I agree that during the period of my employment by Company, I will not, without Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by Company.

5. **No Solicitation of Employees, Consultants or Contractors**. To the extent permitted by applicable law, I agree that during the period of my employment and for the one year period after the date my employment ends for any reason, including but not limited to voluntary termination by me or involuntary termination by Company, I will not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either directly or through others, except on behalf of Company, solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person known to me to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company, even if I did not initiate the discussion or seek out the contact.

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

**6. Reasonableness of Restrictions.**

    6.1.   I have read this entire Agreement and understand it. I agree that this Agreement does not prevent me from earning a living or pursuing my career. I agree that the restrictions contained in this Agreement are reasonable, proper, and necessitated by Company's legitimate business interests. I represent and agree that I am entering into this Agreement freely and with knowledge of its contents with the intent to be bound by this Agreement and the restrictions contained in it.

    6.2.   In the event that a court finds this Agreement, or any of its restrictions, to be ambiguous, unenforceable, or invalid, I and Company agree that the court will read this Agreement as a whole and interpret the restriction(s) at issue to be enforceable and valid to the maximum extent allowed by law.

    6.3.   If the court declines to enforce this Agreement in the manner provided in subsection 6.2, Company and I agree that this Agreement will be automatically modified to provide Company with the maximum protection of its business interests allowed by law and I agree to be bound by this Agreement as modified.

**7. No Conflicting Agreement or Obligation.** I represent that my performance of all the terms of this Agreement and as an employee of Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement.

**8. Return of Company Property.** When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. I further agree that any property situated on Company's premises and owned by Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company's personnel at any time with or without notice. Prior to leaving, I agree to: (a) provide Company any and all information needed to access any Company property or information returned or required to be returned pursuant to this paragraph, including without limitation any login, password, and account information; (b) cooperate with Company in attending an exit interview; and (c) completing and signing Company's termination statement if required to do so by Company.

**9. Legal and Equitable Remedies.**

    9.1.   I agree that it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement.

    9.2.   In the event Company enforces this Agreement through a court order, I agree that the restrictions of Section 5 will remain in effect for a period of 12 months from the effective date of the Order enforcing the Agreement.

**10. Notices.** Any notices required or permitted under this Agreement will be given to Company at its headquarters location at the time notice is given, labeled "Attention Chief Executive Officer," and to me at my address as listed on Company payroll, or at such other address as Company or I may designate by written notice to the other. Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, notice will

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

be considered to have been given five business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt.

**11. Publication of This Agreement to Subsequent Employer or Business Associates of Employee.**

11.1. If I am offered employment or the opportunity to enter into any business venture as owner, partner, consultant or other capacity while the restrictions described in Section 5 of this Agreement are in effect, I agree to inform my potential employer, partner, co-owner and/or others involved in managing the business with which I have an opportunity to be associated of my obligations under this Agreement and also agree to provide such person or persons with a copy of this Agreement.

11.2. I agree to inform Company of all employment and business ventures which I enter into while the restrictions described in Section 5 of this Agreement are in effect and I also authorize Company to provide copies of this Agreement to my employer, partner, co-owner and/or others involved in managing the business with which I am employed or associated and to make such persons aware of my obligations under this Agreement.

**12. General Provisions.**

12.1. **Governing Law; Consent to Personal Jurisdiction**. This Agreement will be governed by and construed in accordance with the laws of the state of your primary work location ("**State Law**"). I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in the state of my primary work location for any lawsuit filed there against me by Company arising from or related to this Agreement.

12.2. **Severability**. In case any one or more of the provisions, subsections, or sentences contained in this Agreement will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement. If moreover, any one or more of the provisions contained in this Agreement will for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it will be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it will then appear.

12.3. **Successors and Assigns**. This Agreement is for my benefit and the benefit of Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives.

12.4. **Survival**. This Agreement shall survive the termination of my employment, regardless of the reason, and the assignment of this Agreement by Company to any successor in interest or other assignee.

12.5. **Employment At-Will**. I agree and understand that nothing in this Agreement will change my at-will employment status or confer any right with respect to continuation of employment by Company, nor will it interfere in any way with my right or Company's right to terminate my employment at any time, with or without cause or advance notice.

12.6. **Waiver**. No waiver by Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by Company of any right under this Agreement will be construed as a waiver of any other right. Company will not be required to give notice to enforce strict adherence to all terms of this Agreement.

12.7. **Export**. I agree not to export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company or any products utilizing such data, in violation of the United States export laws or regulations.

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

12.8. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

12.9. **Advice of Counsel**. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT WILL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION OF THIS AGREEMENT.

12.10. **Entire Agreement**. The obligations pursuant to Sections 1 and 2 of this Agreement will apply to any time during which I was previously engaged, or am in the future engaged, by Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter of this Agreement and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

This Agreement is effective as of the date of Employee's signature.

| COMPANY | | EMPLOYEE | |
|---|---|---|---|
| Signature: | *Robert Ochoa* | Signature: | *Xuechen Li* (DocuSigned by) 3760BBD30E30414 |
| Name: | Robert Ochoa | Name: | Xuechen Li |
| Title: | Human Resources | Date: | 2/26/2024 |

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

**EXHIBIT A**

**EXCLUDED INVENTIONS**

1. Excluded Inventions Disclosure.  Except as listed in Section 2 below, the following is a complete list of all Excluded Inventions:

The complete list of prior inventions attached in the next pages.

_____

_____

2. Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to the Excluded Inventions generally listed below, the intellectual property rights and duty of confidentiality with respect to which I owe to the following party(ies):

Excluded Invention:

_____

_____

Party(ies):

_____

_____

Relationship:

_____

_____

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

# List of Prior Inventions

1. **A Simulation Framework for Methods that Learn from Human Feedback**
    a. publications/research articles:
        i. Dubois, Yann, Chen Xuechen Li, Rohan Taori, Tianyi Zhang, Ishaan Gulrajani, Jimmy Ba, Carlos Guestrin, Percy S. Liang, and Tatsunori B. Hashimoto. "Alpacafarm: A simulation framework for methods that learn from human feedback." *Advances in Neural Information Processing Systems* 36 (2024).
        ii. Alpaca: A Strong, Replicable Instruction-Following Model. Rohan Taori* and Ishaan Gulrajani* and Tianyi Zhang* and Yann Dubois* and Xuechen Li* and Carlos Guestrin and Percy Liang and Tatsunori B. Hashimoto.
    b. code: https://github.com/tatsu-lab/alpaca_farm
    c. abstract: A simulator for research and development for learning from feedback at a low cost. The simulator mimics human feedback with large language models, analyzes the performance of methods, and provides a fast and cheap automated evaluation that reflects human judgement.

