KATHI VIDAL (State Bar No. 194971)
kvidal@winston.com
MATTHEW R. MCCULLOUGH (State Bar No. 301330)
mrmcullough@winston.com
CARSON SWOPE (State Bar No. 353352)
cswope@winston.com
**WINSTON & STRAWN LLP**
255 Shoreline Drive, Suite 520
Redwood City, CA 94065
Telephone: (650) 858-6500
Facsimile: (650) 858-6550

LEELLE B. SLIFER (*pro hac vice*)
lslifer@winston.com
JONATHAN HUNG (*pro hac vice*)
johung@winston.com
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Telephone: (214) 453-6500
Facsimile: (214) 453-6400

Attorneys for Plaintiffs X.AI CORP. and X.AI LLC

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X.AI CORP. and X.AI LLC, | **Case No. 3:25-cv-07292-RFL** |
| Plaintiffs, | **XAI'S REPLY TO THE ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| vs. | |
| XUECHEN LI, | Date: January 13, 2025 |
| Defendant. | Time: 10:00 am |
| | Judge: Honorable Rita F. Lin |

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................................1

II.    ADDITIONAL FACTS UNCOVERED THROUGH THE TRO PROCESS ...........................2

    A.    xAI's source code and slide deck *remained* in Li's ███ account............................2

    B.    Li maintained other xAI confidential information in his ███ account and appears to have used it in interviews with OpenAI.........................................................................2

    C.    Li deleted evidence and changed passwords to hide his misconduct, including *after xAI confronted him regarding his theft*..........................................................................3

    D.    Li failed to comply with the TRO by failing to provide access to other accounts where he stored xAI-related information..................................................................................4

    E.    Li refused to provide *any* discovery in this case...................................................5

III.   ARGUMENT ........................................................................................................................5

    A.    xAI is likely to prevail on the merits. .....................................................................5

        1.    The TRO forensic analysis confirms xAI is likely to prevail on the merits. ......5

        2.    The Court should draw an adverse inference that xAI is likely to prevail. .......6

        3.    Li's arguments fail to rebut that xAI is likely to prevail...................................7

    B.    xAI will suffer irreparable harm. ..........................................................................10

        1.    Li's contract admits that any breach is irreparable harm, and the TRO forensic analysis revealed multiple additional breaches...............................................10

        2.    The Court should draw an adverse inference of irreparable harm...................11

        3.    Li's arguments fail to rebut that xAI will be irreparably harmed. ...................11

    C.    The balance of equities and public interest weighs in favor of injunctive relief. ........14

    D.    xAI's proposed preliminary injunction is properly tailored. ......................................15

IV.    CONCLUSION....................................................................................................................15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Baxter v. Palmigiano*,
   425 U.S. 308 (1976)..................................................................................................6

*Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*,
   312 F. Supp. 3d 944 (D. Nev. 2018)........................................................................13

*Imi-Tech Corp. v. Gagliani*,
   691 F. Supp. 214 (S.D. Cal. 1986)...........................................................................14

*Mechanix Wear LLC v. Branson*,
   No. 2:24-CV-03090-RGK-AJR, 2024 WL 2846068 (C.D. Cal. Apr. 23, 2024)......11

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*,
   149 F.4th 1081 (9th Cir. 2025) ..................................................................................8

*S.E.C. v. Colello*,
   139 F.3d 674 (9th Cir. 1998) .............................................................................6, 11

*Sitrus Tech. Corp. v. Le*,
   600 F. Supp. 3d 1106 (C.D. Cal. 2022) ...................................................................13

*Space Data Corp. v. X*, No. 16-CV-03260-BLF, 2017 WL 5013363 (N.D. Cal. Feb.
   16, 2017) .................................................................................................................7, 8

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999)........................................................................................11

*UCAR Tech. (USA) Inc. v. Yan Li*,
   No. 5:17-CV-01704-EJD, 2017 WL 8294248 (N.D. Cal. Apr. 19, 2017).........12, 13

*United States Sec. & Exch. Comm'n v. Collector's Coffee, Inc.*,
   697 F. Supp. 3d 138 (S.D.N.Y. 2023).........................................................................6

*Waymo LLC v. Uber Techs., Inc.*,
   No. C 17-00939 WHA, 2017 WL 2123560 (N.D. Cal. May 15, 2017).................9, 10

*Williams v. San Francisco Unified Sch. Dist.*,
   340 F. Supp. 438 (N.D. Cal. 1972) .............................................................................4

**Statutes**

18 U.S.C. § 1839(3) .....................................................................................................8, 15

18 U.S.C. § 1839(3)(A)......................................................................................................9

18 U.S.C. § 1839(5) ........................................................................................................15

18 U.S.C. § 1839(5)(B)(ii)(II)...........................................................................................5

**Other Authorities**

Fed. R. Evid. 802 ..............................................................................................................13

## I.    INTRODUCTION

Li admitted to stealing xAI trade secrets, including the entirety of xAI's codebase for its flagship Grok product.  Source code is xAI's crown jewel: it encapsulates years of research, proprietary architecture, and implementation choices that cannot be reverse-engineered from public outputs.  With xAI's source code in hand, a competitor such as OpenAI could shortcut development, replicate or degrade the very features that differentiate Grok, and unfairly erode xAI's business.  The resulting loss of customers, market position, and secrecy cannot be remedied with money damages.  The risk of irreparable harm is immediate and concrete.

