# EXHIBIT K

Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

```
X.AI CORP. and X.AI LLC,        )
                                )
          Plaintiffs,           )
                                )
   VS.                          )   NO. 3:25-CV-08133-RFL
                                )
OPENAI, INC., OPENAI GLOBAL,    )
LLC, and OPENAI OPCO, LLC,      )
                                )
          Defendants.           )
_____)
```

San Francisco, California
Tuesday, February 3, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

WINSTON & STRAWN LLP
2121 North Pearl Street, Suite 900
Dallas, Texas 75201
**BY:  LeELLE B. SLIFER, ATTORNEY AT LAW**


WINSTON & STRAWN LLP
255 Shoreline Drive, Suite 520
Redwood City, California 94065
**BY:  MATTHEW R. MCCULLOUGH, ATTORNEY AT LAW**
**CARSON SWOPE, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official U.S. Reporter

1  **APPEARANCES**:  (CONTINUED)

2  For Defendants OpenAI, Inc., OpenAI Global, LLC, and OpenAI
   OpCo, LLC:

3                              MUNGER, TOLLES & OLSON LLP
                              560 Mission Street, 27th Floor

4                              San Francisco, California 94105
               BY:  **CAROLYN HOECKER LUEDTKE, ATTORNEY AT LAW**

5                    **GABRIEL M. BRONSHTEYN, ATTORNEY AT LAW**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Tuesday - February 3, 2026**<span style="float:right">**10:03 a.m.**</span> |

1  **Tuesday - February 3, 2026**                          **10:03 a.m.**

2                          **P R O C E E D I N G S**

3                              **---o0o---**

4       **THE COURTROOM DEPUTY:**  Calling Civil Action 25-8133,

5  X.AI Corporation, et al. versus OpenAI, Inc., et al.

6       Counsel, please approach the podium and state your

7  appearances for the record, beginning with counsel for

8  plaintiffs.

9       **MS. SLIFER:**  LeElle Slifer with Winston & Strawn on

10  behalf of the plaintiffs xAI.

11       **MS. LUEDTKE:**  And Carolyn Luedtke on behalf of

12  defendant OpenAI, and I'm joined by my colleague Gabe

13  Bronshteyn.

14       **THE COURT:**  Good morning to all of you.

15       I had put out a tentative ruling last week for you all to

16  review.  And what I think makes the most sense this morning is

17  for us to start with the response from xAI to the Court's

18  tentative, and then we can give OpenAI an opportunity to

19  respond, and xAI will have the last word.

20       **MS. LUEDTKE:**  Thank you.

21       **THE COURT:**  Thank you.

22       **MS. SLIFER:**  Thank you, Your Honor.

23       And may it please the Court, first of all, really

24  appreciate having received this on Friday.  I wish all federal

25  judges would do this so that we could have a more productive

1    conversation.

2        Let me step back and address two overarching things that I

3    saw in what Your Honor was asking about.

4        The first is, I would encourage Your Honor to not separate

5    each of these facts but, rather, look at the facts together.

6    In preparing for this, based on what Your Honor was asking, I

7    came across an additional case that I'm happy to hand up to

8    Your Honor and opposing counsel, *Wisk Aero vs. Archer Aviation*.

9        Thank you.

10       And I will hand Your Honor a copy.

11           **THE COURT:**  Just give it to my courtroom deputy,

12   please, who will pass it up.

13               (Document handed up to the Court.)

14           **THE COURTROOM DEPUTY:**  Thank you.

15       **MS. SLIFER:**  Thank you, Your Honor.

16       Page 9 has a quote that sort of sets every -- the tone for

17   this response.  It says [as read]:

18           "Reliance on circumstantial evidence can be

19       especially warranted in showing trade secret

20       misappropriation.  Misappropriation and misuse can

21       rarely be proved by convincing direct evidence.  In

22       most cases plaintiffs must construct a web of perhaps

23       ambiguous circumstantial evidence from which the

24       trier of fact may draw inferences which convince him

25       that it is more probable than not that what

1    plaintiffs allege happened did in fact take place.

2    . . . this often delicate construction of

3    circumstantial evidence there frequently must be

4    balanced -- must be balanced defendants and

5    defendants' witnesses who directly deny everything."

6    And that is on the left side of page 9 of the PDF, but 10

7    of the case.