2. **Methods, Software Implementations, and Applications for Differentially Private Machine Learning**
    a. publications:
        i. He, Jiyan, Xuechen Li, Da Yu, Huishuai Zhang, Janardhan Kulkarni, Yin Tat Lee, Arturs Backurs, Nenghai Yu, and Jiang Bian. "Exploring the limits of differentially private deep learning with group-wise clipping." The Eleventh International Conference on Learning Representations.
        ii. Li, Xuechen, Florian Tramer, Percy Liang, and Tatsunori Hashimoto. "Large language models can be strong differentially private learners." The Tenth International Conference on Learning Representations.
        iii. Yue, Xiang, Huseyin A. Inan, Xuechen Li, Girish Kumar, Julia McAnallen, Hoda Shajari, Huan Sun, David Levitan, and Robert Sim. "Synthetic text generation with differential privacy: A simple and practical recipe." The 61st Annual Meeting of the Association for Computational Linguistics.
    b. code: https://github.com/lxuechen/private-transformers
    c. abstract: Methods for improving the run time and memory efficiency of differentially private machine learning. Software implementation techniques for scaling the technical approaches to very large neural

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

network models. Applications to generate synthetic data to preserve privacy.

3. **Methods and software implementation for scalable training of neural network models with differential equations**
   a. publications:
      i. Li, Xuechen, Ting-Kam Leonard Wong, Ricky TQ Chen, and David Duvenaud. "Scalable gradients for stochastic differential equations." In *International Conference on Artificial Intelligence and Statistics*, pp. 3870-3882. PMLR, 2020.
      ii. Kidger, Patrick, James Foster, Xuechen Li, and Terry J. Lyons. "Neural sdes as infinite-dimensional gans." In *International conference on machine learning*, pp. 5453-5463. PMLR, 2021.
      iii. Xu, Winnie, Ricky TQ Chen, Xuechen Li, and David Duvenaud. "Infinitely deep bayesian neural networks with stochastic differential equations." In *International Conference on Artificial Intelligence and Statistics*, pp. 721-738. PMLR, 2022.
      iv. Kidger, Patrick, James Foster, Xuechen Chen Li, and Terry Lyons. "Efficient and accurate gradients for neural sdes." Advances in Neural Information Processing Systems 34 (2021): 18747-18761.
   b. code: https://github.com/google-research/torchsde
   c. abstract: Methods and software implementation for scalable gradient estimation through stochastic differential equations.

4. **Methods and evaluation protocols for unsupervised training of neural generative models with disentangled latent factors**
   a. publication: Chen, Ricky TQ, Xuechen Li, Roger B. Grosse, and David K. Duvenaud. "Isolating sources of disentanglement in variational autoencoders." *Advances in neural information processing systems* 31 (2018).
   b. abstract: Methods for training variational autoencoders with disentangled latent factors and novel evaluation metrics for the performance of approaches for disentangling.

# EXHIBIT 2



**EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT**

This Agreement is between:

X.AI LONDON LIMITED, 20 Air Street, London, United Kingdom, W1B 5AN (the '**Company**') and Jimmy Fraiture of ██████████████████████████████████ ('**you**').

Background

(A) The Company has employed you in accordance with the terms of an Employment Agreement (the "Employment Agreement) dated March 3, 2025.

(B) This Employee Confidential Information and Invention Assignment Agreement (the "**CIIAA**" or "**Agreement**") forms part of the terms and conditions of your employment with the Company and/or any Group Company (as defined in the Employment Agreement). It is a requirement of the Employment Agreement that this CIIAA is signed by you.

(C) Therefore, the parties agree as follows:

  **1.** Confidential Information Protections.

 1.1.  **Recognition of Company's Rights; Nondisclosure.**

  1.1.1. You understand and acknowledge that your employment by the Company creates a relationship of confidence and trust with respect to the Company's and any Group Company's Confidential Information (as defined below) and that the Company and any Group Company has a protectable interest therein.

  1.1.2. At all times during and after your employment, you will hold in confidence and will not disclose, use, or publish any of the Company's or Group Company's Confidential Information, except as such disclosure, use or publication may be required in connection with your work for the Company, or unless:

   1.1.2.1. an officer of the Company or a Group Company expressly authorizes such disclosure;

   1.1.2.2. you are required to do so by law; and/or

   1.1.2.3. you are protected in doing so by a legal right of protected disclosure.

  1.1.3. You will obtain the Company's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that discloses and/or incorporates any Confidential Information.

  1.1.4. You hereby assign to the Company any rights you may have or acquire in such Confidential

Information and recognize that all Confidential Information shall be the sole and exclusive property of the Company and its assigns.

1.1.5. You must:

1.1.5.1. make sure that all trade secrets and confidential information obtained or otherwise received in connection with your employment are kept securely and are protected effectively against improper disclosure or use; and

1.1.5.2. use reasonable endeavors to prevent improper disclosure or use of such trade secrets or confidential information by third parties.

1.2.    **Confidential Information**.

1.2.1. The term "**Confidential Information**" shall mean any and all confidential knowledge, data or information of the Company and any Group Company.

1.2.2. By way of illustration but not limitation, "Confidential Information" includes:

1.2.2.1. trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Works and Inventions (as defined below) including all Intellectual Property Rights in the Works and Inventions;

1.2.2.2. information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business or the business of any Group Company, suppliers and supplier information, and purchasing;

1.2.2.3. information regarding customers and potential customers of the Company and any Group Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by the Company or any Group Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of the Company or any Group Company and other non-public information relating to customers and potential customers;

1.2.2.4. information regarding any of the Company's or any Group Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by the Company or any Group Company, and other non-public information relating to business partners;

1.2.2.5. non-public information regarding other Company or any Group Company personnel, consultant lists, employee lists, compensation and employee and consultant skills that have not been disclosed by the individuals themselves;

1.2.2.6. information regarding stockholders, affiliates of stockholders and sponsors of the Company or any Group Company;

1.2.2.7. any other non-public information that a competitor of Company or any Group Company could use to the Company's competitive disadvantage; and

1.2.2.8. any information relating to the Company or any Group Company which the Company or Group Company in question reasonably considers to be confidential.

1.3. **Permitted Communications and Activities**. Notwithstanding the foregoing, the Company agrees that you are free to use information that is, at the time of use, generally known in the trade or industry through no breach of this Agreement or act or omission by you.