Against this backdrop, Li's Opposition tries to recast him as cooperative.  The record shows the opposite.  After being caught red-handed, Li admitted to only that which xAI could already prove—that he absconded with xAI's entire source code base and a slide deck describing xAI's model training, and then deleted evidence of that theft.  After xAI confronted him, Li packed his bags and went to the airport, apparently contemplating a flight that could have placed xAI's trade secrets beyond this Court's reach and compounded the risk of irreparable injury.  He then escalated his obstruction: he deleted additional files, changed account passwords, and wiped his web history, concealing when and how he downloaded xAI's code and other materials.  Some of that evidence is permanently gone, depriving xAI—and the Court—of critical visibility into the scope of the misappropriation and whether the trade secrets remain in Li's possession or control.  To the extent evidence remains, that evidence—some of which has already been discovered through the forensic analysis permitted by the TRO—reveals a broader pattern of misconduct and exploitation.

Li's subterfuge did not stop there.  He initially failed to comply with the TRO by not immediately turning over two accounts (█████) containing xAI materials that he deleted or modified in August—and only granted access after xAI confronted him.  Other than accounts turned over for forensic analysis under with the TRO, Li has refused to provide any further discovery or produce a single document, invoking the Fifth Amendment across the board.  These are not the actions of a cooperative litigant.  They are the hallmarks of ongoing concealment and continuing risk.

The law recognizes what common sense confirms: a defendant who admits theft, destroys evidence, tries to skirt court orders, and then refuses discovery invites adverse inferences.  The Court

1

should infer that Li's misconduct is broader than currently known, that he retains xAI's trade secrets, and that his actions threaten ongoing and irreparable harm. Those inferences are independently corroborated by the multitude of evidence before the Court. And indeed, in civil, unlike criminal, litigation, Li's invocation of the Fifth Amendment entitles xAI to an adverse inference.

Though broader, interim restrictions on Li's employment and communications were warranted when the urgency, uncertainty, and need for forensic investigation were at their peak—and though they might still be warranted—xAI now seeks a focused, necessary remedy. As outlined in the proposed injunction filed herewith, xAI asks the Court to enjoin Li from possessing, using, copying, reproducing, disclosing, transferring (including to any third party), disseminating, or otherwise exploiting (1) the specific files identified by forensic analysis and listed in Appendix A to the proposed order, and (2) any xAI trade secrets. Far from overbroad, xAI has narrowed the requested relief from the TRO stage. The requested order is both modest and essential to prevent further misappropriation, preserve the status quo, and protect the integrity of this Court's processes. And because the restrictions on Li's employment and communication have been removed, the majority of Li's Opposition, which focused heavily on those conditions, is moot. The Court should grant xAI's motion.

## II.    ADDITIONAL FACTS UNCOVERED THROUGH THE TRO PROCESS

Since filing its opening brief on August 28, xAI—through the TRO-granted forensic process (Dkt. 20) conducted by Nardello & Co.—has uncovered precisely what the contemporaneous record foretold: extensive additional proof of Li's trade secret misappropriation and spoliation, including permanent deletion of evidence of the full scope of his theft. *See* Exs.1–5.

### A.    xAI's source code and slide deck *remained* in Li's ███ account.

Li previously admitted to stealing over ███ of xAI source code and a slide deck on the software design for xAI's model training. Dkt. 7-9. Nardello's forensic analysis found that two copies of that source code and one copy of the slide deck *remained* in Li's ███ account. Ex. 1 at 3. Each file was ███ and the slide deck was renamed ███"—common tactics to conceal theft. *Id.*

### B.    Li maintained other xAI confidential information in his ███ account and appears to have used it in interviews with OpenAI.

But that is not all. Nardello also found *more* xAI trade secrets that Li omitted from his

handwritten confession. *See* Dkt 7-9. Specifically, Nardello found over ███ emails from ████ relating to corporate xAI source code repositories in Li's ████ email account. Ex. 1 at 3; Ex. 2 at 5. These emails included "code snippets, pseudocode, and other potentially confidential information" relating to xAI source code. Ex. 1 at 3.

Nardello also located a file named ██████████████████ in Li's ██████. *Id.* The slide deck summarizes xAI's key learnings and design insights from developing its leading Grok AI model. Ex. 12. Based on the name of the file referring to an "████" and ████, based on Li's invocation of the Fifth Amendment in response to Interrogatories requesting identification of *what* information he shared (No. 2), *who* he shared it with (Nos. 3 and 6), and *how* he shared it (No. 5) (Ex. 6), and based on other record evidence, the Court may infer that Li used this xAI information in interviews with OpenAI on or around July 13. The evidence that OpenAI produced corroborates this—

████████████████████████████████████████████████████████ ██████████████████████████ Ex. 10, 11.