8    Just a little bit further down, it talks about [as read]:

9    "In analyzing misappropriation, the inquiry

10    focuses on all of the threads of its allegations

11    woven together -- the 'whole gestalt.'"

12    So that's what we're talking about here is the whole

13    gestalt.  If this was just Li, L-i, or just Fraiture,

14    F-r-a-i-t-u-r-e, or just Ruddarraju or just Pham or just

15    Knight, it would be one thing; but this is several different

16    employees during a very short period of time all,

17    unquestionably, stealing source code and trade secrets.

18    Taken together -- taken individually, it might be like the

19    case Your Honor cited on the third page, *Alert Enterprises*.

20    That was one employee, one meeting with the CEO prior to being

21    hired.  But this case is unlike *Alert*.  It is like the other

22    cases that we cited -- *Citcon*, *Cutera*, *SOAProjects* -- where

23    there were several employees all at the same time, all stealing

24    information, all talking in some cases to the same exact

25    recruiter, Tifa Chen, and immediately pivoting to OpenAI,

1  deleting evidence of their wrongdoing and lying to xAI about

2  it, especially Fraiture, who when confronted about having taken

3  the source code, said, "I didn't take any source code.  I don't

4  have it."  Turned out he did.

5      So if you look at all of these facts together, it gives

6  the plausible inference that OpenAI was involved and knew about

7  this and was directing it.

8      And I specifically point Your Honor to the communications

9  between Li and Tifa Chen.  Within hours of having stolen the

10  source code, Ms. Chen says "No way," and then two minutes later

11  they have a call together.

12      **THE COURT:**  Did she say "No way"?  I thought the

13  allegation was that she had written "NW," exclamation point.

14  Or is there a separate communication that is a "No way"

15  communication.

16      **MS. SLIFER:**  That's exactly what she wrote.  It is

17  taken to mean -- like somebody, you know, says OMG is "Oh, my

18  gosh"; right?

19      **THE COURT:**  Or "No worries" or "No way."  It can mean

20  either?

21      **MS. SLIFER:**  It is -- it is taken as "No way,"

22  Your Honor.  I mean, that's the way it's sort of generally

23  understood, is "No way," exclamation point.

24      And if they dispute that, we could put on evidence of

25  that; and if we need an expert, we can go there.

1    But, yes, Your Honor.

2    **THE COURT:**  But let me just take a step back.

3    I know you focused a lot on the Li allegations in the

4    briefing, and I have to say that it wasn't clear to me how I

5    could infer that OpenAI directed Li to do what he had done.

6    The allegation is that he, over a period, was stealing

7    information and then he downloaded information.  And at the

8    same time, he's being recruited by OpenAI, so he's having

9    communications with OpenAI; and at one point, he has a

10    communication with OpenAI that is within hours of downloading

11    the code in which the OpenAI recruiter says "NW."  But we don't

12    know what it was in response to.

13    It's hard for me to look at that and say that one could

14    draw a plausible inference that he was directed to do what he

15    had done by OpenAI.  Help me understand how that's enough from

16    a circumstantial evidence perspective to draw that inference.

17    **MS. SLIFER:**  Sure.  Your Honor.

18    So, first of all, the fact that we don't have the

19    communications itself is indicative of the fact that OpenAI was

20    acting secretively.  They were using Signal.  Not text, not

21    email, but specifically an app that automatically deletes, and

22    they are unrecoverable messages after a certain period of time.

23    So the fact that they chose to use a secretive form of

24    communication to communicate with Li rather than one that might

25    be kept, that is more usual, like text or WhatsApp or email, is

1  itself indicative that OpenAI wanted to keep hidden its

2  communications with him.

3      **THE COURT:**  Is that in the complaint, that Signal is a

4  really unusual way for people to communicate with recruiters

5  about a potential new job?  I can understand why somebody --

6  it's a private, sensitive thing when you have a job at one

7  place and you're looking for a job at another place.  But I

8  also don't work in that industry, and so I don't know if that's

9  a really unusual way and a huge red flag in some sense.

10     **MS. SLIFER:**  It would not have to be unusual,

11 Your Honor.  It is -- however, unquestionably, it deletes,

12 auto-deletes after a certain amount of time and is

13 unrecoverable, unlike any of these other ones.  It doesn't have

14 to be unusual.  It simply has to be a secretive form of doing

15 it.