1.4. **Third Party Information**. You understand, in addition, that the Company has received and, in the future, will receive from third parties their confidential and/or proprietary knowledge, data or information ("**Third Party Information**") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of your employment and thereafter, you will hold Third Party Information in confidence and will not disclose to anyone (other than the Company or Group Company personnel who need to know such information in connection with their work for the Company or Group Company) or use Third Party Information, except in connection with your work for the Company, or unless expressly authorized by an officer of the Company or Group Company in writing.

1.5. **Term of Nondisclosure Restrictions**. You understand that Confidential Information and Third Party Information is never to be used or disclosed by you, except as expressly provided in this Section 1, and you agree that the restrictions in Section 1 are intended to continue indefinitely, even after your employment ends.

1.6. **No Improper Use of Information of Prior Employers and Others.** During your employment by Company, you will not improperly use or disclose confidential information or trade secrets, if any, of any former employer or any other person to whom you have an obligation of confidentiality, and you will not bring onto the premises of Company any unpublished documents or any property belonging to any former employer or any other person to whom you have an obligation of confidentiality unless consented to in writing by that former employer or person.

## 2.    Intellectual Property and Proprietary Rights

### 2.1. **Definitions**.

2.1.1.    "**Materials**" means any work or material created, developed, written or prepared by or on your behalf during the course of your employment (whether individually, collectively or jointly with the Company and/or any Group Company and on whatever media) including (without limitation) any documents, reports, studies, data, diagrams, charts, specifications or computer programs and related copies and working papers, whether created, developed, written or prepared before or after the signing of the Agreement.

2.1.2.    "**Intellectual Property Rights**" means:

2.1.2.1.    all patents, petty patents, short term patents, utility models, registered designs, trade or service marks, present and future copyright, performance rights, unregistered design rights, database rights, rights in any software (including rights in any source or object code), rights in firmware or hardware, rights in any compilation of data, rights in any trade, brand or business names, rights in any trading style or get-up, rights in goodwill or any and all other analogous rights subsisting anywhere in the world whether registered or unregistered;

2.1.2.2.    any application for or any right to apply for registration of any such right; and

2.1.2.3.    any revival, extension, renewal or reversion of any such right; and

2.1.2.4.    the benefit (subject to the burden) of any agreement, arrangement or license in connection with any such right.

2.1.3.    "**Invention**" means any invention, improvement, modification, device, concept, process, formula, model or prototype which is created, devised, developed, discovered or worked on by you (whether alone or jointly) during the course of your employment which is:

2.1.3.1.    capable of exploitation by the Company or any Group Company in the normal course of their business; or

2.1.3.2.    so created, devised, developed, discovered or worked on by you during the course of or in connection with your employment.

2.1.4.    "**Works**" means any material, data, document or object (whether in electronic or physical form), idea, information, name, trading style or get up, business method, trade secret, know-how, technique or goodwill which is created, devised, developed, delivered, discovered or worked on by you (whether alone or jointly) during the period of your employment which is:

2.1.4.1.    capable of exploitation by the Company or any Group Company in the normal course of their business; or

2.1.4.2.    so created, devised, developed, discovered, delivered or worked on by you during the course of or in connection with your employment.

2.2. You agree that, because of the nature of your duties and responsibilities, you are under a special obligation to further the Company's and Group Company's interests.

6

2.3. You:

    2.3.1.    agree that all Works and Inventions (including all Intellectual Property Rights in the Works and Inventions) belong to the Company from the date of creation;

    2.3.2.    (to the extent that they do not vest automatically) hereby assign to the Company with full title guarantee and free from all encumbrances (and in the case of copyright and design right by way of a present assignment of future copyright or design right as applicable) all Intellectual Property Rights in the Works and Inventions;

    2.3.3.    undertake to do anything reasonably required (both during and after the termination of your employment) to ensure that all such Intellectual Property Rights in the Works and Inventions belong to or are assigned to the Company and to assist the Company in obtaining, registering, protecting, maintaining, enforcing or defending them (although the Company will not be obliged to do so);

    2.3.4.    will promptly disclose in writing and deliver any Inventions to the Company and will not disclose any Inventions to anyone else without the Company's prior consent;

    2.3.5.    (both during and after the termination of your employment) will give any information, explanations or demonstrations reasonably requested of you to enable the Company or any Group Company to make use of any Works or Inventions; and

    2.3.6.    will upon request by the Company, and in any event upon the termination of your employment, promptly deliver to the Company all Works and Inventions in your possession or control.

2.4. You will notify the Company of any Intellectual Property Rights owned by a third party which you intend to incorporate in the Works or Inventions, where the relevant third party owner will not grant an assignment to you, the Company or, where relevant, any Group Company.  You will obtain the Company's prior written consent before using such Works or Inventions.

2.5. You undertake to do anything reasonably required (both during and after the termination of your employment) to ensure that any domain names registered in your name during the course of or in connection with your employment are assigned to the Company (although the Company will not be obliged to maintain any registrations).

2.6. If any moral right or analogous right arises in respect of any Work or Invention you:

    2.6.1.    hereby irrevocably waive and agree not to assert (save as directed by us) such rights; and

    2.6.2.    will ensure that all applicable consents have been obtained to entitle us or any Group Company to make the fullest use of the Intellectual Property Rights in the Works and Inventions without restriction or further payment.

2.7. You consent to the Company doing any act, which would, in the absence of such consent, infringe your rights in performance under Part II of the Copyright, Designs and Patents Act 1988 or any similar legislation anywhere in the world (such as recording a presentation or workshop given by you).

2.8. You irrevocably appoint such director as the Company may nominate to be your attorney and in your name and on your behalf to execute any documents and do any acts necessary to ensure that you comply with your obligations under this clause.

2.9. **Excluded Inventions**. Attached hereto as **Exhibit A** is a list describing all existing Inventions and Works, if any, that:

  2.9.1.     are owned by you or in which you have an interest and were made or acquired by you prior to the date you were first employed by Company or any Group Company, and

  2.9.2.     may relate to Company's business or actual or demonstrably anticipated research or development, and

  2.9.3.     are not to be assigned to Company ("**Excluded Inventions**").

If no such list is attached, you agree that no Inventions or Works that would be classified as Excluded Inventions exist as of the date of this Agreement. You acknowledge and agree that if you use any Excluded Inventions in the scope of your employment, or if you include any Excluded Inventions in any product or service of Company, or if your rights in any Excluded Inventions may block or interfere with, or may otherwise be required for, the exercise by Company of any rights assigned to Company under this Agreement, (i) you will immediately notify Company in writing and (ii) unless Company and you agree otherwise in writing, you will ensure that all applicable consents have been obtained to entitle the Company to make the fullest use of the Intellectual Property Rights in the Materials and Inventions without restriction or further payment.