### C.    Li deleted evidence and changed passwords to hide his misconduct, including *after xAI confronted him regarding his theft.*

When xAI caught Li stealing its trade secrets, it sent him a letter regarding his misconduct via email on August 11 at 6:39 p.m.[1] Ex. 9. Nardello's forensic analysis found that, in response to this notification, Li took actions to cover up his misconduct.

First, at 6:48 p.m.—fewer than 10 minutes after receiving xAI's email—Li deleted the folder where he had stored the source code and xAI slide deck in his personal ████ account. Ex. 1 at 3. He then permanently deleted those files from the Trash of his ████ account. *Id.*[2]

Just a few hours later, at 9:56 pm, Li changed the password to the primary ████ account where he had uploaded the xAI source code and presentation, later representing to this Court that he "forgot" that password. Dkt. 7-10 ¶ 10; Dkt. 17.

Around the same time, Nardello found evidence that Li deleted his ████ web browser history prior to August 12 at 7:39 p.m. (the earliest date any history was still available). Ex. 1 at 5.

---

[1] For simplicity, all UTC times in forensic reports/evidence have been converted to Pacific time.
[2] The next day, Li restored these files and they remained there when Nardello analyze the account.

This web history "would show access to the above files by URL and/or to the ▮▮▮ folder in which the files were located for any ▮▮▮ web browser that [Li] was logged into his ▮▮▮ account." *Id.*

**Li deleted the very evidence most relevant to determining the full extent of his use and distribution of the xAI trade secrets.**

These actions evidence a continued pattern of spoliation, which Li only partially admitted—confirming that Li is only "cooperative" when he is caught.[3]

> **D.    Li failed to comply with the TRO by failing to provide access to other accounts where he stored xAI-related information.**

The TRO required Li to "temporarily surrender control and access . . . to any personal electronic devices, . . . online storage repositories, . . . or other electronic storage devices that are currently accessible by Li or in Li's possession." Dkt. 20 ("TRO") ¶ 1(a). In response, Li served what he titled a "Notice of Compliance." Ex. 7. But this document evidenced the exact opposite of compliance: Li only selectively provided access to *some* of his accounts, failing to disclose his ▮▮▮ accounts. *Id.*; *see also* Dkt. 7-7 (in initial Authorization Agreement, Li also failed to disclose ▮▮▮ accounts). Li only provided access to these accounts under the TRO in November, after Nardello's forensic analysis of other disclosed accounts or devices revealed evidence relating to these accounts.

Nardello's forensic analysis revealed that the ▮▮▮ and ▮▮▮ accounts appeared to have contained xAI-related information, though Li had since deleted or modified it. Specifically, Nardello located a number of xAI-related pages in the ▮▮▮ and ▮▮▮ accounts that had been either modified or deleted on August 12 (around the same time Li was deleting evidence in his ▮▮▮ account, and again *after* xAI had confronted Li regarding his theft of xAI source code). Ex. 5 at 2–3.

---

[3] For instance, Li previously only admitted to deleting system logs when he stole files from his work computer. Dkt. 7-4, ¶ 22. Li tries to discount these admissions by claiming he "does not concede the accuracy" and "does not address or rely on any statements made." Opp at 4 n.6. But Li cannot stick his head in the sand and ignore evidence. xAI submitted competent evidence that Li chose not to rebut. As such, the Court must accept xAI's evidence of Li's admissions. *Williams v. San Francisco Unified Sch. Dist.*, 340 F. Supp. 438, 442 (N.D. Cal. 1972) (on motion for preliminary injunction: "Although given the opportunity to do so, defendants did not attempt to rebut the [] affidavits . . . Accordingly, this court is required to take as true the statements of fact contained in the affidavits.").

**E.      Li refused to provide *any* discovery in this case.**

In response to the RFPs and Interrogatories authorized by this Court in the TRO (Dkt. 20), Li asserted his Fifth Amendment rights to every single request. Exs. 6, 8. Li did not provide a single substantive response, nor has he produced a single document. *See id.*

**III.   ARGUMENT**

Most of Li's opposition is rendered moot by xAI's narrowed proposed injunction, which removes the restrictions on Li's employment or communications. As such, Li's arguments under the First Amendment and California laws or policy on competition and employee mobility are moot.

**A.      xAI is likely to prevail on the merits.**

**1.      The TRO forensic analysis confirms xAI is likely to prevail on the merits.**

The forensic analysis confirms xAI is likely to prevail on the merits for both its DTSA and breach of contract claims because—in addition to the xAI source code and slide deck Li admitted to stealing that were addressed in xAI's Motion—subsequent forensic analysis confirmed Li maintained and used *additional* xAI confidential information in violation of his contract and the DTSA.