16     And so if you take a secretive form of communication with

17 many deleted messages, stolen source code, and not just from

18 one individual but from many individuals talking to the same

19 recruiter, taken together, that paints the overall gestalt of

20 OpenAI's knowledge and involvement.

21     **THE COURT:**  That is the other question I had about the

22 picture I see xAI painting.  I can understand that argument

23 if everyone was working with one recruiter; we have eight

24 people all working with one recruiter; they all stole source

25 code in the same way or they did something that was all the

1  same thing in some fashion.  But I don't see that here.

2      And so help me understand how it is that I should infer

3  that OpenAI is directing people to take confidential

4  information but they're doing it in all different ways that

5  seem to have nothing to do with one another.

6      **MS. SLIFER:**  In fact, that's actually more indicative

7  that they're trying to steal information.  Why steal something

8  two, three times when you already have it once?

9      So they were hoping to get the source code, and they got

10  that from Li and Fraiture at the exact same time, but they were

11  also hoping to get other information from them.  And they would

12  take anything that they could get from anybody.

13      And so they took infrastructure information.  They took

14  tuning information.  They got a video of one of the founders

15  talking about the technology.  They tried to access hiring

16  information.  They hired somebody who had zero experience in

17  data centers prior, only worked at xAI for a short

18  three months, and then was hired in a lower position to work on

19  data centers at OpenAI.

20      So they are trying to take all sorts of different

21  information to improve the overall product.  It's not necessary

22  to take the same thing in eight different ways, but rather, you

23  would want to get eight different things -- right? -- because

24  then you have more information.

25      And they do have a common thread in that the same

1    recruiter was talking to several of these individuals.

2         **THE COURT:**  Which ones was Ms. Chen talking to?  I

3    thought it was Li and Fraiture.  Is there another one also?

4         **MS. SLIFER:**  That we know of.  We do not yet have

5    access to some of the others because discovery hasn't started

6    yet.

7         And that's the exact thing that many of these cases say.

8    If Your Honor goes to *Applied Biological* or *Autodesk*, both of

9    those cases talk about how it is unreasonable to require

10   evidence at this stage.  It simply has to be plausible.  And

11   the plausibility standard -- *Autodesk* says this, Your Honor

12   [as read]:

13          "The plausibility standard does not impose a

14          probability standard.  It requires pleading enough

15          facts to just raise a reasonable expectation that

16          discovery will then reveal the evidence supporting

17          the allegation."

18        And all of these facts together are far more than what

19   were in the *Autodesk* case in Your Honor's notice.

20        And the circumstantial evidence itself for one individual

21   person could, of course, be parsed apart and picked apart.  But

22   this is not one.  This is a -- one or two maybe is a

23   coincidence.  This is a pattern of several different attempts.

24        And Your Honor cited, you know, the comments that the

25   finance executive made.  What do all of these individuals have

1    in common?  They have no problem lying to xAI about taking

2    information, stealing information, flouting confidentiality

3    obligations.  And so that is further evidence, by that

4    individual's comments of "I really don't care about your

5    confidentiality obligations," that OpenAI is targeting

6    individuals who are willing to breach their confidentiality

7    obligations and give them the information that they're seeking.

8         So that evidence alone, of course, if that was by itself

9    and siloed, would not be evidence of much; but when you add

10   that on top of the mountain that we have on the other side, it

11   just further adds to the narrative.  It's one more piece of the

12   puzzle.

13        And we're starting to finally get the picture.  Discovery

14   will allow us to fill it in.

15        **THE COURT:**  Should I infer, from employees' hostility

16   towards their former employer and failure to comply with their

17   legal obligations as to their former employer, that their new

18   employer is the one that told them to do that?  It's hard for

19   me to see how I draw that connection exactly as a matter of

20   plausibility.

21        **MS. SLIFER:**  Correct, Your Honor.  I would not ask

22   Your Honor to draw that connection but, rather, that OpenAI is

23   targeting people who have no problem flouting their

24   confidentiality obligations.

25        **THE COURT:**  But how do I know that OpenAI knew they

1    were doing that when it targeted them?

2        **MS. SLIFER:**  It doesn't have to know when they

3    targeted them but to continue the conversation.

4        So, for instance, with Fraiture, if he had immediately

5    said, "Oh, no, I can't tell you all about the data centers

6    because I have these confidentiality obligations," then they

7    might not have continued the conversations and hired him.