2.10.     **Obligation to Keep Company Informed**. During the period of your employment, you agree to promptly and fully disclose to Company in writing all Inventions authored, conceived, or reduced to practice by you, either alone or jointly with others.

2.11.     **Government or Third Party**. You agree that, as directed by Company, you will assign to a third party, including without limitation the government, all your right, title, and interest in and to any particular Company Invention.

3.    **Records**. You agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Confidential Information developed by you and all Inventions and/or Works made by you during the period of your employment, which records will be available to and remain the sole property of the Company at all times.

4.    **No Conflicting Agreement or Obligation**. You represent that your performance of all the terms of this Agreement and as an employee of Company does not and will not breach any agreement to keep in confidence information acquired by you in confidence or in trust prior to your employment by the Company. You have not entered into, and you agree you will not enter into, any agreement either written or oral in conflict with this Agreement.

5.    Legal and Equitable Remedies. You agree that it may be impossible to assess the damages caused by your violation of this Agreement or any of its terms. You agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company, and the Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach or threatened breach of this Agreement.

6. **Notices**.

    6.1. Any notice to be given by you to the Company under this Agreement will be in writing and will be deemed to have been received at the time of submission, if:

        6.1.1.    in the case of email, at the time of transmission if sent to <u>legal@x.ai</u>;

        6.1.2.    in the case of pre-paid first class UK post or other next working day delivery service, at 9.00 am on the second business day after posting or at the time recorded by the delivery service at the Company's headquarters location at the time notice is given; or

        6.1.3.    in the case of delivery by hand, at the time the notice is left at the Company's headquarters location at the time notice is given and labeled "Attention: Legal".

    6.2. Any notice to be given by Company to you under this Agreement will be in writing and will be deemed to have been received, if:

        6.2.1.    in the case of email, at the time of transmission if sent to you to your personal email address last on file with the Company;

        6.2.2.    in the case of pre-paid first class UK post or other next working day delivery service, at 9.00 am on the second business day after posting or at the time recorded by the delivery service at your last home address on file with the Company; or

        6.2.3.    in the case of delivery by hand, at the time the notice is left at the address (in your case, at the last home address on file with the Company) or given to the addressee.

7. **General Provisions**.

    7.1. **Governing Law**. This Agreement will be governed by the laws of England and Wales and the Courts of England and Wales will have non-exclusive jurisdiction to adjudicate any disputes arising under it.

    7.2. **Severability**. In case any one or more of the provisions, subsections, or sentences contained in this Agreement will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement. If moreover, any one or more of the provisions contained in this Agreement will for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it will be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it will then appear.

    7.3. **Successors and Assigns**. This Agreement is for your benefit and the benefit of the Company, any Group Company, and their successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon your heirs, executors, administrators and other legal representatives.

    7.4. **Survival**. This Agreement shall survive the termination of your employment, regardless of the reason, and the assignment of this Agreement by Company to any successor in interest or other assignee.

9

7.5. **Waiver**. No waiver by Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by Company of any right under this Agreement will be construed as a waiver of any other right. Company will not be required to give notice to enforce strict adherence to all terms of this Agreement.

7.6. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.7. **Variation**. No modification of or amendment to this Agreement will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in your duties, salary or compensation will not affect the validity or scope of this Agreement.

SIGNED on behalf of the Company

DocuSigned by:
Robert Ochoa
2CC48530FC45423...

DATED
3/3/2025

I have read, understood, agree and accept the terms and conditions set out in this Agreement:

SIGNED AND DELIVERED AS A DEED
by the Employee

Signed by:
Jimmy Fraiture
E5964542FA9F45C...

DATED
3/4/2025

In the presence of:

Witness signature:

Signed by:
Tobires Powen
24DC59BD30094AA...

Witness name & address:

**EXHIBIT A**

**EXCLUDED INVENTIONS**

1.       Excluded Inventions Disclosure. Except as listed in Section 2 below, the following is a complete list of all Excluded Inventions:

_____

_____

2.       Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to the Excluded Inventions generally listed below, the intellectual property rights and duty of confidentiality with respect to which I owe to the following party(ies):

Excluded Invention:

_____

_____

Party(ies):

_____

_____

Relationship:

_____

_____

# EXHIBIT 3



**EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT**

As a condition of my becoming employed (or my continued employment) by **X.AI LLC**, a Nevada corporation, or any of its current or future subsidiaries, parents, affiliates, successors or assigns (collectively, the "**Company**"), which I acknowledge to be good and valuable consideration for my obligations hereunder, I hereby enter into this Employee Confidential Information and Invention Assignment Agreement (the "**Agreement**") and agree as follows:

1. **Confidential Information Protections.**

   1.1. **Recognition of Company's Rights; Nondisclosure**. I understand and acknowledge that my employment by Company creates a relationship of confidence and trust with respect to Company's Confidential Information (as defined below) and that Company has a protectable interest therein. At all times during and after my employment, I will hold in confidence and will not disclose, use, or publish any of Company's Confidential Information, except as such disclosure, use or publication may be required in connection with my work for Company, or unless an officer of Company expressly authorizes such disclosure. I will obtain Company's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that discloses and/or incorporates any Confidential Information. I hereby assign to Company any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of Company and its assigns. I will take all reasonable precautions to prevent the inadvertent accidental disclosure of Confidential Information. Notwithstanding the foregoing, pursuant to 18 U.S.C. Section 1833(b), I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

   1.2. **Confidential Information**. The term "**Confidential Information**" shall mean any and all confidential knowledge, data or information of Company. By way of illustration but not limitation, "Confidential Information" includes (a) trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Intellectual Property Rights (as defined below) therein (collectively, "**Inventions**"), including all Company Inventions (as defined below); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non-public information relating to business partners; (e) non- public information regarding other Company personnel, consultant lists, employee lists, compensation and employee and consultant skills that have not been disclosed by the individuals themselves; (f) information regarding stockholders, affiliates of stockholders and sponsors of Company; and (g) any other non-public information that a competitor of Company could use to Company's competitive disadvantage.