Most notably, Li prepared a slide deck, titled "████████████████", with confidential xAI information that the Court may infer Li presented to OpenAI during one or more of his interviews. This slide deck contained "learnings" about AI model "tuning" (Ex. 12 at 4, 9)—xAI previously submitted evidence that it maintains this information as trade secrets. Dkt. 7-4 ¶ 3 (trade secrets include "tuning methods" and "know-how"). Disclosure of xAI's trade secrets without consent, where Li had a contractual duty to maintain secrecy (Dkt. 8-5) is a form of misappropriation. 18 U.S.C. § 1839(5)(B)(ii)(II). Further, the use and disclosure of that information also breaches Li's contract— even if the information were not a trade secret—because Li agreed "I will hold in confidence and will not disclose, use, or publish any of Company's Confidential Information." Dkt. 8-5 ¶ 1.1.

Additionally, Li's continued possession of xAI confidential information in his interview slide deck (as well as in his ████ and ████ accounts and ████ emails in his ████ email) amount to another breach because Li agreed to return "all copies [], and any other material containing or disclosing any . . . Confidential Information," and there can be no dispute he failed to do so. *Id.* ¶ 8.

Thus, the forensic analysis confirms that xAI is likely to prevail.

**2.    The Court should draw an adverse inference that xAI is likely to prevail.**

Although xAI has demonstrated it is likely to prevail based on the evidence, the Court should also draw an adverse inference that xAI is likely to prevail based on Li's blanket assertion of his Fifth Amendment rights and refusal to provide any discovery.

As part of the TRO, the Court expressly authorized xAI to serve Interrogatories directed to identifying devices/accounts where Li acquired or stored xAI confidential information and xAI trade secrets (Nos. 1, 9–11), the xAI documents Li possessed after July 25 (No. 2), the persons he shared or discussed such documents with (Nos. 3, 4, and 6), any communications of such documents (No. 5), and any persons with an official position in a foreign government that Li discussed xAI trade secrets with (No. 8). Ex. 6. The Court also authorized and xAI served Requests For Production directed to similar topics. Ex. 8. Li refused to answer any part of these Interrogatories, refused to provide a single document responsive to any Request for Production, and instead made a blanket assertion of his Fifth Amendment rights as a basis to refuse to provide any discovery at all.

Li's assertion of the Fifth Amendment has consequences. "Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences . . . . [B]y his initial obstruction of discovery and his subsequent assertion of the privilege, defendant has forfeited the right to offer evidence disputing the plaintiff's evidence or supporting his own denials." *S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (affirming grant of summary judgment based on adverse inference); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."). There is ample evidence supporting such an adverse inference here, such as Li's own admission of stealing xAI source code and a slide deck, as well as the forensic analysis described above showing Li's possession and use of xAI confidential information in his interview slides, ▮ emails, ▮ account, and ▮ account. *See Colello*, 139 F.3d at 677.

The stage of proceedings and the existence of a pending criminal investigation against Li is no obstacle to the Court drawing an adverse inference: "[c]ourts routinely draw adverse inferences in connection with preliminary injunction proceedings" including "[e]ven where an overlapping criminal investigation or proceeding is pending." *United States Sec. & Exch. Comm'n v. Collector's Coffee,*

6

*Inc.*, 697 F. Supp. 3d 138, 154 (S.D.N.Y. 2023) (internal quotation marks omitted).

Accordingly, the Court should infer that xAI is likely to prevail on its claims given Li's blanket assertion of privilege and refusal to provide discovery that would reveal the full extent of his disclosure, use, and misappropriation of xAI's trade secrets and confidential information.

**3.    Li's arguments fail to rebut that xAI is likely to prevail.**

Li first argues that xAI is unlikely to succeed because xAI cannot show damages. But tellingly, Li does not cite any case in support of this argument because it is unfounded in law. *See* Opp. at 18. As Li admits, all xAI need show is "the misappropriation caused or threatened damage." *Id.* xAI provided evidence that the specific trade secrets Li stole included sufficiently detailed information about xAI's Grok that "could be weaponized by competitors such as OpenAI to, at a minimum, improve competing products such as ChatGPT with Grok's more innovative and imaginative features . . . , undermine xAI's product roadmap, and disrupt its market expansion strategy"— obviously so, given that Li stole xAI's entire Grok codebase. Dkt. 7-4, ¶ 13. xAI further provided evidence that this would enable xAI's competitors to save "billions in R&D dollars and years of engineering effort, handing any competitor a potentially unsurmountable advantage." *Id.* Li does not address, much less rebut, this evidence, nor could he. Further, Li agreed in his contract with xAI that "any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to [xAI]." Dkt. 8-5 ¶ 9.1. Lastly, as explained further below, the Court should draw an adverse inference that xAI will be irreparably harmed because Li invoked the Fifth Amendment. *See infra* Section III.B.2. Accordingly, xAI has shown, for multiple independent reasons, that it is likely to succeed in proving both harm and irreparable harm on both its claims.

Next, Li argues the inevitable disclosure doctrine is unavailable, based on provisions limiting his employment and communications, which are now removed, rendering this moot. Opp. at 18–20.