8        With Li, if after that first meeting with Li on July 13th,

9    Li had said, "Oh, no, no, I can't really give you any more

10   information," they might have stopped talking to him.

11       With Fraiture, after he visited their offices July 23rd,

12   I believe, if he had had a stalwart reaction to his

13   confidentiality obligations or request from OpenAI not to --

14   request from OpenAI to take information, he would have said,

15   "No, I can't do that," and they might not have moved forward.

16       But each of these individuals has displayed the

17   willingness to flout confidentiality obligations, and they were

18   all targeted by open OpenAI.

19       **THE COURT:**  Is there any indication that OpenAI knew,

20   when it was doing these interviews and initial conversations

21   with those folks, that the information that those people were

22   describing was confidential or trade secret information from

23   xAI?  Are there facts from that that you can point me to that

24   should have been a red flag to OpenAI:  "Hey this thing this

25   interviewee is talking about is likely confidential"?

1    **MS. SLIFER:** The source code, for instance, taking the

2  source code. Everyone knows that source code is confidential.

3  That's why in patent cases -- right? -- we have very intense

4  protective orders and limit where you can view source code and

5  how you can print it out and use it, lest some copy of it get

6  out.

7    **THE COURT:** Did somebody show source code during an

8  interview with OpenAI? I missed that in the complaint.

9    **MS. SLIFER:** No, Your Honor. But we do have

10  allegations that Li uploaded the source code to a cloud storage

11  device that was connected to ChatGPT, and OpenAI could access

12  that source code through that cloud storage device. It doesn't

13  have to be that Li sent it directly to OpenAI.

14    For a person who has a doctorate in computer science,

15  there are more clandestine ways to get the source code over

16  into OpenAI by leaving a question mark. One of those ways is

17  to put it in your own cloud storage device and say to OpenAI,

18  "Oh, hey, I stored it here. You could access it through

19  ChatGPT. You have access to this. You can see my files."

20    And so they did have access to the source code. And we

21  are hoping, through discovery, to see everything that they had

22  access to. How did they react to Li's presentation? How did

23  they react to hearing about the tuning methods and the training

24  methods that Li was taking with him? We don't have access to

25  that information because it's in discovery and only OpenAI has

1    it.

2        **THE COURT:** But didn't you also sue Mr. Li?

3        So, in -- I can understand -- and I think we're already

4    past the pleading stage in that case.

5        I can understand xAI suing a number of these former

6    employees, and there are plausible allegations that a number of

7    these folks took things that were likely to be trade secrets,

8    and it seems like xAI is in the process of suing a lot of

9    these folks.  And it could well come out in discovery that

10   these folks were coordinating with OpenAI at the time that they

11   were being recruited and also taking information from xAI.

12   So I understand the discovery argument generally.

13       But in this case, it seems particular odd for OpenAI -- I

14   mean, for xAI to say that you need discovery from OpenAI in

15   this case in order to make out the allegations against the

16   company when you have the opportunity for that very same

17   discovery in other litigation that you are concurrently

18   pursuing.  So help me understand how that analysis should

19   inform what I'm doing here.

20       **MS. SLIFER:** If we had not sued those individuals, we

21   would not have access to that discovery and would be seeking

22   the same discovery in this case, which is why, in talking to

23   OpenAI about protective orders, we discussed using evidence and

24   discovery from the Li case and how could we simplify everything

25   so that we could use it in this matter too because they are

1    related.

2        xAI should not be punished for having sought additional

3    litigation against the individuals in their own individual

4    capacity.  The federal government is also -- it has started

5    criminal investigations into both Li and Fraiture and seized

6    devices and are doing their own investigation.

7        And we may also get discovery from the criminal

8    investigation as this case progresses, but we shouldn't halt

9    the case against OpenAI simply because we will also get further

10   discovery through other avenues.

11       **THE COURT:**  I didn't mean to suggest that.  I meant

12   more sort of as a general matter, in a case where you have a

13   number of employees who are leaving Company A to go to

14   Company B, those employees have taken, some of them,

15   confidential information but there's no evidence Company B had

16   any idea that was happening or told them to do it or that they

17   used it at Company B, the question is:  When can I infer from

18   the circumstantial evidence that Company B did know about it

19   and was using it later?