   1.3. **Permitted Communications and Activities**. Notwithstanding the foregoing, Company agrees that I am free to use information that I knew prior to my employment with Company or that is, at the time of use, generally known in the trade or industry through no breach of this Agreement or act or omission by me. I understand that nothing in this Agreement prevents me from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that I have reason to believe is unlawful. Company further agrees that this Agreement does not limit my right to discuss my compensation or the compensation of others in a manner consistent with each employee's right to privacy, to disclose other terms and conditions of my employment, to report possible information about reasonably suspected violations of law or regulation to the Equal Employment Opportunity Commission, the United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or any other federal, state or local government or law enforcement agency (unless subject to the attorney-client privilege), or public body or other third parties, to disclose information about suspected violations of the law to persons in the Company who have authority to address the violation, to engage in any communications or other activity protected by Section 7 of the National Labor Relations Act, to engage in political speech or activities in my own personal capacity, or to make other disclosures expressly protected under the applicable provisions of the law or regulation, including but not limited to "whistleblower" statutes and any applicable statutes that protect political speech or activities.

   1.4. **Third Party Information**. I understand, in addition, that Company has received and, in the future, will receive from third parties their confidential and/or proprietary knowledge, data or information ("**Third Party Information**") subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in confidence

and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use Third Party Information, except in connection with my work for Company, or unless expressly authorized by an officer of Company in writing.

**1.5. Term of Nondisclosure Restrictions**. I understand that Confidential Information and Third Party Information is never to be used or disclosed by me, except as expressly provided in this Section 1, and I agree that the restrictions in Section 1 are intended to continue indefinitely, even after my employment by Company ends. If a temporal limitation on my obligation not to use or disclose such information is required under applicable law, and the Agreement or its restriction(s) cannot otherwise be enforced, I agree and Company agrees that the two year period after the date my employment ends will be the temporal limitation relevant to the contested restriction; provided, however, that my obligation not to disclose or use trade secrets that are protected without time limitation under applicable law shall continue indefinitely.

**1.6. No Improper Use of Information of Prior Employers and Others.** During my employment by Company, I will not improperly use or disclose confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of Company any unpublished documents or any property belonging to any former
employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

2.    **Assignments of Inventions.**

**2.1. Definitions**. As used in this Agreement, the term "**Intellectual Property Rights**" means all trade secrets, Copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country; the term "Copyright" means the exclusive legal right to reproduce, perform, display, distribute and make derivative works of a work of authorship (as a literary, musical, or artistic work) recognized by the laws of any jurisdiction or country; and the term "**Moral Rights**" means all paternity, integrity, disclosure, withdrawal, special and any other similar rights recognized by the laws of any jurisdiction or country.

**2.2. California Labor Code Section 2870(a) Notice**. I acknowledge that California Labor Code section 2870(a) (the "**Specific Inventions Law**") provides that I cannot be required to assign to Company any Invention that I develop entirely on my own time without using Company's equipment, supplies, facilities or trade secret information, except for Inventions that either (a) relate at the time of conception or reduction to practice to Company's business, or actual or demonstrably anticipated research or development, or (b) result from any work performed by me for Company (the "**Non-Assignable Inventions**"). To the extent that a provision in this Agreement purports to require me to assign an Invention otherwise excluded in this Section 2.2 to Company, the provision is against the public policy of the state of California and is unenforceable. This limited exclusion does not apply to any patent or Invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or Invention to be in the United States.

**2.3. Excluded Inventions**. Attached hereto as Exhibit A is a list describing all existing Inventions, if any, tha (a) are owned by me or in which I have an interest and were made or acquired by me prior to my date of first employment by Company, and (b) may relate to Company's business or actual or demonstrably anticipated research or development, and (c) are not to be assigned to Company ("**Excluded Inventions**"). If no such list is attached, I agree that no Inventions that would be classified as Excluded Inventions exist as of the date of this Agreement. I acknowledge and agree that if I use any Excluded Inventions and/or Non-Assignable Inventions in the scope of my employment, or if I include any Excluded Inventions and/or Non-Assignable Inventions in any product or service of Company, or if my rights in any Excluded Inventions and/or any Non-Assignable Inventions may block or interfere with, or may otherwise be required for, the exercise by Company of any rights assigned to Company under this Agreement, (i) I will immediately notify Company in writing and (ii) unless Company and I agree otherwise in writing, I hereby grant to Company, in such circumstances (whether or not I give Company notice as required above), a non- exclusive, perpetual, transferable, fully-paid, royalty-free, irrevocable, worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium, whether now known or later developed, make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights, in such Excluded Inventions or Non-Assignable Inventions. To the extent that any third parties have any rights in or to any Excluded Inventions or any such Non-Assignable Inventions, I hereby represent and warrant that such third party or parties have validly and irrevocably granted to me the right to grant the license stated above.

**2.4    Assignment of Company Inventions** Inventions assigned to Company in this subsection or to a third party as directed by Company pursuant to Section 2.6 are referred to in this Agreement as "**Company Inventions**." Except for Excluded Inventions and Non-Assignable Inventions, I hereby assign to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, developed, prepared, produced, authored, edited, amended, reduced to practice, or learned or set out in any tangible medium of expression or otherwise created, in whole or in part, by me, either alone or with others, during my employment by Company, and all printed, physical, and electronic copies, and other tangible embodiments of Inventions. To the extent required by applicable Copyright laws, I agree to assign in the future (when any copyrightable Inventions are first fixed in a tangible medium of expression) my Copyright rights in and to such Inventions. Any assignment of Company Inventions (and all Intellectual Property Rights with respect thereto) hereunder includes an assignment of all Moral Rights. To the extent such Moral Rights cannot be assigned to Company and to the extent the following is allowed by the laws in any country where Moral Rights exist, I hereby unconditionally and irrevocably waive the enforcement of such Moral Rights, and all claims and causes of action of any kind against Company or related to Company's customers, with respect to such rights. I further acknowledge and agree that neither my successors-in-interest nor legal heirs retain any Moral Rights in any Company Inventions (and any Intellectual Property Rights with respect thereto).

**2.5. Obligation to Keep Company Informed**. During the period of my employment, I will promptly and fully disclose to Company in writing all Inventions authored, conceived, or reduced to practice by me, either alone or jointly with others. At the time of each such disclosure, I will advise Company in writing of any

Inventions that I believe constitute Non-Assignable Inventions; and I will at that time provide to Company in writing all evidence necessary to substantiate that belief. Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to Company pursuant to this Agreement relating to Non-Assignable Inventions. I will preserve the confidentiality of any Invention that does not fully qualify for protection under the Specific Inventions Law.

**2.6.  Government or Third Party.** I agree that, as directed by Company, I will assign to a third party, including without limitation the United States, all my right, title, and interest in and to any particular Company Invention.