Li then argues xAI is not likely to succeed because its trade secrets have not been sufficiently identified. Opp. at 20–21. Li is wrong, and he bases his argument on the "reasonable particularity" language of the California Uniform Trade Secrets Act,[4] which the 9th Circuit has since confirmed

---

[4] Further, *Space Data* does not actually contain the quote proffered by Li (Opp. at 20). *Space Data Corp. v. X*, No. 16-CV-03260-BLF, 2017 WL 5013363, at *1-2 (N.D. Cal. Feb. 16, 2017).

XAI'S REPLY TO THE ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE
CASE NO. 3:25-CV-07292-RFL

does not apply to DTSA claims. *See Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1085 (9th Cir. 2025) ("unlike CUTSA, the federal DTSA does not require a plaintiff to identify with particularity its alleged trade secrets from the start").

And even if the reasonable particularity standard applied—which it does not—xAI satisfies it. As the case Li relies on in his own briefing states, "[a] plaintiff need not spell out the details of the trade secret, the plaintiff must describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge . . . , and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Space Data*, 2017 WL 5013363, at *2 (citations and internal quotation marks omitted). The specific listing of files in the appendix to the proposed injunction sufficiently separates the alleged trade secrets from matters of general knowledge and permits Li to ascertain the boundaries within which the secret lies. After all, these files include literally xAI's entire source code for Grok, a state-of-the-art AI model that is the product of billions of dollars in investments. It is difficult to imagine a more obvious trade secret than that. xAI also adduced evidence that the source code stolen by Li is "confidential and proprietary" and subject to "measures to protect" the information (Dkt. 7-4 ¶¶ 4, 12), i.e., *xAI has made reasonable efforts to keep the source code secret*, and that if made public it could allow competitors to adopt Grok's "more innovative and imaginative features" and hand competitors "a potentially insurmountable advantage" (*id.* ¶ 13), i.e., *that the source code derives value from being secret*. This evidence, which Li does not refute, satisfies the definition of a trade secret under the DTSA. 18 U.S.C. § 1839(3).

Li argues "xAI cannot reasonably contend that *all* information relating to its generative AI model is trade secret." Opp. at 20. This argument is a strawman because xAI has never contended as such. xAI's proposed injunction is narrowly tailored, exempts information "generally known in the trade or industry," and identifies specific files with trade secrets including, most significantly, the complete codebase. Dkt. 7-4, ¶¶ 12–13. Li argues *some* information about older Grok models has been made open source. Opp. at 20. While true, xAI did not make the *entire* codebase that Li stole available to the public and Li does not contend (much less provide evidence) otherwise.[5] Thus, there

---

[5] xAI released the "weights of *Grok 2*." https://huggingface.co/xai-org/grok-2. xAI did not release the entire code for current and future products, and Li does not contend or provide evidence otherwise.

XAI'S REPLY TO THE ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE
CASE NO. 3:25-CV-07292-RFL

is no reasonable dispute that the specific files Li stole (including the entire codebase for current and future versions of Grok) included confidential source code that is a trade secret. Li further argues xAI did not show its "general security practices" apply to its trade secrets. Opp. at 20. But this argument cannot be reconciled with xAI's evidence that xAI's trade secrets include "training data, tuning methods, [and] system prompts" (Dkt. 7-4 ¶ 3), which would be embodied in code, and that xAI protects these trade secrets through security measures, training, policies, and practices (*id.* ¶¶ 4-6).

Li next argues xAI's employment agreements "expressly contemplate the use of personal computers and accounts for xAI work." Opp. at 20. Not so. Li's agreement merely states "*if* I have used any personal computer, server or e-mail system . . . I agree to provide . . . [a] copy . . . and then permanently delete and expunge." Dkt. 8-5 ¶ 8. This provision is a "reasonable measure[] to keep such information secret" under the DTSA, 18 U.S.C. § 1839(3)(A), *if* an employee uses a personal device or account. It is not a waiver of trade secret status under DTSA or an authorization of any misappropriation, and Li cites no authority for his apparent argument otherwise. Further, the premise of Li's argument—"use of personal computers and accounts *for xAI work*" (Opp. at 20)—does not apply because Li did not upload ███████ of source code to his personal ████████ drive *for xAI work*, and Li does not introduce any evidence that he did. To the contrary, Li uploaded the code after having accepted a job with OpenAI, where he would have been able to use that source code to unfairly and illegally compete against xAI. Thus, even if Li's agreement authorized some use of personal devices *for xAI work*, that authorization would not extend to Li's misappropriation here.

Li next argues xAI did not attempt to distinguish Li's former inventions from the trade secrets. Opp. at 20–21. Not true. xAI's proposed injunction identifies specific files at issue—none of which are Li's inventions—and expressly exempts "Li's Prior Inventions." Li has not introduced evidence that any of his former inventions are encompassed in any alleged trade secret or were ever used or adopted by xAI in any manner. As such, his argument is entirely speculative. Li's caselaw does not support this argument, either. In *Waymo*, the Court enjoined an employee from working on an entire technology ("LiDAR") and found that this relief was "narrow and carefully-tailored." *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *12–13 (N.D. Cal. May 15, 2017). xAI's requested relief is narrower, as xAI has identified specific files at issue, including xAI's

xAI's REPLY TO THE ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE
CASE NO. 3:25-CV-07292-RFL

confidential source code.  Thus, xAI's requested injunction is even more "narrow and carefully-tailored" than the relief in *Waymo* and satisfies the test laid out in that case.