20       And one of the arguments I hear you saying is that, well,

21   if you set this rule that we have to have some facts implying

22   that Company B knew about what was going on that was beyond the

23   fact that a bunch of people took confidential information prior

24   to going there, if you're saying it's too much to require

25   plaintiffs to have those facts before discovery, it makes me

 1    wonder, in many of these cases, the plaintiff company could

 2    just sue the individual employees and get discovery from them.

 3        So I'm not sure it makes sense to make an exception to the

 4    usual plausibility requirement or to lower the bar because of

 5    the need for discovery in these cases.  But I'm open to hearing

 6    if there's something you think I should consider or think more

 7    about in that regard.

 8        **MS. SLIFER:**  That's a very valid concern, Your Honor.

 9    You don't want to open the floodgates to competitor litigation

10    in this way.

11        And the *Alert* case that Your Honor cited is the exact sort

12    of case that would protect competitors in that situation, where

13    you do have just threadbare allegations of one person

14    individually took some things and there's absolutely zero

15    evidence on the other side, circumstantial or not, that the

16    competitor had any information.

17        But our case is much more like *Citcon, Cutera,*

18    *SOAProjects*, *Tritool*.  *Tritool* is another perfect example where

19    there was a whole list of things that happened.  Multiple

20    employees at the same time all had access, all stole trade

21    secrets.  They asked for copies of their confidentiality

22    obligations right before leaving, months before leaving.  And

23    the Court said:  That is one of the things that I'm considering

24    because it shows that they're thinking about what are their

25    confidentiality obligations.  How do I take these into account?

1    And that circumstantial evidence as a whole -- multiple

2  employees around the same time looking at confidentiality

3  obligations, taking things with them, the same thing in all

4  four cases that I cited to Your Honor -- that is much more like

5  our case where you have a lot of circumstantial evidence and

6  very clear theft and very clear lying to xAI about that

7  theft.

8    There is no question.  Li has admitted that he took the

9  source code.  Fraiture has admitted that he lied to xAI about

10 deleting the source code that he stole too.  Ruddarraju, Uday

11 Ruddarraju tried to access a link to hiring information from

12 xAI two months after he started working at OpenAI.

13    And it comes back to the sentence in *Cutera* from

14 the Court.  Why else would they have taken, copied this

15 information?  Right?  There is no other plausible explanation

16 for several employees around the same time all talking to

17 OpenAI, many of them talking to the same recruiter, using a

18 method of communication where their communications were

19 deleted, then deleting evidence of their theft, then going to

20 OpenAI.  That leads to a very plausible explanation that OpenAI

21 was in on it.  It doesn't have to be proven at this stage,

22 merely plausible.

23        **THE COURT:**  I understand the argument.

24    Let me give OpenAI an opportunity to respond.

25        **MS. SLIFER:**  Thank you, Your Honor.

1          **MS. LUEDTKE:**  Thank you, Your Honor.

2      We've seen you on video before.  It's nice to see you in

3  person.

4      I will try to keep it brief and address some of

5  Your Honor's questions and the points, and then if you have

6  questions for me.  We agree with your tentative and encourage

7  you to adopt it.

8      Following up on a few of your questions and counsel's

9  points, first, I think -- I think Your Honor asked a good

10  question when you asked whether there are any red flags, and

11  I think that really does get to the heart of what we need to be

12  looking at here.

13      This is a case, in this courtroom right now, about OpenAI.

14  And there have to be plausible allegations about either use or

15  acquisition by OpenAI.

16      And they've raised a lot of concerns about Xuechen Li, who

17  never came to work for OpenAI.  They've raised concerns about

18  Mr. Fraiture, who's in England.  They're pursuing litigation

19  against him there, and those allegations can be handled there.

20  But there are no allegations linking their behavior to use or

21  acquisition by OpenAI.

22      Same with all of these allegations they have about the

23  other individuals trying to access a document and it not

24  working, retaining some personal materials.  There's no linkage

25  to -- any plausible linkage to OpenAI.

1    And Your Honor is right to ask were there any red flags,

2    because if there were allegations about people telling OpenAI

3    "I'm going to steal the source code" and OpenAI saying "Great,"

4    then that would be a red flag; that would be a linkage that

5    OpenAI knew something and was somehow condoning the behavior

6    they allege.  But there simply are no allegations with any

7    red flags for OpenAI.