**2.7.  Ownership of Work Product**. I agree that Company will exclusively own all work product that is made by me (solely or jointly with others) within the scope of my employment, and I hereby irrevocably and unconditionally assign to Company all right, title and interest worldwide in and to such work product. I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by Copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101). I understand and agree that I have no right to publish on, submit for publishing, or use for any publication any work product protected by this Section, except as necessary to perform services for Company.

**2.8.  Enforcement of Intellectual Property Rights and Assistance**. I will assist Company in every proper way to obtain, and from time to time enforce, United States and foreign Intellectual Property Rights and Moral Rights relating to Company Inventions in any and all countries. To that end, I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Intellectual Property Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Intellectual Property Rights to Company or its designee, including the United States or any third party designated by Company. My obligation to assist Company with respect to Intellectual Property Rights relating to such Company Inventions in any and all countries will continue beyond the termination of my employment, but Company will compensate me at a reasonable rate after my termination for the time actually spent by me at Company's request on such assistance. In the event Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in this paragraph, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and on my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this Agreement with the same legal force and effect as if executed by me. I hereby waive and quitclaim to Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Intellectual Property Rights assigned under this Agreement to Company.

**2.9.  Incorporation of Software Code**. I agree that I will not incorporate into any Inventions, including Company software, or otherwise deliver to Company any software code licensed under the GNU General Public License or Lesser General Public License or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company, except in strict compliance with Company's policies regarding the use of such software.

**3.  Records**. I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Confidential Information developed by me and all Company Inventions made by me during the period of my employment at Company, which records will be available to and remain the sole property of Company at all times.

**4.  Duty of Loyalty During Employment**. I agree that during the period of my employment by Company, I will not, without Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by Company.

**5.  No Solicitation of Employees, Consultants or Contractors** To the extent permitted by applicable law, I agree that during the period of my employment and for the one year period after the date my employment ends for any reason, including but not limited to voluntary termination by me or involuntary termination by Company, I will not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either directly or through others, except on behalf of Company, solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person known to me to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company, even if I did not initiate the discussion or seek out the contact.

**6.  Reasonableness of Restrictions.**

6.1.  I have read this entire Agreement and understand it. I agree that this Agreement does not prevent me from earning a living or pursuing my career. I agree that the restrictions contained in this Agreement are reasonable, proper, and necessitated by Company's legitimate business interests. I represent and agree that I am entering into this Agreement freely and with knowledge of its contents with the intent to be bound by this Agreement and the restrictions contained in it.

6.2.  In the event that a court finds this Agreement, or any of its restrictions, to be ambiguous, unenforceable, or invalid, I and Company agree that the court will read this Agreement as a whole and interpret the restriction(s) at issue to be enforceable and valid to the maximum extent allowed by law.

6.3.  If the court declines to enforce this Agreement in the manner provided in subsection 6.2, Company and I agree that this Agreement will be automatically modified to provide Company with the maximum protection of its business interests allowed by law and I agree to be bound by this Agreement as modified.

**7.  No Conflicting Agreement or Obligation** I represent that my performance of all the terms of this Agreement and as an employee of Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement.

**8.  Return of Company Property**. When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. I further agree that any property situated on Company's premises and owned by Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company's personnel at any time with or without notice. Prior to leaving, I agree to: (a) provide Company any and all information needed to access any Company property or information returned or required to be returned pursuant to this paragraph, including without limitation any login, password, and account information; (b) cooperate with Company in attending an exit interview; and (c) completing and signing Company's termination statement if required to do so by Company.

**9.  Legal and Equitable Remedies.**

9.1.  I agree that it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement.

9.2.  In the event Company enforces this Agreement through a court order, I agree that the restrictions of Section 5 will remain in effect for a period of 12 months from the effective date of the Order enforcing the Agreement.

**10.  Notices** Any notices required or permitted under this Agreement will be given to Company at its headquarters location at the time notice is given, labeled "Attention Chief Executive Officer," and to me at my address as listed on Company payroll, or at such other address as Company or I may designate by written notice to the other. Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, notice will be considered to have been given five business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt.

**11.  Publication of This Agreement to Subsequent Employer or Business Associates of Employee.**

11.1.  If I am offered employment or the opportunity to enter into any business venture as owner, partner, consultant or other capacity while the restrictions described in Section 5 of this Agreement are in effect, I agree to inform my potential employer, partner, co-owner and/or others involved in managing the business with which I have an opportunity to be associated of my obligations under this Agreement and also agree to provide such person or persons with a copy of this Agreement.

11.2.  I agree to inform Company of all employment and business ventures which I enter into while the restrictions described in Section 5 of this Agreement are in effect and I also authorize Company to provide copies of this Agreement to my employer, partner, co-owner and/or others involved in managing the business with which I am employed or associated and to make such persons aware of my obligations under this Agreement.

**12.  General Provisions.**

12.1.  **Governing Law; Consent to Personal Jurisdiction**. This Agreement will be governed by and construed in accordance with the laws of the state of your primary work location ("**State Law**"). I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in the state of my primary work location for any lawsuit filed there against me by Company arising from or related to this Agreement.

12.2.  **Severability**. In case any one or more of the provisions, subsections, or sentences contained in this Agreement will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement. If moreover, any one or more of the provisions contained in this Agreement will for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it will be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it will then appear.

12.3.  **Successors and Assigns**. This Agreement is for my benefit and the benefit of Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives.

12.4.  **Survival**. This Agreement shall survive the termination of my employment, regardless of the reason, and the assignment of this Agreement by Company to any successor in interest or other assignee.

12.5.  **Employment At-Will**. I agree and understand that nothing in this Agreement will change my at-will employment status or confer any right with respect to

continuation of employment by Company, nor will it interfere in any way with my right or Company's right to terminate my employment at any time, with or without cause or advance notice.

**12.6.   Waiver**. No waiver by Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by Company of any right under this Agreement will be construed as a waiver of any other right. Company will not be required to give notice to enforce strict adherence to all terms of this Agreement.

**12.7.   Export**. I agree not to export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company or any products utilizing such data, in violation of the United States export laws or regulations.

**12.8.   Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**12.9.   Advice of Counsel**. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT WILL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION OF THIS AGREEMENT.

**12.10. Entire Agreement**. The obligations pursuant to Sections 1 and 2 of this Agreement will apply to any time during which I was previously engaged, or am in the future engaged, by Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter of this Agreement and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

This Agreement is effective as of the date of Employee's signature.