Finally, Li argues xAI is unlikely to succeed on its breach of contract claim because "xAI offers no evidence that any alleged trade secrets were copied, transferred or disclosed to a third party" and "Dr. Li immediately cooperated with xAI to return and/or delete all allegedly xAI confidential information." Opp. at 21.  With respect to the first argument, Li mischaracterizes the scope of the contract, which provides that Li "will not copy . . . any information contained upon my Company computer or Company equipment before I return it to Company." Dkt. 8-5 ¶ 8.  Li already admitted to copying the source code and slide deck (Dkt. 7-9), and thus has already admitted to breach of this provision of the contract.[6]  With respect to the second argument, Li did not fully cooperate with xAI and instead obfuscated, changed his passwords, deleted files, deleted web history, and failed to identify all of his accounts.  As a result, he further breached paragraph 8 of his contract, which required him to "provide Company access to [his] system" and to "provide Company any and all information needed to access any Company property or information returned or required to be returned." Dkt. 8-5 ¶ 8.

**B.    xAI will suffer irreparable harm.**

**1.    Li's contract admits that any breach is irreparable harm, and the TRO forensic analysis revealed multiple additional breaches.**

Li's theft of xAI's source code and other confidential information threatens irreparable harm for which there is no adequate remedy at law, which Li already admitted in his signed confidentiality agreement. Dkt. 8-5 ¶ 9.1.  The TRO forensic analysis has confirmed multiple additional breaches of his contract, including Li's possession, use, apparent disclosure, and/or failure to return xAI confidential information in his interview slides, ███ emails, ███ account, and ███ account.

Li dismisses his prior agreement that a breach constitutes irreparable harm by making First Amendment arguments that are moot because xAI's proposed injunction removes the restriction on Li's communications. Opp. at 16.  The Court therefore can and should rely on Li's prior agreement because an "agree[ment] that his breach would cause irreparable harm" is "evidence of irreparable

---

[6] Additionally, xAI is likely to succeed in arguing that Li breached other provisions of this contract, including by his improper "use" and/or "disclos[ure]" (¶ 1.1) and failing to return information (¶ 8).

xAI's REPLY TO THE ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE
CASE NO. 3:25-CV-07292-RFL

harm." *Mechanix Wear LLC v. Branson*, No. 2:24-CV-03090-RGK-AJR, 2024 WL 2846068, at *4 (C.D. Cal. Apr. 23, 2024); *see also Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999).

**2.    The Court should draw an adverse inference of irreparable harm.**

For substantially the same reasons explained above, the Court should draw an adverse inference that xAI will be irreparably harmed because Li made a blanket assertion of his Fifth Amendment rights and refused to provide any discovery that would reveal the nature and extent of harm to xAI resulting from Li's misappropriation and breach of contract.  Specifically, Li invoked the Fifth Amendment in response to Interrogatories directed to identifying *what* information he stole (No. 2), *who* he shared it with (Nos. 3 and 6), and the communications, i.e., *how* he shared that information (No. 5).  Ex. 6 at 2–5.  These requests were directed to determining the extent and nature of xAI's harm by showing, for example, whether Li shared the most competitively sensitive xAI trade secrets (the *what*), whether he shared it with a party who could use it to illegally compete against xAI such as a direct competitor like OpenAI (the *who*), and whether Li shared it in a format that could be readily used by a competitor or other person to steal or otherwise unfairly compete against xAI (the *how*).  The Court should therefore draw an adverse inference that xAI has and will continue to be irreparably harmed by Li's misappropriation because Li invoked the Fifth Amendment in a blanket fashion and refused to provide any discovery directed to identifying xAI's irreparable harm.  *Colello*, 139 F.3d at 677.  As above, this inference is amply supported by evidence, including that Li admitted to breaching his contract and agreed any breach constitutes irreparable harm, and because xAI adduced evidence of the irreparable harm it would suffer if its trade secrets including its source code were disclosed to and/or used by competitors to unfairly compete against xAI.  Dkt. 7-4 ¶ 13.

**3.    Li's arguments fail to rebut that xAI will be irreparably harmed.**

Li's argues the identification and remediation of material through the TRO forensic process eliminates any "ongoing risk of irreparable harm."  Opp. at 12.  Li is wrong: xAI remains at risk of irreparable harm because Li deleted and destroyed evidence of the full extent of his use and disclosure of xAI's trade secrets (e.g. his web history) *after* xAI confronted him, so injunctive relief remains necessary to protect xAI.  Ex. 1 at 5; Ex. 9.  Because of Li's spoliation, xAI has been unable to confirm how many times Li downloaded copies of the source code or whether he may have downloaded or

11

sent the source code to any other devices or persons (e.g., a device belonging to a competitor or a device to which Li may still have access). That Li engaged in this spoliation *after* learning that xAI was aware of his theft strongly supports that the deleted information would show *additional* misappropriation beyond what xAI already knew about, further supporting that xAI has demonstrated irreparable harm and that this Court should draw an adverse inference.