8        The closest they come to is trying to say that there was a

9    presentation during a recruiting interview by Xuechen Li.  But

10   as Your Honor rightly noted in your tentative, there's no

11   allegation that OpenAI would have any idea that such a

12   presentation contained xAI confidential information, if it

13   even did.  There's simply no allegation.

14       So Your Honor is right to ask is there any red flag,

15   because I think that's an important factual distinction here

16   that OpenAI was not on notice of any potential wrongdoing if we

17   assume their allegations are true, which at this point we do;

18   nor is there any evidence that OpenAI induced or encouraged or

19   said, "We would like you to bring our trade secrets."  Zero

20   evidence of that.  Zero allegations even of that.  There's just

21   speculation, and speculation is simply not enough.

22       Counsel for xAI came up here and brought your attention

23   to *Wisk Aero*, and she wants to talk about the whole gestalt.

24   She wants to talk about all the facts together.  But that's not

25   what Your Honor should do.  Under *Iqbal* and *Twombly*, you need

1      to look at the specific allegations in the complaint.  We can't

2      just have hand-waving and say, "There must have been

3      wrongdoing."

4          And if you look at the very case that xAI handed up,

5      where it says let's look at the whole gestalt, it then

6      concludes and says, okay, look at all of the facts; but the

7      weaker those individual strands are, the weaker the overall

8      case.  So zero plus zero still equals zero.  Here, we have a

9      lot of very weak allegations, and looking at lots of weak

10     allegations does not make a strong case.  That's what *Wisk Aero*

11     says.

12         And that's what I think Your Honor needs to keep in mind

13     and you did keep in mind in your tentative, going very

14     specifically fact by fact to see is there a plausible

15     allegation of use or acquisition by OpenAI, which under

16     *Flexport* and *Alert*, is clearly the standard.

17         Now, they seem to be suggesting that maybe there should be

18     some exception for trade secret cases because they're so hard

19     to prove and they don't have discovery yet.  And Your Honor

20     asked:  Should I be creating an exception?

21         And I would implore Your Honor not to create such an

22     exception.  You'd be the first court to do so, and it could

23     open a floodgates for cases like this one where, respectfully,

24     I submit there are pretty weak allegations by a company that

25     seems to be stopping and trying to threaten its employees from

1   leaving.  It seems to be trying to use this case as a bullying

2   tactic, which the State of California does not allow and

3   prohibits by statute.

4       Employees are allowed to leave their jobs.  They're

5   allowed to go to the employer that they think offers a better

6   employment situation.  And that seems to be happening in droves

7   from xAI.

8       And this litigation cannot be creating an exception that

9   allows employers to go after their employees who are simply

10  trying to escape from a very bad situation where they don't

11  want to work.

12      And to create such an exception is not what has happened

13  in the cases they cite, *Citcon*, *Tritool*, *Cutera*, the cases they

14  list off.  If you look at all of those cases, there is some of

15  the speculative allegations about timing, but there's also

16  allegations about use or acquisition.  For example, in *Cutera*,

17  there is evidence that there was use of the sales method.

18      And even if you look at the *Wisk Aero* case that they

19  handed up where they're talking about looking at the whole

20  gestalt, in *Wisk Aero* the Court ultimately found that there was

21  evidence of use of the downloaded documents in a presentation

22  because the presentation was done quicker than was possible and

23  so there's evidence of use.

24      So I encourage Your Honor to follow your instinct from

25  your tentative.  It was exactly right.  There's not an

exception in trade secret cases for claims against a company

because they can't prove their case.  They have to allege facts

to support their case before they get to go into discovery and

searching around for evidence in their competitor's files.

So --

**THE COURT:**  What's your response to their argument

that this was not just an isolated incident with one or two

employees, because they have allegations as to a series of

employees taking confidential information, that I should draw

an inference, a plausible inference from that that OpenAI must

have induced this in some way?  Otherwise, people wouldn't be

breaking their obligations to xAI right and left in this way.

**MS. LUEDTKE:**  I would say there's no case law to

support that.

And if you -- you have to look at the facts.  You can't

just say, "A bunch of people left and we've found these things

that we're going to" -- they said "NW" in a message.  I think

that means "No worries"; they think that means "No way."

Whatever.