**COMPANY**

Signature: *Robert Ochoa*

Name: Robert Ochoa

Title: Human Resources Lead

**EMPLOYEE**

Signature: ███████████████

Name: ███████████

Date: April 8, 2025

**EXHIBIT A**

**EXCLUDED INVENTIONS**

1. Excluded Inventions Disclosure. Except as listed in Section 2 below, the following is a complete list of all Excluded Inventions:

2. Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to the Excluded Inventions generally listed below, the intellectual property rights and duty of confidentiality with respect to which I owe to the following party(ies):

Excluded Invention:

Party(ies):

Relationship:

# EXHIBIT 4



# Termination Certification

This is to certify that I have complied with all the terms of X.AI LLC's ("xAI" or the "Company") Employee Confidential Information and Invention Assignment Agreement ("ECIIAA") signed by me, including the reporting of any inventions and original works of authorship conceived or made by me (solely or jointly with others) covered by that agreement.

I also certify that I have returned to the Company all Company documents (and all copies thereof) and other Company property in my possession or control, including but not limited to Company files, notes, drawings, records, plans, forecasts, reports, studies, analyses, proposals, agreements, financial information, research and development information, sales and marketing information, customer lists, prospect information, pipeline reports, sales reports, operational and personnel information, specifications, code, software, databases, computer-recorded information, tangible property and equipment (including, but not limited to, computers, mobile telephones, servers, credit cards, entry cards, identification badges and keys), and any materials of any kind which contain or embody any confidential or proprietary information of the Company (and all reproductions thereof in whole or in part). I represent that I have made a diligent search to locate any such documents, property and information. I agree that I have not and will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to the Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed.

I further agree that, in compliance with the ECIIAA, I will hold in confidence and will not disclose, use or publish any of the Company's Confidential Information. "Confidential Information" shall mean any and all confidential knowledge, data or information of the Company. By way of illustration but not limitation, Confidential Information includes (a) trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Intellectual Property Rights (as defined in the ECIIAA) therein (collectively, "Inventions"), including all Company Inventions (as defined in the ECIIAA); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and

potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non public information relating to business partners; (e) non- public information regarding other Company personnel, consultant lists, employee lists, compensation and employee and consultant skills that have not been disclosed by the individuals themselves; (f) information regarding stockholders, affiliates of stockholders and sponsors of Company; and (g) any other non-public information that a competitor of Company could use to Company's competitive disadvantage.

**READ, UNDERSTOOD AND AGREED**

Name (Print): Xuechen Li

Signature:

Date: August 1, 2025

# EXHIBIT 5



# Termination Certification

This is to certify that I have complied with all the terms of X.AI LLC's ("xAI" or the "Company") Employee Confidential Information and Invention Assignment Agreement ("ECIIAA") signed by me, including the reporting of any inventions and original works of authorship conceived or made by me (solely or jointly with others) covered by that agreement.

I also certify that I have returned to the Company all Company documents (and all copies thereof) and other Company property in my possession or control, including but not limited to Company files, notes, drawings, records, plans, forecasts, reports, studies, analyses, proposals, agreements, financial information, research and development information, sales and marketing information, customer lists, prospect information, pipeline reports, sales reports, operational and personnel information, specifications, code, software, databases, computer-recorded information, tangible property and equipment (including, but not limited to, computers, mobile telephones, servers, credit cards, entry cards, identification badges and keys), and any materials of any kind which contain or embody any confidential or proprietary information of the Company (and all reproductions thereof in whole or in part). I represent that I have made a diligent search to locate any such documents, property and information. I agree that I have not and will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to the Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed.

I further agree that, in compliance with the ECIIAA, I will hold in confidence and will not disclose, use or publish any of the Company's Confidential Information. "Confidential Information" shall mean any and all confidential knowledge, data or information of the Company. By way of illustration but not limitation, Confidential Information includes (a) trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Intellectual Property Rights (as defined in the ECIIAA) therein (collectively, "Inventions"), including all Company Inventions (as defined in the ECIIAA); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non- public information relating to business partners; (e) non- public information regarding other Company personnel, consultant lists, employee lists, compensation and employee and consultant skills that have not been disclosed by the individuals themselves; (f) information regarding stockholders, affiliates of stockholders and sponsors of Company; and (g) any other non-public information that a competitor of Company could use to Company's competitive disadvantage.

**READ, UNDERSTOOD AND AGREED**

Name: ██████████████████

Signature:   Employee signature

Date: Employee signature date

# EXHIBIT 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

X.AI Corp, a Nevada corporation. and X.AI LLC, a Nevada limited liability company,

Plaintiffs,

vs.

XUECHEN LI, an individual,

Defendant.

Case No.   3:25-cv-07292-RFL

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PERMITTING EXPEDITED DISCOVERY AS MODIFIED

1

<u>**[PROPOSED]** ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND PERMITTING EXPEDITED DISCOVERY AS MODIFIED</u>

2

Having considered the Motion for Temporary Restraining Order, Order to Show Cause Why a

3

Preliminary Injunction Should Not Issue, and Order Permitting Expedited Discovery ("Motion") filed by

4

Plaintiffs X.AI Corp. and X.AI LLC (collectively, "Plaintiffs" or "xAI") seeking to immediately enjoin

5

Defendant Xuechen Li's ("Defendant" or "Li") from engaging in certain acts in breach of his Employee

6

Confidential Information and Invention Assignment Agreement signed by Li on February 26, 2024 (the

7

"Agreement"),[1] and for the reasons set forth on the record at the September 2, 2025 hearing, the Court

8

finds that the evidence establishes the elements necessary for the issuance of a temporary restraining order

9

and good cause for permitting expedited discovery.

10

Accordingly, the Court hereby **GRANTS** xAI's Motion and **ORDERS** the following relief:

11

1. Li shall, within three business days of the issuance of this Order,

12

    a. temporarily surrender control and access (for a period of 14 days or less to allow

13

        for a forensic examination to identify, remediate, and/or delete Confidential

14

        Information belonging to xAI) to any personal electronic devices (e.g., cellular

15

        devices, computers), online storage repositories (e.g., Gmail, Google Drive,

16

        iCloud), or other electronic storage devices that are currently accessible by Li or in

17

        Li's possession, custody, or control, but he may procure new devices and create

18

        new accounts going forward, so long as nothing is moved there from his existing

19

        devices and accounts;

20

    b. return to xAI, through its counsel of record, all Confidential Information belonging

21

        to xAI currently in Li's possession, custody, or control, that exists in any physical

22

        form (e.g., notepad, paper files);

23

    c. provide a written statement identifying all personal locations, personal devices,

24

        personal accounts, or personal storage media–whether physical or electronic–where

25

        any Confidential Information belonging to xAI is or has been stored, maintained,

26

---

27

[1] A copy of the Agreement shall be provided to Defendant Li along with this Temporary Restraining Order
so that Defendant Li has full knowledge of the information, including the definition of Confidential
Information.