In addition to his destruction of evidence, Li's interview slides further demonstrate that Li likely used xAI trade secrets relating to xAI's model tuning and training when interviewing for new positions. Ex. 12 at 5–10. The evidence shows Li likely already disclosed and used that information in his interviews with OpenAI, based on the title and date of the file and his ███████████████████████ ██████████████████████████ Exs. 10–11. Although OpenAI rescinded Li's offer, Li's objection to any employment restriction suggests he may soon interview for other positions with other competitors. These interviews, and any further use of xAI trade secrets in them, would pose the same sort of irreparable harm the Court already found at the TRO stage. Thus, Li's actions—including his destruction of evidence and use of xAI information in interviews—support that xAI remains at risk of irreparable harm that can only be remedied through a preliminary injunction.

Li's caselaw regarding return of trade secrets is inapposite. In *UCAR*, there was no "evidence to suggest that [defendant's] actions permanently erased any data that UCAR does not have stored elsewhere." *UCAR Tech. (USA) Inc. v. Yan Li*, No. 5:17-CV-01704-EJD, 2017 WL 8294248, at *3 (N.D. Cal. Apr. 19, 2017). Here, by contrast, Li permanently deleted his ████████ web browser history prior to August 12, which means that xAI has no way to determine when, where, or how many times Li downloaded the source code. Nardello explained that the history is missing "corresponding" entries for downloads it already identified through direct forensic analysis of Li's devices. Ex. 1 at 5. Thus, xAI has provided specific evidence of information that has been permanently deleted (the web history), unlike in *UCAR*. Further, the timing of Li's deletion of that web history—*after* xAI confronted him— strongly supports that Li believed the ████████ history would include additional incriminating information not otherwise available to xAI. xAI thus faces an ongoing risk that Li may have stored the source code and other files in additional locations which xAI may never be able to uncover. Further, in *UCAR*, there was insufficient evidence that the defendants would use the trade secrets, and

12

the defendants all submitted "sworn declarations" attesting to their lack of intent to misuse the trade secrets. 2017 WL 8294248, at *3. But here there is evidence Li has already provided xAI's trade secrets to competitors (at least when interviewing) and thus may do so again in interviews with other competitors, and Li has not submitted a declaration because he has refused to provide any discovery. Thus, *UCAR* rests on dramatically different facts and provides no support for Li's argument.

Next, Li relies on *Chemeon*, but there, "[n]either party addresses . . . irreparable harm" and the plaintiff could not even identify "what materials [plaintiff] believes [defendant] still possesses." *Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 965 (D. Nev. 2018). Here, by contrast, xAI has articulated both the materials it believes Li may still possess (at least the source code and slide deck he stored in his ███████ under the account Li deleted his ██████ web history) and the irreparable harm (that Li may have other copies of such information accessible that he will use with competitors and/or that he will use xAI trade secrets when interviewing with other competitors, as the evidence shows he likely did with OpenAI). *Chemeon* is therefore inapposite.

*Sitrus* does not support Li's argument either. In *Sitrus*, there was no evidence of "whether Defendant did transfer or copy files onto other devices" and instead plaintiff relied *solely* on the absence of log files to allege irreparable harm. *Sitrus Tech. Corp. v. Le*, 600 F. Supp. 3d 1106, 1111 (C.D. Cal. 2022). But here, Nardello's forensic analysis of two of Li's personal laptops showed evidence of downloads, which Li deleted from his online web history. Ex. 1 at 5. Thus, xAI is not relying solely on the *absence* of information, but on definitive proof of actual downloads combined with deletion of history that would show *other* downloads. In yet another important distinction, the defendant in *Sitrus* provided discovery and submitted a declaration explaining his conduct, which Li refuses to do here. 600 F. Supp. at 1111. *Sitrus* is thus inapposite as well.

Li argues OpenAI confirmed it never received xAI confidential information from Dr. Li. Opp. at 15. But responses to a document subpoena and pleadings from another case, signed only by OpenAI's outside counsel and not sworn to by any OpenAI employee with knowledge (much less, subject to cross examination by xAI), are inadmissible hearsay and not evidence.[7] *See* Fed. R. Evid.

---

[7] Li's argument regarding OpenAI's "docs link" (Opp. at 15 n.19) is likewise hearsay, and also irrelevant given other means by which Li appears to have shared information (e.g., interview slides).

xAI's Reply to the Order to Show Cause Why Preliminary Injunction Should Not Issue
Case No. 3:25-cv-07292-RFL

802.  And OpenAI has its own interests to protect, rendering this hearsay especially unreliable—as this Court is aware, xAI has brought a separate claim against OpenAI for misappropriation of xAI's trade secrets in Case No. 3:25-cv-08133.  Further, OpenAI's production is incomplete and unreliable. For example, xAI uncovered evidence of communications between Li and OpenAI recruiter Tifa Chen via Signal, yet OpenAI did not produce a single communication from Tifa Chen on Signal.