You can't just throw up these facts.  You have to look at

the facts.  And here, if we look at the facts about, I think

they name eight individuals, two of whom did nothing wrong,

they just changed jobs; two of whom apparently kept some

documents on personal devices.  Lots of people likely do that.

They have a phone.  They keep things.  No evidence of

1    wrongdoing.  One person allegedly had a computer that accessed

2    an old link but it got blocked.

3        So those all are allegations, I would submit, you're going

4    to pretty commonly find amongst employees changing jobs in 2025

5    in a technology industry.  Those don't, to me, show any

6    coincidence or coordinated -- they don't show any coordinated

7    effort.

8        And then you have two employees, Xuechen Li and

9    Jimmy Fraiture, who are alleged to have downloaded source code.

10   There's simply no allegation that there was a connection.

11   There's simply no allegation that it was induced by Tifa Chen

12   or anyone at OpenAI.  Xuechen Li was never hired, and

13   Jimmy Fraiture deleted the source code before he started.

14       So you have to look at the actual allegations.  And the

15   fact that they've thrown up allegations, some of which are just

16   that they changed jobs, you can't infer from that that there's

17   been an inducement that rises to the level of specificity that

18   you need to state a claim under the DTSA.  The fact that lots

19   of people left is just as much evidence that this was a bad

20   place to work and they wanted to go somewhere else.

21       They tried to dig through and find things to throw up in

22   their first amended complaint after we filed our first motion

23   to dismiss, but those -- as *Wisk Aero* says, the weaker the

24   strands, the weaker the case.  Here, the strands are pretty

25   weak.

1        **THE COURT:**  I promised xAI the last word.

2        **MS. SLIFER:**  Thank you, Your Honor.

3     I heard Ms. Luedtke make a very reasonable mathematical

4  statement:  Zero plus zero equals zero.

5     However, the *Wisk* case says [as read]:

6          "Archer's reply is that 'zero plus zero still

7       equals zero' and, so, allegations that are

8       individually insufficient cannot be enough together.

9       But just because one piece of circumstantial evidence

10      would be insufficient if it were all the plaintiff

11      had alleged does not mean that that piece of evidence

12      remains worthless once refracted through the lens of

13      other circumstantial evidence."

14     I have responses to every one of the points that

15  Ms. Luedtke raised.

16     Li was hired by OpenAI, and the only reason he didn't

17  work -- start work at OpenAI was because we got an injunction

18  from Your Honor to bar that.  And OpenAI admitted that the only

19  reason that they stopped talking to Li was because Li stopped

20  communicating with them, not the other way around

21     Fraiture, he took the source code and then lied to xAI

22  about having deleted it.  Why should we believe him now that he

23  now double-secret deleted it?

24     Two people kept information.  What Ms. Luedtke is not

25  saying is that they are refusing to let xAI look at their

devices to see what information have you kept so that we can

determine whether or not it should be deleted, what it is, what

you have.  We have reached out to OpenAI to ask that, and they

have refused.

This is minimizing every one of these individual

allegations.  And they can do that, and they can make their

story to the jury that these people were disgruntled employees

and wanted to leave.  They can say that.

But we're also entitled to show our side of the story and

get discovery to show that this is not just some disgruntled

employees.  This was people stealing source code, the entire

source code.  That is far out of the ordinary for what happens

in Silicon Valley.  It is being investigated by the federal

government as theft.  We have these allegations in our

complaint, and taken together, this is very much like the other

cases.

And I would just point out, for *Cutera*, that was for

injunctive relief, a higher standard, the part that Ms. Luedtke

was referring to where it needed likelihood of success on the

merits and so it pointed to the evidence, potential evidence of

use for likelihood of success.

Earlier in the case, where they simply talk about the

employees leaving together, that is sufficient for a motion to

dismiss.

Thank you, Your Honor.

 1          **THE COURT:**  Thank you.

 2       Thank you for the argument.  I will take the matter under

 3    submission and issue a written order.

 4       Be well.

 5                (Proceedings adjourned at 10:37 a.m.)

 6                         ---o0o---

 7

 8                   **CERTIFICATE OF REPORTER**

 9       I certify that the foregoing is a correct transcript

10    from the record of proceedings in the above-entitled matter.

11

12    DATE:  Friday, February 20, 2026

13

14

15

16                   _Ana Dub_

17    _____

18     Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
              Official United States Reporter
19

20

21

22

23

24

25