28

United States District Court
Norther District of California

or accessed;

    d.   provide, and not modify for the 14-day period referenced in (a) above, the passwords, credentials, keys, MultiFactor Authentication information, and other information necessary to fully access all devices, repositories, storage media, and accounts listed in (a); and

    e.   for any password or credentials listed in relation to (a) which Defendant claims he has forgotten or is unsure how to readily access, cooperate and work with xAI to reset or recover the same and/to otherwise cooperate with xAI as necessary to provide xAI access to such accounts and devices listed in (a).

2.      Li, his agents, employees, partners, and any others acting in concert with him or on his behalf, are hereby enjoined from:

    a.   controlling, logging into, or otherwise accessing (other than as required by 1(e) above) any personal electronic devices (e.g., cellular devices, computers), online storage repositories (e.g., Gmail, Google Drive, iCloud), or other electronic storage devices that are currently accessible by Defendant or in Defendant's possession, custody, or control, but he may procure new devices and create new accounts going forward, so long as nothing is moved there from his existing devices and accounts;

    b.   possessing, using, copying, reproducing, disclosing, transferring (including to a third party), disseminating, or otherwise exploiting, any Confidential Information (as defined in the Agreement), including the xAI files uploaded to his Personal System, and any copies, derivatives, or materials created therefrom;

    c.   destroying, deleting, changing, altering, or otherwise eliminating any version (whether hard copy, native, or electronic) of any documents or electronically stored information on any device or in any account (whether in printed form or downloaded to any remote storage system, computer, hard drive, server, disk drive, flash drive, cellular telephone, CD, DVD, USB drive, or any other device that can be used to electronically store data or information) relating to the Confidential

Information;

d. disposing of, deleting, changing, altering, wiping, tampering with, or destroying any remote storage systems (including cloud storage accounts), computers, hard drives, servers, disk drives, flash drives, cellular telephones, CDs, DVDs, USB drives, and any other devices that can be used to electronically store data or information that are (a) currently accessible by Defendant or in Defendant's possession, custody, or control; or (b) have been accessible by Defendant or in Defendant's possession, custody, or control, since February 26, 2024, and any data, files, information, forensic remnants, or digital artifacts stored on or within the device;

e. destroying, deleting, changing, altering, or otherwise eliminating any emails to or from any email accounts used by Defendant since February 26, 2024, either in printed form or downloaded to any computers, laptops, online storage repositories, cloud storage, or electronic storage devices;

f. destroying, deleting, changing, altering, or otherwise eliminating any text, electronic postings, or other application messages from any cellular telephones or devices, computers, laptops, online storage repositories, cloud storage, or electronic storage devices (a) are currently accessible by Defendant or in Defendant's possession, custody or control; or (b) have been accessible by Defendant, or in Defendant's possession, custody or control, since February 26, 2024; and

g. Violating, aiding, or participating in the violation of any terms of the Agreement or Termination Certification, as detailed in the Complaint;

3. Li is hereby enjoined from having any role or responsibility at OpenAI or any other competitor of xAI pertaining to generative AI including without limitation OpenAI's ChatGPT until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted.

4. Li is hereby enjoined from having any communication on the subject of generative AI

with any officer, director, employee, agent, supplier, consultant, or customer of OpenAI or any other competitor of xAI until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted.

5.      xAI is granted leave to propound expedited discovery immediately in aid of preliminary injunction proceedings before this Court as follows, and Li is ordered to respond and comply with such discovery, as follows:

    a.  Li shall respond to xAI's First Set of Interrogatories (attached hereto as **Exhibit A**) under oath within seven days of entry of this Order;

    b.  Li shall respond to and comply with xAI's First Set of Requests for Production (attached hereto as **Exhibit B**) within seven days of entry of this Order; and

    c.  Li is to sit for deposition at a time and place mutually agreed between the parties, but no later than ten (10) days of entry of this Order.[2]

**IT IS FURTHER ORDERED** that the accounts and devices subject to the above provisions are limited to the those that Li created or accessed on or after the date that he started working for xAI.

**IT IS FURTHER ORDERED** that if Li objects to complying with any of the above-described relief on the basis of the attorney-client privilege, then he must:  (1) provide a privilege log; and (2) produce the non-privileged information by another means  (*e.g.*, conducting third-party forensic imaging of devices which will be produced with redactions).

**IT IS FURTHER ORDERED** that, if Defendant refuses to comply with any of the relief described in Paragraphs 1 and 5 above based on his assertion of the right against self-incrimination under the Fifth Amendment, Defendant shall identify the specific portions with which he refuses to comply by **September 3, 2025**.  The relief described in Paragraphs 2-4 does not appear to implicate the Fifth Amendment.  The Parties shall file simultaneous briefing of no longer than 10 pages by **September 8, 2025,** on the issue of whether the Court should nonetheless order compliance despite Li's Fifth Amendment objections, and the Court will schedule a hearing if necessary.  Any forthcoming order resolving the Fifth Amendment issue will address xAI's request at the September 2 hearing for an early

---

[2] Li remains free to object to xAI's discovery requests as permitted under the ordinary rules of discovery, but any objections must be submitted within the deadlines set forth in Paragraph 5 above.

Rule 26 conference.

**IT IS FURTHER ORDERED** that Li must show cause why a preliminary injunction should not issue at a hearing on **October 7, 2025, at 10:00 a.m.** Li shall file his opposition by **September 16, 2025**, and xAI shall file its reply by **September 23, 2025.** If the Parties wish to stipulate to further extend the hearing date, they must file their stipulation and proposed order by no later than **September 23, 2025**. Any such stipulation and proposed order shall: (a) confirm the Parties' agreement that there is good cause to extend this Temporary Restraining Order through the newly proposed hearing date; (b) require submission of the reply brief at least 14 days prior to the newly proposed hearing date; and (c) select the newly proposed hearing date after confirming the Court's availability either through the public calendar or communications with the Courtroom Deputy.

**IT IS FURTHER ORDERED** that, if the Parties believe referral to a magistrate judge for an emergency settlement conference would be productive, the Parties may submit a stipulation and proposed order to that effect.

**IT IS FURTHER ORDERED** that this Temporary Restraining Order, unless extended for good cause or by agreement of the Parties, will expire by its terms at 9:00 p.m. on October 7, 2025. The Court finds good cause to extend this Order to that date, based on the Parties' stipulation at the hearing and the complexity of the issues.

DATE: September 2, 2025

RITA F. LIN
United States District Judge