Li next argues that injunctive relief would amount to a non-compete (Opp. at 16-17), but this argument is moot because xAI is no longer seeking any restriction on Li's employment.

Li argues against a presumption of irreparable harm, relying on inapposite copyright cases and his contention that xAI has no evidence of disclosure or use of any trade secrets.  Opp. at 17.  But Li does not contest that courts in this district have regularly presumed irreparable harm in cases of trade secret misappropriation.  *Google LLC*, 2025 WL 1616533, at *5 (courts "in this district have presumed that [a] Plaintiff will suffer irreparable harm if its proprietary information is misappropriated").  Further, even under Li's improperly heightened standard, xAI would still be entitled to injunctive relief because there is evidence that Li used and disclosed xAI trade secrets at least through the interview slides he appears to have presented to OpenAI on or around July 13.

Finally, Li attempts to rebut the irreparable harm that would come from Li fleeing the country with xAI's trade secrets.  Opp. at 18.  But Li is wrong to characterize xAI's argument as disparaging Li based on his nationality.  Li does not address the most significant facts: that after xAI confronted him over his misappropriation, Li packed his bags and went to the airport, and did so with millions from the stock sales he made around the time of his theft.  Li's Opposition does not acknowledge any of this, much less provide any alternative explanation for his conduct.  Thus, xAI has shown irreparable harm because of the risk that Li will abscond with xAI's trade secrets, denying xAI the ability to obtain complete relief.  *Imi-Tech Corp. v. Gagliani,* 691 F. Supp. 214, 230 (S.D. Cal. 1986).

**C.    The balance of equities and public interest weighs in favor of injunctive relief.**

Li's argument on the balance of equities and public interest factors is based entirely on restrictions on his employment or communication, which are no longer at issue and thus moot.  Opp. at 21–22.  Thus, for the reasons explained in xAI's motion—and not rebutted by Li—the balance of equities and public interest heavily favor granting injunctive relief because it will impose little to no

burden on Li, particularly in light of his previous agreement to maintain all this information as confidential, and will protect xAI from the risk of further misappropriation. *See* Mot. at 15-17.

### D.    xAI's proposed preliminary injunction is properly tailored.

Although a broader injunction was appropriate at the TRO stage given the immediate need to isolate and protect xAI's trade secrets, and may still be appropriate given the extent of Li's misconduct and the risks that still exist, xAI has now submitted a narrower proposed injunction with this Reply. This narrower injunction is tailored to xAI's trade secrets and the specific examples of xAI confidential information identified through the TRO forensic analysis process. *See id.* This is plainly an appropriate scope of injunction for a trade secrets claim and given that Li has repeatedly admitted he agreed to deletion of the specific files identified during the TRO process (e.g., Opp. at 2, 7, 21), and thus he should have no objection to an injunction that he not possess or use those files.

Li further argues that to the extent the injunction covers information "that may be within Dr. Li's knowledge, such a claim relies [sic] an inevitable disclosure theory and is thus improper." Opp. at 23. Li is wrong: the mere fact that Li has knowledge of trade secrets in his mind that may not be embodied in any physical or electronic file does not permit him to disclose or use those trade secrets. The DTSA is clear that a trade secret includes "tangible or intangible" information regardless of "whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. § 1839(3). Thus, even a purely intangible trade secret that is not stored in any manner is still a trade secret, and any improper use or disclosure of that trade secret is a misappropriation under 18 U.S.C. § 1839(5).

The remainder of Li's arguments about the scope of the injunction are directed to the employment and communication restrictions, restrictions on possessing personal devices or accounts, or the term "Confidential Information" (Opp. at 23-25), which xAI has removed and so these arguments are moot.

## IV.    CONCLUSION

For the reasons above, the Court should enter the preliminary injunction filed herewith because xAI is likely to prevail, has shown irreparable harm, and the balance of equities and public interest weigh heavily in favor of granting an injunction against Li for his admitted theft of xAI trade secrets.

Dated: December 16, 2025

**WINSTON & STRAWN LLP**

By: */s/ LeElle B. Slifer*
KATHI VIDAL (State Bar No. 194971)
kvidal@winston.com
MATTHEW R. MCCULLOUGH (State Bar No. 301330)
mrmcullough@winston.com
CARSON SWOPE (State Bar No. 353352)
cswope@winston.com
**WINSTON & STRAWN LLP**
255 Shoreline Drive, Suite 520
Redwood City, CA 94065
Telephone: (650) 858-6500
Facsimile: (650) 858-6550

LEELLE B. SLIFER (*pro hac vice*)
lslifer@winston.com
JONATHAN HUNG (*pro hac vice*)
johung@winston.com
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Telephone: (214) 453-6500
Facsimile: (214) 453-6400

Attorneys for Plaintiffs X.AI CORP. and X.AI LLC

XAI'S REPLY TO THE ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE
CASE NO. 3:25-CV-07292-RFL