BENJAMIN S. KINGSLEY (CSB No. 314192)
bkingsley@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile: 415.281.1350

JESSICA M. KAEMPF (admitted *pro hac vice*)
jkaempf@fenwick.com
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 206.389.4511

CHRISTIAN E. PICONE (CSB No. 218275)
ANGELA SHAW (CSB No. 321726)
BERLINER COHEN, LLP
Ten Almaden Boulevard, 11th Floor
San Jose, California 95113-2233
Telephone: 408.286.5800
Facsimile: 408.998.5388
christian.picone@berliner.com
angela.shaw@berliner.com

Attorneys for Defendant
XUECHEN LI

FENWICK & WEST LLP
ATTORNEYS AT LAW

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

X.AI Corp., a Nevada corporation, and X.AI LLC, a Nevada limited liability company,

Plaintiffs,

v.

XUECHEN LI,

Defendant.

Case No.: 3:25-cv-07292-RFL

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTION AND RESPONSE TO ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Case Filed: August 28, 2025

[redacted]

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 3

A. Dr. Li Contributes His Expertise in Large Language Model Training to xAI ..... 3

B. Dr. Li Resigns from xAI and Cooperates with xAI's Requests ..... 4

C. xAI Files Suit, Seeking a Broad Employment Ban Alleging Acquisition of Specified Materials, But Not Improper Copying, Transfer or Disclosure ..... 5

D. Through Dr. Li's Full Cooperation, xAI Conducts Extensive Review of Dr. Li's Devices and Images, and Deletes all Information it Unilaterally Determined to be xAI Confidential Information ..... 6

E. The Parties' Investigation Confirms That Dr. Li Never Copied, Transferred or Disclosed the Alleged Trade Secret Material to Any Third Party ..... 8

F. Despite Efforts of Dr. Li, xAI's Investigation Efforts Have Lacked Urgency and xAI Has Needlessly Prolonged the Investigation ..... 9

III. LEGAL STANDARD ..... 11

IV. ARGUMENT ..... 12

A. The *Winter* Factors Weigh Against Granting an Injunction ..... 12

1. xAI Cannot Show Irreparable Harm ..... 12

a. xAI Has Not Shown and Cannot Show That Irreparable Harm is Likely, Because There is No Evidence of Copying, Transfer or Disclosure to Third Parties, Nor Any Evidence of Continued Access ..... 12

b. xAI's Remaining Arguments Do Not Show Irreparable Harm ..... 16

2. xAI Does Not Have a Likelihood of Success on the Merits ..... 18

a. xAI is Not Likely to Succeed Because There is No Damage to xAI ..... 18

b. xAI is Not Likely to Succeed Because the Inevitable Disclosure Doctrine is not Available Under the DTSA ..... 18

c. xAI Cannot Succeed on Any Trade Secret Claim That Relies on Trade Secrets That Have Not Been Sufficiently Identified ..... 20

d. xAI is Not Likely to Succeed on Its Breach of Contract Claim ..... 21

FENWICK & WEST LLP
ATTORNEYS AT LAW

B. The Balance of Equities Weighs Heavily Against Injunctive Relief, and Granting xAI's Preliminary Injunction is Injurious to the Public Interest ........... 21

C. xAI's Proposed Injunction Is Not Narrow or Carefully Tailored to the Trade Secrets, and Should Be Denied ........... 22

1. xAI's First Bucket of Proposed Relief is Overbroad and Unnecessary ........... 23

2. xAI's Second Bucket of Proposed Relief Violates the DTSA and California's Strong Public Policy of Employee Mobility ........... 23

V. CONCLUSION ........... 25

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*AEG Holdco LLC v. Vazquez*,
No. 2:21-CV-05290, 2021 WL 4859975 (C.D. Cal. Sept. 22, 2021) ....................................19

*Bank of Am., N.A. v. Immel*,
No. C 10-02483, 2010 WL 2380877 (N.D. Cal. June 11, 2010) ..........................................22

*Bayer Corp. v. Roche Molecular Sys., Inc.*,
72 F. Supp. 2d 1111 (N.D. Cal. 1999) ....................................................................................19

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988)......................................................................................................12

*Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*,
312 F. Supp. 3d 944, 965 (D. Nev. 2018), *on reconsideration in part*, No. 3:15-CV-00294, 2018 WL 3127454 (D. Nev. June 26, 2018)............................................................13

*Citcon USA, LLC v. RiverPay Inc.*,
No. 18-CV-02585, 2019 WL 2603219 (N.D. Cal. June 25, 2019) ..................................12, 22

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
444 F. Supp. 3d 1198 (E.D. Cal. 2020)....................................................................................22

*Env't Prot. Info. Ctr. v. Carlson*,
968 F.3d 985 (9th Cir. 2020)......................................................................................................18

*Fair Isaac Corp. v. Gurobi Optimization, LLC*,
No. CV 25-00194-RGA, 2025 WL 2636403 (D. Del. Sept. 12, 2025) ..................................19

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
654 F.3d 989 (9th Cir. 2011)......................................................................................................17

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015)..................................................................................................16, 17

*IDEXX Lab'ys, Inc. v. Bilbrough*,
No. 2:22-CV-00056-JDL, 2022 WL 3042966 (D. Me. Aug. 2, 2022), *report and recommendation adopted*, 2022 WL 4940200 (D. Me. Oct. 4, 2022) ....................................19

*Implicit Conversions, Inc. v. Stine*,
No. 24-cv-03744, 2024 WL 4112335 (N.D. Cal. Sept. 6, 2024) ..........................................22

*Inspection Mgmt. Sys., Inc. v. Open Door Inspections, Inc.*,
No. 2:09-CV-00023, 2009 WL 805813 (E.D. Cal. Mar. 26, 2009) ........................................16

*Int'l Ass'n of Plumbing & Mech. Offs. v. Int'l Conf. of Bldg. Offs.*,
79 F.3d 1153 (9th Cir. 1996)......................................................................................................16

*Int'l Auto. Technicians' Network, Inc. v. Winzig.*,
No. CV 18-4208, 2018 WL 6264997 (C.D. Cal. Nov. 21, 2018) ..........................................12

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Karma Auto. LLC v. Lordstown Motors Corp. et al.*,
No. 8:20-CV-02104, 2021 WL 4691908 (C.D. Cal. Sept. 16, 2021) ....................................17

*Kinship Partners, Inc. v. Embark Veterinary, Inc.*,
No. 3:21-CV-01631, 2022 WL 72123 (D. Or. Jan. 3, 2022) ....................................19

*Lam Rsch. Corp. v. Deshmukh*,
157 F. App'x 26 (9th Cir. 2005) ....................................19

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011)....................................12

*Perrin Bernard Supowitz, LLC v. Morales*,
No. 23-55189, 2024 U.S. App. LEXIS 2513 (9th Cir. Oct. 19, 2023) ....................................24

*Proofpoint, Inc. v. Vade Secure, Inc.*,
No. 19-CV-04238-MMC, 2020 WL 836724 (N.D. Cal. Feb. 20, 2020) ....................................20

*Sitrus Tech. Corp. v. Le*,
600 F. Supp. 3d 1106 (C.D. Cal. 2022) ....................................13, 14

*Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 5013363 (N.D. Cal. Feb. 16, 2017) ....................................20

*UCAR Tech. (USA) Inc. v. Yan Li*,
No. 5:17-CV-01704, 2017 WL 8294248 (N.D. Cal. Apr. 19, 2017) ....................................13, 15, 16

*Universal Trading & Inv. Co. v. Kiritchenko*,
No. C-99-3073 MMC (EDL), 2006 WL 3798157 (N.D. Cal. Dec. 22, 2006)....................................1

*Waymo LLC v. Uber Techs., Inc.*,
No. C 17-00939, 2017 WL 2123560 (N.D. Cal. May 15, 2017) ....................................20, 22, 24

*Whyte v. Schlage Lock Co.*,
101 Cal. App. 4th 1443 (2002) ....................................16, 22

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................................11, 12

*Zendar Inc. v. Hanks*,
No. 20-cv-03391, 2020 WL 4458903 (N.D. Cal. 2020) ....................................17

**STATUTES**

18 U.S.C. § 1836(b)(3)(A) ....................................19, 24

**RULES**

Fed. R. Civ. P. 65 ....................................12

**OTHER AUTHORITIES**

A. Saeedy, "Executives at xAI Clashed with Musk Advisers Before Departing" (Sept. 17, 2025), *available at:* https://www.wsj.com/tech/ai/elon-musk-xai-executives-advisers-clash-eac3913b?msockid=1e7a7da6a85f66ae26986829a9dc67b7....................................21

*AI Standards*, NAT'L INST. STANDARDS & TECH., https://www.nist.gov/artificial-intelligence/ai-standards (2021, updated 2025) (last accessed Nov. 10, 2025) ........................25

*Artificial Intelligence Index Report 2025*, STANFORD UNIV. HUMAN-CENTERED AI, https://hai.stanford.edu/assets/files/hai_ai_index_report_2025.pdf.........................................25

Becky Peterson and Berber Jin, *Elon Musk's xAI Is in Advanced Talks to Raise $15 Billion, Lifting Valuation*, WALL ST. J. (Nov. 19, 2025), *available at:* https://www.wsj.com/tech/ai/elon-musks-xai-in-advanced-talks-to-raise-15-billion-lifting-valuation-00bcfa80 ..........................................................................................14

Cong. Research Serv., *Data Centers and Cloud Computing: Information Technology Infrastructure for Artificial Intelligence* (2023)..............................................................25

*In re Application of X.AI LLC for Subpoena to OpenAI, Inc., OpenAI Global, LLC, and OpenAI OpCo, LLC*, No. 3:25-mc-80299-JCS, Dkt. 16 (October 20, 2025)..............................................................4

Pat Grady & Sonya Huang, *Generative AI's Act Two*, SEQUOIA CAPITAL (June 6, 2023), *available at:* https://sequoiacap.com/article/generative-ai-act-two/ ........................................25

R. Bellan, "xAI's CFO is the latest executive to leave Elon Musk's AI firm" (Sept. 3, 2025), *available at:* https://techcrunch.com/2025/09/03/xais-cfo-is-the-latest-executive-to-leave-elon-musks-ai-firm/ .........................................................................21

FENWICK & WEST LLP
ATTORNEYS AT LAW

## I. INTRODUCTION

Preliminary injunctions are an extraordinary remedy reserved for clear cases of ongoing or imminent harm—not a vehicle to impose an indefinite de facto non-compete on a departing scientist, when there is no evidence whatsoever of copying, transfer or disclosure of alleged trade secrets to any third party.[1] Yet that is precisely what xAI seeks here.

Dr. Xuechen Li left xAI on August 1, 2025. On August 11, 2025, xAI contacted him with its allegations that he had uploaded xAI confidential information to his personal Google Drive. Since that time, Dr. Li has either voluntarily or under the terms of this Court's TRO fully cooperated with every request by xAI to investigate each place Dr. Li may have copied, stored, used, or transferred digital files. As a result, his digital life has undergone a full-body inspection by his former employer. In total, xAI has had complete forensic access to four personal devices and twelve accounts. As laid out below, at many times, xAI has shown a lack of urgency in undertaking this work, and even more notably, xAI had in its possession all it needed to restore its access to the key Google account as of August 18—and chose not to avail itself of that opportunity and instead filed this lawsuit.

Despite having essentially unfettered access to Dr. Li's digital life over the past three months, and conducting extensive forensic examinations of his devices and digital accounts, it remains the case that xAI can offer no evidence that Dr. Li copied, transferred, or disclosed to any third party the xAI materials in its Motion.

Meanwhile, Dr. Li, who is an expert in a critically important and fast-moving field, has had his life turned upside down and his work put on ice indefinitely. Indeed, xAI's requested relief

[1] Dr. Li is the subject of a criminal investigation, which is believed to have been instigated by xAI. (*See* Dkt. 46, TRO Hearing Tr. at 10:5-6; 21:22-22:10). This has put Dr. Li in the untenable position of having to defend against xAI's attempts to keep him from working and speaking about his work while also preserving his constitutional rights. In light of that investigation, Dr. Li expressly reserves and does not waive his Fifth Amendment privilege. *Universal Trading & Inv. Co. v. Kiritchenko*, No. C-99-3073 MMC (EDL), 2006 WL 3798157, at *3 (N.D. Cal. Dec. 22, 2006) (explaining that courts "must tightly guard against waiver of the Fifth Amendment privilege"). This filing does not assert, disclose, or rely on any information from Dr. Li that could constitute a waiver of that privilege; unless otherwise noted, all factual references are drawn from xAI's submissions, public sources, or opinions of third-party forensic examination analysts. As explained in this brief, xAI's Motion fails because it has not and cannot meet its burden for its requested preliminary injunction.

would continue to bar Dr. Li from working "in any role" on "generative AI" for any company it labels a competitor and to forbid him from even discussing the topic with anyone who works for any such companies. That sweeping request is highly disfavored and inconsistent with both federal and California law. The law requires far more than conjecture to indefinitely bench a scientist from his life's work. It demands a clear showing of likely success, likely irreparable harm, equities that tip decidedly toward the movant, and a public interest that favors sweeping relief.

xAI cannot meet that standard. The record defeats any claim of irreparable harm. Through Dr. Li's full cooperation with xAI since entry of the TRO, xAI has had ample opportunity to forensically examine all devices and accounts of interest to it—and has uncovered no evidence of copying, transfer or disclosure of the alleged trade secrets to any third party. Moreover, xAI has exercised broad discretion (pursuant to the parties' agreed protocols) to permanently delete any information that its forensic examination vendor has indicated "may" contain xAI information—thus ensuring that Dr. Li no longer possesses, and cannot access, the alleged trade secrets.[2] Particularly where xAI has eliminated any possible access, any argument about future misappropriation is nothing more than speculation.

Nor can xAI show a likelihood of success. Not only does xAI fail to show it has suffered harm, but the merits theory implicit in xAI's proposed order—that Dr. Li carries "knowledge of xAI's key technologies" that he will inevitably use if he works for a competitor—is unavailable under the DTSA and rejected by California courts. The DTSA expressly forbids injunction orders that prevent someone from entering an employment relationship, and California law likewise bars non-competes and their functional equivalents. Even in cases where there is a continuing threat of misappropriation—which there is not here—any injunctive relief granted is narrow and carefully tailored to specifically-identified trade secrets—not industry-wide bans like that requested by xAI.

[2] As explained by xAI's counsel during the September 2, 2025 hearing, the FBI seized two laptops and a cell phone of Dr. Li that had been provided to xAI. (*See* Dkt. 46, TRO Hearing Tr. at 10:5-6; 21:22-22:10.) To the extent xAI argues it is unable to remediate devices in the FBI's possession, that argument should be rejected. Putting aside that it was xAI that initiated the government investigation and that xAI had ample opportunity to delete any xAI information from those devices before the FBI seized them from it, the salient point is that Dr. Li does not possess any information that is now held by the FBI and thus these devices pose no danger to xAI.

The balance of equities and the public interest also weigh decisively against xAI's proposal. xAI's proposed order would destroy Dr. Li's right to practice his profession and substantially chill his speech. Dr. Li has spent years building specialized expertise in advanced machine learning and large-scale AI systems; his livelihood, reputation, and ongoing work depend on the ability to continue practicing in that field. The proposed injunction would not only prevent him from engaging in ordinary engineering and research tasks, but also chill his ability to discuss non-proprietary methodologies, publish or present, attend conferences, and network—core activities essential to maintaining and advancing his career.

There are also effects far beyond this case: it would deter and intimidate employees from voluntarily leaving xAI (or other AI companies), and stifle competition and innovation that the law and public policy are designed to protect. The public interest, especially in a strategically vital and fast-moving domain like AI, favors employee mobility and fair competition—not immobilizing talented engineers like Dr. Li based on conjecture.

Because xAI has failed to establish irreparable harm or likely success that warrants its requested injunction, and because its requested relief cuts sharply against the balance of equities and the public interest, the Court should deny xAI's request for a preliminary injunction.

## II. STATEMENT OF FACTS

### A. Dr. Li Contributes His Expertise in Large Language Model Training to xAI

xAI aptly describes Xuechen Li as "[a]n accomplished researcher in the AI community." Complaint at 10, *x.AI Corp. v. OpenAI, Inc.*, No. 3:25-cv-08133-RFL (N.D. Cal. Sep. 24, 2025), Dkt. 1 ("*OpenAI* Case"). Dr. Li holds a Ph.D. in Computer Science from Stanford University where he worked in the Stanford Artificial Intelligence Laboratory, Stanford Machine Learning Group, and Stanford Natural Language Processing Group.[3] Dr. Li has over 20 academic publications and his research has been cited thousands of times.[4]

---

[3] *See* LinkedIn Profile of Xuechn Li, *available at:* https://www.linkedin.com/in/xuechen-li-a106b9b9/ (last accessed on Nov. 24, 2025).

[4] *See* Google Scholar Profile of Xuechen Li, *available at:* https://scholar.google.com/citations?user=GaYmpIgAAAAJ&hl=en (last accessed on Nov. 24, 2025).

When Dr. Li was hired by xAI in February 2024, xAI signed his Employment Agreement acknowledging multiple inventions of Dr. Li, which were "made or acquired by [Dr. Li] prior to [his] date of first employment by [xAI]." (Dkt. 8-5, Declaration of Bruce Applin in Support of Plaintiffs' Motion for Temporary Restraining Order ("Applin Decl."), Ex. B at ¶ 2.3.) xAI acknowledges in the Agreement that though these inventions of Dr. Li "may relate to [xAI's] Company's business," they "are not to be assigned to [xAI]." (*Id.*) These prior inventions of Dr. Li highlight his expertise in training AI models, including for example, methods for "scalable training of neural network models with differential equations," and a "simulation framework for methods that learn from human feedback." (*Id.* at Ex. A ("List of Prior Inventions").)

**B. Dr. Li Resigns from xAI and Cooperates with xAI's Requests**

Like many other employees of xAI,[5] Dr. Li sought to leave his employment there. As described in xAI's Motion, Dr. Li's last day of employment was on August 1, 2025. (Dkt. 8-3, Applin Decl. at ¶¶ 14-15.) On August 11, 2025, xAI sent Dr. Li a letter identifying a compressed file uploaded to Google Drive, and instructing Dr. Li to "provide xAI with a computer-useable copy of all [xAI] Confidential Information," and "permanently delete and expunge such Confidential Information from those systems." (Dkt. 8-7, Applin Decl. Ex. D at 2.)

As further described in xAI's Motion, within just 3 days of receiving the letter, Dr. Li proceeded to have meetings with xAI, during which he voluntarily answered the extensive questioning of xAI's investigators and voluntarily relinquished his personal devices—two laptops and his cell phone—to xAI.[6] (Dkt. 8-3, Applin Decl. at ¶¶ 21, 25.) Dr. Li then signed an agreement, pursuant to xAI's request, authorizing xAI to have essentially unfettered access to his personal accounts and devices, and providing his login credentials where possible (the "Authorization

---

[5] As described by OpenAI in a recent filing responding to xAI's Section 1782 requests: "xAI has been hemorrhaging talent to other AI competitors, including OpenAI. xAI employees have been driven from the company for a number of reasons, including dissatisfaction with the management style of Elon Musk, a lack of faith in the future success of xAI or its products, concerns about company decisions, and an unforgiving, unmanageable work schedule." *In re Application of X.AI LLC for Subpoena to OpenAI, Inc., OpenAI Global, LLC, and OpenAI OpCo, LLC*, No. 3:25-mc-80299-JCS, Dkt. 16 at 1 (October 20, 2025).

[6] For purposes of this opposition brief, Dr. Li does not address or rely on any statements made during the August 14 and 15, 2025 meetings. However, to be clear, Dr. Li does not concede the accuracy of Mr. Applin's declaration regarding statements made during the August 14 and 15 meetings.

Agreement").[7] (*Id.*, ¶ 26; *see also* Dkt. 8-8, Applin Decl., Ex. E.) xAI was accordingly able to forensically image and review three devices of Dr. Li before the filing of this lawsuit. (Dkt. 8-16, Pochron Decl. at ¶¶ 4-5.)

In the days leading to xAI filing suit, Dr. Li, through his counsel, repeatedly offered to facilitate xAI's access to the devices—including by suggesting a "password reset" on the Google account, which xAI's counsel refused to do because it was purportedly not "forensically sound." (Declaration of John F. Hyland ("Hyland Decl."), ¶¶ 4-5; *see also* Dkt. 17-2 at ¶¶ 8-17.) Specifically, Dr. Li's counsel informed xAI that should the Gmail app on Dr. Li's phone (a device ***in xAI's possession***) be unable to access the Gmail account, then xAI could "do a password reset," wherein the "reset code should go to text (to which [xAI] should have access)." (Hyland Decl., ¶ 4.) xAI did not proceed with the proposed, simple password reset, stating that it "must [access the account] in a forensically sound way that does not impact any of the data or metadata on the devices." (*Id.*, ¶ 5.) Dr. Li's counsel continued to check in with xAI, asking "if [xAI] need[ed] anything from [Dr. Li] to facilitate access or otherwise." (Dkt. 17-2 at ¶ 17.) xAI did not take Dr. Li's offer to facilitate, but instead filed suit against him two days later.

### C. xAI Files Suit, Seeking a Broad Employment Ban Alleging Acquisition of Specified Materials, But Not Improper Copying, Transfer or Disclosure

On August 28, 2025, xAI brought this action, seeking a temporary restraining order and preliminary injunction against Dr. Li. (Dkt. 8 ("Mot.").) xAI's proposed injunction seeks to prevent Dr. Li from "having any role or responsibility" with any "competitor of xAI pertaining to generative AI," or "having any communication on the subject of generative AI" with representatives of "any competitor of xAI." (Dkt. 8-2 at ¶¶ 8-9.) xAI bases its request on its allegation that Dr. Li "surreptitiously cop[ied] over 70 gigabytes of xAI's Confidential

[7] Following entry of the TRO (which separately grants xAI access to devices and accounts), counsel for Dr. Li sent a letter to xAI revoking access under the Authorization Agreement, but explaining that the revocation "does not affect xAI's access to accounts to accounts and devices to the extent permitted under the Court's Temporary Restraining Order." (Ex. C at 2.) The letter also explains that while "xAI has already had ample opportunity to 'identify[] and locat[e] xAI information' on the Devices and Accounts," Dr. Li will "cooperate with xAI pursuant to the terms of a mutually agreeable protocol that both protects Dr. Li's privileged and confidential information and allows Dr. Li access to his own data and information on the Devices and Accounts." (*Id.*)



FENWICK & WEST LLP ATTORNEYS AT LAW

Information … from his company-issued laptop to a personal Google Drive account." (Mot. at 6.)

The xAI Confidential Information that xAI alleges was copied is limited to a finite set of materials: source code and one slide deck (hereinafter, "xAI Material"). (Mot. at 10 (citing Applin Decl., ¶ 22 and Ex. G); *see also* Declaration of Jessica M. Kaempf ("Kaempf Decl."), Ex. V at 6 (identifying trade secrets at issue as: "(1) '2 compressed files of the xAI main codebase' and (2) '1 file that is a slide deck of software design for RL'"). These files are identified as generic archival files: arch.7z, arch2.7z and arch3.7z. (*See* Kaempf Decl., Ex. G at 1.)[8]

xAI's Complaint and Motion did not allege that Dr. Li copied, transferred or disclosed any xAI Material to any third party. At most, xAI speculated that "Li may also have other accounts," and "xAI remains in the dark about whether, where, and to whom Li may have shared the xAI's Confidential Information." (Applin Decl., ¶ 29.)

### D. Through Dr. Li's Full Cooperation, xAI Conducts Extensive Review of Dr. Li's Devices and Images, and Deletes all Information it Unilaterally Determined to be xAI Confidential Information

Since entry of the TRO on September 2, 2025 (Dkt. 20), Dr. Li has fully cooperated with all of xAI's requests. Dr. Li, through counsel, entered into three protocols with xAI to facilitate its investigation, and he has personally spent a significant amount of time since the TRO was entered partaking in account recovery sessions. (Exs. A-B, D.) Notably, xAI proposed a protocol for account recovery by means of a "password reset," including "[r]eceiving a code via SMS"—i.e., ***the same process*** that Dr. Li's counsel proposed to xAI before xAI filed suit. (*See* Ex. A at 3.) And, while xAI could have performed the password reset via SMS code when it still had possession of Dr. Li's phone (i.e., when Dr. Li's counsel proposed the process), xAI could no longer do so at the time of its proposal, as the FBI had already taken possession of Dr. Li's phone.

Through Dr. Li's extensive cooperation, xAI was able to gain access to the following accounts on the following dates:

| Device / Account | Date of Access |
|---|---|
| [redacted] | August 18, 2025 (*see* Pochron Decl., ¶ 6) |
| [redacted] | August 18, 2025 (*see* Pochron Decl., ¶ 6) |
| [redacted] | August 18, 2025 (*see* Pochron Decl., ¶ 6) |

[8] All exhibits cited herein are attached to the Kaempf Declaration, unless otherwise noted.

| Device / Account | Date of Access |
|---|---|
| [redacted] | September 5, 2025 (*see* Picone Decl., ¶ 5) |
| [redacted] | September 13, 2025 (*see* Kaempf Decl., ¶ 8) |
| [redacted] | September 13, 2025 (*see* Kaempf Decl., ¶ 8) |
| [redacted] | October 7, 2025[9] (*see* Kaempf Decl., ¶ 11) |
| Dropbox account [redacted] | October 30, 2025 (*see* Kaempf Decl., ¶ 20) |
| Microsoft account [redacted] | October 30, 2025 (*see* Kaempf Decl., ¶ 20) |
| iCloud account[10] [redacted] | October 30, 2025 (*see* Kaempf Decl., ¶ 20) |
| [redacted] | October 30, 2025 (*see* Kaempf Decl., ¶ 20) |
| [redacted] | October 30, 2025 (*see* Kaempf Decl., ¶ 20) |
| [redacted] | November 7, 2025 (*see* Kaempf Decl., ¶ 22) |
| ChatGPT account [redacted] | November 7, 2025 (*see* Kaempf Decl., ¶ 22) |
| Figma account [redacted] | November 21, 2025 (*see* Kaempf Decl., ¶ 26) |
| Notion account [redacted] | November 21, 2025 (*see* Kaempf Decl., ¶ 26) |

Dr. Li not only facilitated access to these accounts, but also facilitated remediation by giving xAI broad authority to delete any information xAI's vendor *unilaterally* determined "may" be xAI's confidential information.[11] (Ex. B.) xAI's vendor has deleted all information that xAI has alleged to be trade secret information, including specifically the "files of interest." (*See* Ex. N at 4-5.) Dr. Li's forensic analyst, Samuel Plainfield, also confirmed that based on his extensive analysis of the devices and accounts, no evidence exists to support that the Arch files of interest remain on Dr. Li's accounts and devices. (Declaration of Samuel Plainfield ("Plainfield Decl."), ¶ 51.)[12]

---

[9] While records reflect that xAI may have had access to the Google account before this date, for purposes of this Opposition, xAI had access no later than October 7.

[10] While xAI's vendor was able to gain access to the iCloud account on October 30, 2025, xAI's counsel informed Dr. Li's counsel over a week later that its vendor in fact did not gain access because additional authentication was needed. (Kaempf Decl., ¶ 23.) The same day, counsel for Dr. Li immediately provided permission to xAI's vendor to proceed with authentication. (*Id.*)

[11] The Parties' Forensic Protocol for Imaging and Analysis of Electronic Devices and Accounts allowed its vendor, Nardello to conduct a forensic examination to identify, remediate, and/or delete information ***believed to be Confidential Information***." (Ex. B at 1 (emphasis added).) The protocol further states: "[f]or the avoidance of doubt, Li does not agree that all Information believed to be Confidential Information is in fact xAI Confidential Information. However, in an effort to cooperate with xAI's efforts and provide xAI with assurance that it has remediated and/or deleted all information believed to be its confidential information, ***Li agrees to allow the Vendor to use the proposed definition***. (*Id.* (emphasis added).)

[12] With respect to the deposition of Dr. Li, after the Parties agreed to extend the deadline for xAI

FENWICK & WEST LLP
ATTORNEYS AT LAW

### E. The Parties' Investigation Confirms That Dr. Li Never Copied, Transferred or Disclosed the Alleged Trade Secret Material to Any Third Party[13]

With respect to what xAI identified as the "key online account" of Dr. Li—his Google account (Mot. at 2)—xAI's forensic examination vendor (Nardello & Co.) provided its Forensic Report of its analysis on November 6. (Ex. G.) While claiming to have limited information, the Forensic Report nonetheless reports that xAI's vendor "Nardello & Co. ***did not uncover any direct evidence of further copying or disclosure*** of the above documents"—which includes the "files of interest," named "'arch.7z,' 'arch2.7z' and 'arch3.7z'"—"within the Google account itself." (*See* Ex. G at 1, 5 (emphasis added).) The forensic examination of Mr. Plainfield reached the same conclusion—that "Dr. Li did not exfiltrate any of these three files to any devices or cloud accounts of any third party." (Plainfield Decl. at ¶ 52.)

Analysis of Dr. Li's devices indicates the absence of any evidence showing such copying, disclosure or transfer of the alleged trade secret material to third parties:

- **Examination of Dr. Li's Macbook Pro**: The only files on this laptop at any point in time were the arch.7z file and arch3.7z file were on that laptop; there was no evidence of any copying, disclosure or transfer of those files to any third party—whether by USB or hard drive, uploading to other cloud accounts, or otherwise. (Plainfield Decl., at ¶¶ 18-22.)
- **Examination of Dr. Li's MacBook Air**: The only file on this laptop at any point in time was the arch3.7z file (a slide deck) (*Id.* at ¶ 26); that file was downloaded to the laptop immediately after xAI sent a letter to Dr. Li instructing him to "provide xAI with a computer-useable copy of all [xAI] Confidential Information." (Mot., Ex. D at 2.) There was no evidence of any copying, disclosure or transfer of that file to any third party—whether by USB or hard drive, uploading to other cloud accounts, or otherwise.

---

to take a deposition to October 15, 2025 (Dkts. 39, 44), xAI's counsel only reached out on the day of the deadline (October 15), then did not follow up again seeking to take the deposition. (Kaempf Decl., ¶¶ 38, 39.) At this stage, any deposition is untimely and unnecessary to resolve xAI's preliminary injunction request, especially given xAI's unfettered access to Dr. Li's digital accounts, his extensive cooperation in the account recovery process, and xAI's two days of voluntary interviews of Dr. Li in August 2025.

[13] Dr. Li's personal devices and accounts are not "third party" devices or accounts.



FENWICK & WEST LLP ATTORNEYS AT LAW

(Plainfield Decl., at ¶¶ 23-29.)

- **Examination of Dr. Li's Mac Studio**: None of the arch.7z, arch2.7z, and arch3.7z files were on ever on this device. (*Id.* at ¶¶ 30-32.)
- **Examination of Dr. Li's iPhone**: None of the arch.7z, arch2.7z, and arch3.7z files were on ever on this device. (*Id.* at ¶¶ 33-34.)

Analysis of Dr. Li's other cloud accounts—including specifically the Dropbox and Microsoft accounts mentioned in passing in xAI's Motion (Mot. at 8)—also show no evidence of copying, disclosure or transfer of the alleged trade secrets. (Plainfield Decl. at ¶¶ 35-49.)

xAI also served a subpoena to OpenAI.[14] OpenAI's responses likewise confirm that there is ***no evidence*** of copying, transfer or disclosure of xAI Material to OpenAI:

> OpenAI has conducted a reasonable and diligent search for non-privileged documents, if any, in its possession, custody or control that reflect (i) the disclosure of xAI information to OpenAI by Defendant, and/or (ii) any request by OpenAI for Defendant to disclose xAI information. ***OpenAI has located no such documents after a reasonable search and inquiry***.

(Ex. U at 5, 7, 10, 12-13, 16, 23 (emphasis added).) In other words, more than three months into this saga, neither xAI nor OpenAI has identified any evidence that Dr. Li copied, transferred, or disclosed any xAI information to OpenAI (or to anyone else, for that matter).

### F. Despite Efforts of Dr. Li, xAI's Investigation Efforts Have Lacked Urgency and xAI Has Needlessly Prolonged the Investigation

Throughout this process, and despite having rushed urgently to Court for a TRO, xAI has failed to diligently pursue all investigative avenues available to it and drawn the account recovery process out. The account recovery process timeline is as follows:

- On September 13, counsel for the parties began the account recovery process. The parties successfully recovered Dr. Li's Stanford email account. (Kaempf Decl., ¶ 8.)
- On September 15, counsel for Dr. Li reached out to xAI's counsel inviting xAI to "schedule additional time for further account recovery attempts on other accounts." (Ex. J.) xAI did not respond to that invitation.

[14] Beyond this case, xAI also filed suit in against OpenAI, alleging that OpenAI is targeting xAI individuals "with knowledge of xAI's key technologies and business plans," including specifically Dr. Li, and inducing them to breach their obligations to xAI. (Ex. W.)

- On October 7, the parties successfully recovered Dr. Li's primary Google account, which provided authentication and/or served as the recovery email for other digital accounts, thereby giving xAI access to such other digital accounts. (Kaempf Decl. ¶ 11.)
- On October 16, Dr. Li's counsel followed up on its September 15 email to ask about "recovery attempts of other accounts," including specifically the Dropbox and Microsoft accounts identified in xAI's Motion. (Ex. J.) Again, xAI did not respond to that request.
- On October 22, in the context of discussing an extension on briefing to allow the parties time to access and review information from the account recovery process, xAI's counsel stated that "[t]here are other accounts that need to be recovered." (Ex. K.) Dr. Li's counsel responded the same day asking xAI to identify other accounts that need to be recovered, and after having received no response, asked again for identification of such other accounts on October 23. (*Id.*)
- On October 23, xAI sent a list of other accounts (*id.*), then later proposed an account recovery session a week later, on October 30 (Kaempf Decl., ¶ 20.) The parties successfully recovered additional accounts on November 7. (*Id.*, ¶ 22.)

To avoid further delay, the parties agreed to complete any remaining account recovery attempts by November 7, 2025. (*See* Dkt. 62 at 2.) While xAI has nonetheless continued to identify additional accounts and devices of interest after the November 7 stipulated deadline, Dr. Li has continued to cooperate and facilitate xAI's account recovery efforts.

xAI has also delayed serving a subpoena to Google. During the September 2, 2025 TRO hearing, xAI's counsel requested an early 26(f) conference to allow it "to serve discovery on third parties" (Dkt. 46 at 31:19-22), the Court entered an order requiring the 26(f) conference by September 16 (Dkt. 34), and the parties conducted the 26(f) conference on September 12 (Kaempf Decl., ¶ 14.) On September 14, xAI's counsel provided Dr. Li's counsel with a draft of third-party subpoenas, including a subpoena to Google—but did not ultimately serve that subpoena.[15] (*Id.*,

[15] In response to xAI's September 14 request, counsel for Dr. Li stated it was amenable to the Google subpoena so long as the parties established an appropriate protocol to handle any such information obtained from Google via subpoena. (Ex. H.)

FENWICK & WEST LLP
ATTORNEYS AT LAW

¶ 15.) Then, on November 7, 2025, eight weeks after the 26(f) conference and over four weeks after xAI had obtained access to the key Google account—xAI's counsel resurrected its alleged need to subpoena Google. (*Id.*, ¶ 16) On November 18, 2025 (less than a week before the filing of the present opposition brief), counsel for xAI also resurrected its request to recover devices and accounts obtained after August 27 2025. (Ex. S.) xAI did so despite Dr. Li's prior extensive efforts (including requests in seven separate emails which xAI never substantively responded to) to finalize a protocol following entry of the TRO.[16]

This is not to say that xAI would have found anything useful to it in these accounts or devices. Indeed, to the contrary, xAI's lack of urgency underscores its apparent awareness that it would not have found the xAI Material in these other accounts (which was then confirmed through its vendor's examination (*see* Exs. G, N, U)), and that it has already had access to and reviewed the locations where evidence most likely to support its theory would exist. In sum, despite Dr. Li's active efforts to advance xAI's investigation and remediation, xAI has failed to act with diligence, resulting in an unnecessarily protracted investigation.

## III. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy never awarded as of right," and "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). A plaintiff seeking a preliminary injunction must demonstrate that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

[16] The post-August 27 devices contain a significant amount of attorney-client privilege and attorney work product materials—including extensively for attorneys representing Dr. Li in the criminal investigation. Pursuant to the TRO (Dkt. 20 at 5), and to protect Dr. Li's privilege, Dr. Li's counsel proposed that its own vendor conduct a privilege analysis before providing these devices to xAI, but xAI insisted on using an xAI vendor for this process—a process which would have put Dr. Li's privilege at risk by allowing a vendor acting under xAI's direction access to privileged material. As a compromise, the parties discussed *jointly* engaging a vendor, and Dr. Li's counsel proposed—and repeatedly followed up regarding—a protocol and stipulation for that compromise. (*See* Ex. P (September 13 email containing compromise proposal), Ex. Q (September 24 email following up regarding proposal), *id.* (September 29-30 emails following up again), Ex. R (October 4 email seeking meet and confer), *id.* (October 9 email providing proposed draft regarding stipulation to be filed with protocol), *id.* (October 10 email following up on stipulation and providing proposed revisions to post-August 27 device protocol)), *id.* (October 13 email following up again). xAI's counsel did not provide any substantive feedback regarding Dr. Li's proposed stipulation, or pursue recovery of the post-August 27 devices leading up to the parties' November 7 deadline.

injunction is in the public interest." *Id.* at 20; *see also* Fed. R. Civ. P. 65.

## IV. ARGUMENT

xAI has failed to establish that any *Winter* factor favors an injunction. With Dr. Li's full cooperation, xAI has had months to conduct its investigation and perform remediation, yet has found no evidence whatsoever of copying, transfer or disclosure to third parties. The injunction xAI seeks—that is, prohibiting Dr. Li from working or communicating with ***any*** xAI competitor in ***any*** capacity relating to generative AI (Dkt. 8-2 at ¶¶ 8-9)—is inequitable, extraordinarily overbroad, and violates the DTSA and California law. The Court should thus deny xAI's preliminary injunction request.

### A. The *Winter* Factors Weigh Against Granting an Injunction

#### 1. xAI Cannot Show Irreparable Harm

A plaintiff cannot prevail on a motion for preliminary injunction absent a "threshold showing regarding irreparable harm … regardless of the petitioner's proof regarding the other [] factors." *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011). Despite its unfettered access to Dr. Li's accounts and devices, xAI has offered no evidence that Dr. Li copied, transferred or disclosed any of xAI Material to any third party, and xAI's own remediation and deletion efforts have removed any access or possession to the xAI Material (thus preventing any future misappropriation). Absent such evidence, xAI cannot show any ongoing risk of irreparable harm. Moreover, any claim that undiscovered sources of information remain is pure speculation—made all the more unfounded by xAI's delays and lack of diligence in pursuing available investigative steps—and the Court should decline to credit such arguments.

##### a. xAI Has Not Shown and Cannot Show That Irreparable Harm is Likely, Because There is No Evidence of Copying, Transfer or Disclosure to Third Parties, Nor Any Evidence of Continued Access

As courts have consistently held, a "[s]peculative injury does not … warrant granting a preliminary injunction." *See, e.g., Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Int'l Auto. Technicians' Network, Inc. v. Winzig.*, No. CV 18-4208, 2018 WL 6264997, at *9 (C.D. Cal. Nov. 21, 2018); *Citcon USA, LLC v. RiverPay Inc.*, No. 18-

FENWICK & WEST LLP
ATTORNEYS AT LAW

CV-02585, 2019 WL 2603219, at *3 (N.D. Cal. June 25, 2019) (denying preliminary injunction where plaintiff did not provide "concrete examples of harm it will endure without injunctive relief"). Courts have recognized that where a defendant has returned and no longer possesses the alleged trade secret information, an injunction is improper absent non-speculative "proof that there is an imminent threat of use or disclosure of [the plaintiff's] confidential information or trade secrets." *See UCAR Tech. (USA) Inc. v. Yan Li*, No. 5:17-CV-01704, 2017 WL 8294248, at *3 (N.D. Cal. Apr. 19, 2017) (no irreparable harm when software engineers left to form competitor and downloaded confidential information following departure, but returned all allegedly confidential information); *see also, e.g.*, *Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 965 (D. Nev. 2018), *on reconsideration in part*, No. 3:15-CV-00294, 2018 WL 3127454 (D. Nev. June 26, 2018) (no irreparable injury when defendant no longer possessed any "trade secrets" and there was no "viable threat [the employee] will use them going forward").

The *Sitrus* case is instructive. There, the defendant had turned over his computers and servers pursuant to a TRO, and the plaintiff's forensic analysts had over a month to review them for evidence of misappropriation. *Sitrus Tech. Corp. v. Le*, 600 F. Supp. 3d 1106, 1109-11 (C.D. Cal. 2022). The plaintiff did not find any such evidence, and instead merely argued that its analysts had "difficulty finding out (at this time) whether Defendant had transferred Plaintiff's proprietary information to other devices or storage spaces," noting a lack of log files suggested that the Defendant had "surreptitiously deleted them to cover his tracks." *Id.* at 1110-11. The court dismissed plaintiff's arguments as speculation, finding that the plaintiff had "failed to show that irreparable harm is likely rather than merely possible based upon Defendant's post-TRO conduct." *Id.* at 1110. The court emphasized that "the evidence show[ed] that Defendant ha[d] complied with the TRO in full, turning over the devices when ordered to do so." *Id.* at 1111. The court further noted that "[t]he TRO in this case lasted for nearly two months, far longer than the typical period of 14 days," and that this extended period has given "Plaintiff's forensic analysts team plenty of time to find *some* evidence that shows that it is likely that Defendant has misappropriated its trade secret information." *Id.* (emphasis added). Because the plaintiff could not identify any non-speculative evidence that "Defendant did transfer or copy files onto other devices he is still

FENWICK & WEST LLP
ATTORNEYS AT LAW

withholding," the court found that any "alleged risk of injury is speculative" and denied without prejudice the request for preliminary injunction. *Id.*

Here, just like the defendant in *Sitrus*, Dr. Li has complied with the xAI's requests in full for now well over two months, and this extended period has given xAI's forensic team "plenty of time" to find "some evidence." Instead, xAI has not offered and cannot offer any evidence of copying, transfer, or disclosure to a third party. xAI's own forensic report indicates that its vendor "did not uncover any direct evidence of further copying or disclosure of the [xAI Material] within the Google account itself." (Ex. G at 5; *see also* Ex. N at 3-4 (Nov. 17 report); Ex. U at 2-3 (Nov. 20 report).) Further, any argument that the analysis was limited due to "limitations in the information available" should be rejected. (Ex. G at 5.) Putting aside that such lack of information is insufficient to show clear and imminent harm, that argument is belied by xAI's extensive analysis of all of Dr. Li's other devices and accounts that are of interest to it, which confirms the absence of evidence of copying, transfer or disclosure to third parties. Specifically, xAI has analyzed three laptops, one phone, and multiple cloud storage repositories and other accounts—yet has offered no evidence of alleged copying, transfer or disclosure to third parties. The forensic analysis of Mr. Plainfield further supports the absence of any evidence showing copying, transfer, or disclosure of xAI Materials to any third party. (*See supra*, Section E (citing Plainfield Decl., at ¶¶ 18-52).) To the extent xAI argues that outstanding sources of information remain to be investigated, that too should be rejected. xAI—an incredibly sophisticated company that values itself at $230 billion,[17] claims it has built some of the most cutting-edge computer technology in human history (*see, e.g.*, Dkt. 8 at 11), with extensive resources and technical expertise—has had "plenty of time to find *some* evidence" of threat of ongoing misappropriation. *See Sitrus*, 600 F. Supp. 3d at 1111. Its failure to do so underscores that xAI cannot demonstrate a likelihood of irreparable injury.[18]

---

[17] *See* Becky Peterson and Berber Jin, *Elon Musk's xAI Is in Advanced Talks to Raise $15 Billion, Lifting Valuation*, WALL ST. J. (Nov. 19, 2025), *available at:* https://www.wsj.com/tech/ai/elon-musks-xai-in-advanced-talks-to-raise-15-billion-lifting-valuation-00bcfa80 (last accessed on Nov. 23, 2025).

[18] The Court should also reject any argument of irreparable injury based on devices and accounts that xAI has not sought to forensically examine, or other pending investigation. As explained above, despite efforts by Dr. Li to facilitate xAI's investigation, xAI failed to diligently pursue certain avenues of investigation—including certain third-party subpoenas and examination of devices and accounts obtained after August 27, 2025. (*See supra*, Section F.) xAI should not be

FENWICK & WEST LLP
ATTORNEYS AT LAW

*UCAR Tech.* is likewise instructive. There, the plaintiff alleged irreparable harm based in part on the allegation that defendants "planned" to take and disclose the trade secrets to a competing company. *UCAR Tech. (USA) Inc.*, 2017 WL 8294248, at *2-3. Judge Davila denied the preliminary injunction request, finding that such contentions were "too speculative," that plaintiff "ha[d] offered no proof that there is an imminent threat of use or disclosure of its confidential information or trade secrets," and thus "had[] not demonstrated that irreparable harm is *likely*, rather than just possible." *Id.* at *3 (emphasis in original). And "[w]hile courts have found that the use of one company's trade secrets by a former employee at a competitor company may satisfy the irreparable harm necessary for injunctive relief, there is little evidence in the record showing why it is likely that Defendants will use or disclose [plaintiff's] proprietary information in that way." *Id*. While acknowledging that defendant had downloaded plaintiff's proprietary documents, deleted such documents, potentially retained some documents, and then joined a potential competitor, Judge Davila nonetheless found that even those acts were insufficient to establish that the defendant would "use or disclose [the plaintiff's] proprietary information." *Id.*

xAI likewise offers no evidence of intent to use the alleged trade secrets beyond mere speculation, and any arguments of possession and deletion are insufficient to show irreparable harm. Dr. Li is an expert in his field; that is the reason why xAI hired him as "one of xAI's initial group of approximately 20 engineers" (Applin Decl., ¶ 10), and it is the reason why companies like OpenAI would seek to hire him. While xAI has, without actual evidence, accused Dr. Li of providing the xAI Material to OpenAI, OpenAI has unequivocally confirmed the opposite—that it never received xAI confidential information from Dr. Li.[19] (*See supra*, Section E (citing OpenAI Responses to xAI Subpoena at RFP No. 2); *see also OpenAI* Case, Motion to Dismiss, Dkt. 30 at 1 (explaining xAI has "no defensible claim that OpenAI ever acquired or even indirectly used xAI's confidential information through Li"); *OpenAI* Case, Answer, Dkt. 31 at 4 ("Li did not transfer the

---

permitted to rely on its lack of diligence and urgency to now argue irreparable harm.

[19] xAI's complaint against OpenAI improperly attempts to create an impression of transfer of alleged trade secrets from Dr. Li to OpenAI, alleging that OpenAI's recruiter sent "a link to, on information and belief, a cloud storage location" to Dr. Li. *See OpenAI* Case, Dkt. 1, ¶ 54. As OpenAI has explained, however, the "cloud storage link was simply a repository for HR paperwork provided to Li during his recruitment process." *Id.*, Dkt. 30 at 1. xAI has offered no evidence of any transfer of any xAI information to OpenAI.



FENWICK & WEST LLP ATTORNEYS AT LAW

source code to OpenAI.") Merely working for a competitor, should Dr. Li choose to do so in the future, is insufficient to support a preliminary injunction. *See UCAR*, 2017 WL 8294248, at *3.[20]

**b. xAI's Remaining Arguments Do Not Show Irreparable Harm**

xAI argues it will be irreparably harmed because (i) a term in Dr. Li's employment agreement establishes that trade secret misappropriation results in irreparable harm, (ii) there is a presumption of irreparable harm, (iii) disclosure of xAI's confidential information can result in "competitive harm," and (iv) Dr. Li is "a Chinese national" and "has the means to flee to a foreign nation." (Mot. at 13-15.) Each of these arguments lack merit.

***First***, courts have routinely rejected xAI's position that the threat or actual violation of an employment agreement can sustain a preliminary injunction. *See, e.g.*, *Inspection Mgmt. Sys., Inc. v. Open Door Inspections, Inc.*, No. 2:09-CV-00023, 2009 WL 805813, at *4 (E.D. Cal. Mar. 26, 2009); *Int'l Ass'n of Plumbing & Mech. Offs. v. Int'l Conf. of Bldg. Offs.*, 79 F.3d 1153 (9th Cir. 1996). They do so for good reason—employers could bury such statements of irreparable harm in every employment contract for any conceivable purpose and use that to get courts to issue injunctions against their employees working elsewhere. Blindly assessing irreparable harm based on the boilerplate language of Dr. Li's employment agreement is especially problematic here, where the injunctive relief xAI seeks is incredibly far-reaching and violates the First Amendment, as it aims to prohibit Dr. Li from even ***discussing*** generative AI, broadly, with anyone xAI deems a potential "competitor." *Garcia v. Google, Inc.*, 786 F.3d 733, 747 (9th Cir. 2015) ("[p]rior restraints" such as "court orders that actually forbid speech activities"—"pose the most serious and the least tolerable infringement on First Amendment rights") (internal citations omitted).

Further, this relief effectively results in a non-compete, which is highly disfavored in California. *See, e.g.*, *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1462 (2002) (affirming denial of preliminary injunction and noting "Business and Professions Code section 16600 generally prohibits covenants not to compete, and California public policy strongly favors employee mobility"). In fact, the requested injunction contradicts the employment agreement itself, which expressly states that it "does not prevent [Dr. Li] from earning a living or pursuing [his]

[20] Dr. Li was never employed at OpenAI. (*See OpenAI* Case, Answer, Dkt. 31 at 4.)

career." (Applin Decl. Ex. B at ¶ 6.1.) Instead, this Court should assess irreparable harm by the facts in the record, and by xAI's failure to establish that it will be harmed by Dr. Li continued employment in his profession and communication with others about his life's research and work.

***Second***, xAI's claim of an automatic presumption of irreparable harm is incorrect. As an initial matter, the Ninth Circuit has not adopted such a presumption in the trade secret context, and in fact has expressly rejected it in other intellectual property cases. *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) ("[A] presumption of irreparable harm is equally improper in a case based on copyright infringement as it is in a case based on patent infringement."). Further, courts in California, including in this District, have found that a presumption of irreparable harm in trade secret cases is not appropriate. *See, e.g.*, *Zendar Inc. v. Hanks*, No. 20-cv-03391, 2020 WL 4458903, at *5 (N.D. Cal. 2020) ("Although the Ninth Circuit has not yet addressed the issue in this context, the Court is not persuaded that a presumption of irreparable harm is appropriate."); *see also Karma Auto. LLC v. Lordstown Motors Corp. et al.*, No. 8:20-CV-02104, 2021 WL 4691908, at *3-4 (C.D. Cal. Sept. 16, 2021) (finding no irreparable harm due to plaintiff's lack of urgency). Indeed, the *Google* case cited by xAI discusses irreparable harm in the context of "***[d]isclosure*** of trade secrets" and "an intention to make imminent or continued ***use*** of a trade secret"—facts that clearly distinguish that case from the one at hand. Regardless, any presumption is rebutted because xAI has offered no evidence of "disclosure" or "use" of the alleged trade secrets.

***Third***, xAI's argument that "[a]ny xAI competitor or adversary that hires Li ***could*** … gain an unfair advantage" (Mot. at 14 (emphasis added)), but again, this is mere speculation. Not only have xAI's remediation efforts removed any possibility of transfer or disclosure going forward, but xAI has also offered no evidence of prior copying, transfer, or disclosure to any such competitors or adversaries. Indeed, the target competitor of xAI's litigation campaign—OpenAI—has affirmatively stated that there was no transfer or disclosure of xAI Material from Dr. Li. After having had months to conduct its investigation, and having found no evidence whatsoever of copying, transfer or disclosure to third parties, xAI cannot show irreparable harm.

***Fourth***, xAI's argument premised on Dr. Li being "a Chinese national" that could remove xAI's confidential information to another country and beyond the reach of this Court (Mot. at 15) is not only speculative, but also implausible: despite its extensive access to accounts and devices, xAI has not demonstrated that Dr. Li possesses any alleged xAI Confidential Information at this time. Thus, there is no risk that Dr. Li could use xAI's Confidential Information elsewhere, much less outside the U.S. xAI's assertions amount to no more than an attempt to smear Dr. Li based solely on his country of birth.

### 2. xAI Does Not Have a Likelihood of Success on the Merits[21]

In determining whether a preliminary injunction is appropriate, courts also consider whether the moving party has established a likelihood of success on the merits. *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020).

#### a. xAI is Not Likely to Succeed Because There is No Damage to xAI

To succeed on its misappropriation of trade secrets claim under the DTSA, xAI must demonstrate, *inter alia*, that the misappropriation caused or threatened damage to the plaintiff. (*See* Mot. at 14-15 (citing 18 U.S.C. § 1839(5).) xAI has failed to show any such damage. xAI again argues that "Li already conceded … that any breach [of the Agreement" would result in irreparable injury to xAI" and that it has suffered "diminished value of its intellectual property and other injuries." (Mot. at 12.) But as explained above, xAI's reliance on boilerplate provisions in Dr. Li's employment agreement and claims of "diminished value" of its intellectual property are unfounded.

#### b. xAI is Not Likely to Succeed Because the Inevitable Disclosure Doctrine is not Available Under the DTSA

xAI's claim is also unlikely to succeed because it implicitly relies on an inevitable disclosure theory that has been soundly rejected by courts applying the DTSA. Here, xAI's requested injunction broadly seeks to enjoin Dr. Li from all employment and communications relating to generative AI, in a manner that is not tied to any alleged trade secrets. (*See* Dkt. 8-2 at

---

[21] xAI's Motion makes clear that the only claims relevant to its injunction request are its misappropriation and breach of contract claims. (*See* Mot. at 9).



FENWICK & WEST LLP ATTORNEYS AT LAW

¶¶ 8-9.) xAI appears to seek this relief against Dr. Li because, as it explained in its suit against OpenAI, Dr. Li has "knowledge of xAI's key technologies." (Ex. 44, ¶ 10.) In other words, xAI appears to be arguing that, regardless of whether Dr. Li continues to have access to the alleged xAI trade secrets, he retains knowledge of xAI's "key technologies" and thus cannot work for, or communicate with, competitors without using or disclosing those key technologies. This theory amounts to the inevitable disclosure doctrine. *Kinship Partners, Inc. v. Embark Veterinary, Inc.*, No. 3:21-CV-01631, 2022 WL 72123, at *6 (D. Or. Jan. 3, 2022) (citation omitted).

Each of the DTSA and California state law forecloses this doctrine. Under the DTSA, a court may not grant an injunction that "prevent[s] a person from entering into an employment relationship." 18 U.S.C. § 1836(b)(3)(A)(i) (emphasis added). In other words, the DTSA prohibits broad employment injunctions that are simply based on the notion that the defendant will inevitably disclose trade secrets in his new employment position. Courts across the country have confirmed this. *See e.g.*, *Kinship*, 2022 WL 72123, at *9 (plaintiff "cannot rely on the inevitable disclosure doctrine for threatened misappropriation" under the DTSA).[22]

Further, because the inevitable disclosure doctrine "requires a court to recognize and enforce a de facto noncompetition agreement," *Id.* at *7, the doctrine has been repeatedly rejected by California courts as conflicting with California state law. *See, e.g., AEG Holdco LLC v. Vazquez*, No. 2:21-CV-05290, 2021 WL 4859975 (C.D. Cal. Sept. 22, 2021) (explaining that "inevitable disclosure" theory is "inconsistent with the law" (citing cases)).[23] Accordingly, xAI's proposed injunction—which seeks to enjoin Dr. Li from employment, in any capacity, with any xAI

[22] *See also IDEXX Lab'ys, Inc. v. Bilbrough*, No. 2:22-CV-00056-JDL, 2022 WL 3042966, at *6 (D. Me. Aug. 2, 2022), *report and recommendation adopted*, 2022 WL 4940200 (D. Me. Oct. 4, 2022) ("based on the plain language of the statute, the inevitable disclosure doctrine does not apply to claims brought pursuant to DTSA"); *Fair Isaac Corp. v. Gurobi Optimization, LLC*, No. CV 25-00194-RGA, 2025 WL 2636403, at *5 (D. Del. Sept. 12, 2025) ("a significant number [of courts] in multiple circuits across the country have found that the [inevitable disclosure] doctrine is not available to support an injunction of the sort that Plaintiff requests.").

[23] *See also Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999) ("California trade-secrets law does not recognize the theory of inevitable disclosure; indeed, such a rule would run counter to the strong public policy in California favoring employee mobility …. To the extent that the theory of inevitable disclosure creates a de facto covenant not to compete without a nontrivial showing of actual or threatened use or disclosure, it is inconsistent with California law."); *Lam Rsch. Corp. v. Deshmukh*, 157 F. App'x 26, 28 (9th Cir. 2005) ("[B]ecause California does not recognize the inevitable disclosure doctrine, the preliminary injunction, which is premised on a valid inevitable disclosure cause of action, must be vacated.").

competitor—conflicts with California state law and violates the DTSA.

### c. xAI Cannot Succeed on Any Trade Secret Claim That Relies on Trade Secrets That Have Not Been Sufficiently Identified

"To [] obtain a preliminary injunction, a plaintiff must first identify its alleged trade secrets with 'reasonable particularity.'" *Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 5013363, at *1 (N.D. Cal. Feb. 16, 2017) (citation omitted); *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19-CV-04238-MMC, 2020 WL 836724, at *3 (N.D. Cal. Feb. 20, 2020) (denying preliminary injunction because there is no "evidence that sufficiently identifies the claimed trade secrets").

As discussed above, xAI has performed extensive remediation and deletion that has removed Dr. Li's access to the material xAI alleged was downloaded. To the extent xAI contends there is still potential for future misappropriation, then those claims necessarily rely on a scope of trade secrets that xAI has not identified. xAI cannot succeed on such claims. Indeed, xAI cannot reasonably contend that ***all*** information relating to its generative AI model is trade secret, as xAI itself has stated that certain aspects of its generative AI models have been made "open source." (*See* Ex. X (xAI CEO posting on the X platform that "[t]he @xAI Grok 2.5 model … is now open source" and "Grok 3 will be made open source in about 6 months."). Moreover, while xAI points to general security practices (Mot. at 4, 11), it does not address whether those practices applied to any of the specific information it may claim as trade secrets.

Whether xAI imposes restrictions on specific documents is particularly important because xAI's employee agreements *expressly contemplate* the use of personal computers and accounts for xAI work. (*See* Mot., Ex. B at 5, ¶ 8 ("if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company Information, including but not limited to, Confidential Information…").) Finally, as discussed above, xAI's Employment Agreement with Dr. Li acknowledges that certain generative AI inventions are "owned by [Dr. Li]" and "not … assigned to [xAI]." (*See* Dkt. 8-5, ¶ 2.3 ("Excluded Inventions" provision); *see also id*. at Ex. A (describing Dr. Li's inventions).) xAI has made no attempt to distinguish such inventions of Dr. Li, from the claimed trade secrets. Its failure to do so not only prevents this Court from crafting an injunction that is "narrow and carefully-tailored" to alleged trade secrets, *Waymo*

FENWICK & WEST LLP
ATTORNEYS AT LAW

*LLC v. Uber Techs., Inc.*, No. C 17-00939, 2017 WL 2123560, at *12 (N.D. Cal. May 15, 2017), but also prevents this Court from evaluating whether any such information is in fact trade secret.

**d. xAI is Not Likely to Succeed on Its Breach of Contract Claim**

xAI contends that Dr. Li breached his contract by allegedly failing to "protect the confidentiality of xAI's Confidential Information" and "refusing to return that information upon his departure." (Mot. at 12.) Both arguments fail. As described in detail above, xAI offers no evidence that any alleged trade secrets were copied, transferred, or disclosed to a third party, and Dr. Li immediately cooperated with xAI to return and/or delete all allegedly xAI confidential information. xAI accordingly cannot show likelihood of success on its breach of contract claims.

**B. The Balance of Equities Weighs Heavily Against Injunctive Relief, and Granting xAI's Preliminary Injunction is Injurious to the Public Interest**

xAI's motion should be denied because the balance of equities weighs heavily in favor of Dr. Li, and a preliminary injunction would be highly injurious to the public interest. xAI's proposed injunction seeks to stop Dr. Li from "having ***any role or responsibility*** at OpenAI ***or any other competitor of xAI*** pertaining to generative AI," and "having ***any communication*** on the subject of generative AI" with "any [] competitor of xAI." (Dkt. 8-2 at ¶¶ 8-9.) This is not, as xAI argues, a mere "slight burden" on Dr. Li that is "no more than is necessary to protect xAI's rights." (Mot. at 16.) To the contrary, this is extraordinarily overbroad. It would prohibit Dr. Li from working in the field in which he has spent years becoming an expert, and has undoubtedly much more to contribute. It also would have a complete chilling effect on Dr. Li's freedom of speech.[24]

Nor would this chilling effect stop with Dr. Li. As public information indicates that talented xAI employees are leaving xAI in masses.[25] Issuing an injunction here would serve to intimidate

[24] xAI argues that all Dr. Li must do under the xAI's requested relief is "comply with the law and the Agreement and Authorization," which is "essentially the same relief that [Mr.] Li already agreed to," and thus he will sustain no injury. Again, this is incorrect. xAI implicitly acknowledges, their requested injunctive relief is not what was in the agreement, but seeks much broader relief—prohibiting Dr. Li from discussing generative AI, broadly, with Open AI or any other "potential competitor" of xAI. Such a restriction would be a massive burden on Dr. Li, and xAI cites to no authority that supports this limit on Dr. Li's employment.

[25] *See, e.g.*, A. Saeedy, "Executives at xAI Clashed with Musk Advisers Before Departing" (Sept. 17, 2025), *available at:* https://www.wsj.com/tech/ai/elon-musk-xai-executives-advisers-clash-eac3913b?msockid=1e7a7da6a85f66ae26986829a9dc67b7 (last accessed on Nov. 24, 2025); R. Bellan, "xAI's CFO is the latest executive to leave Elon Musk's AI firm" (Sept. 3, 2025),



FENWICK & WEST LLP ATTORNEYS AT LAW

current and former xAI employees from choosing to work at their place of choice. Undoubtedly that is one of xAI's purposes in filing these lawsuits, and this Court should not endorse xAI's anti-competitive purposes here. xAI's proposed injunction will thus have far-reaching effects that run in direct contravention of California law and public policy that "strongly favors employee mobility."[26] *See, e.g.*, *Whyte*, 101 Cal. App. 4th at 1462.

Moreover, as xAI acknowledges, a "robust competitive landscape" that "foster[s] innovation and investment that drive[s] economic growth" is in the public interest. (Mot. at 17.) This is particularly true for the AI industry, as the "United States has ardently and unambiguously expressed its continued interest in preserving its position of leadership in the AI industry." (*Id.*) To serve these interests, the U.S. needs its best AI innovators—like Dr. Li—working on the latest and cutting-edge issues related to AI. xAI's attempt to stop Dr. Li from doing just that injures the public interest. *See Citcon USA, LLC*, 2019 WL 2603219 at *3. Any interest in protecting xAI's intellectual property—which has long been out of Dr. Li's possession, and thus is not at risk of being disclosed or used—is far outweighed by the public interests in protecting employee mobility, and fostering competition and continued innovation in the AI industry.

### C. xAI's Proposed Injunction Is Not Narrow or Carefully Tailored to the Trade Secrets, and Should Be Denied

xAI's requested injunction should be denied. xAI characterizes its requested relief as "fall[ing] loosely into two buckets." (Mot. at 17.) As explained below, xAI's first bucket is

---

*available at:* https://techcrunch.com/2025/09/03/xais-cfo-is-the-latest-executive-to-leave-elon-musks-ai-firm/ (last accessed on Nov. 24, 2025).

[26] The cases cited by xAI regarding the balance of equities are inapposite, as the proposed injunction in each cited case did not "preclude Defendants from beginning their new employment." *See Waymo*, 2017 WL 2123560, at *11 (granting "narrow and carefully-tailored" injunction that allowed the defendant-employee to be employed at a competitor (albeit with some restrictions)); *Implicit Conversions, Inc. v. Stine*, No. 24-cv-03744, 2024 WL 4112335, at *12 (N.D. Cal. Sept. 6, 2024) (injunction limited to accessing computer systems, and acquiring, using, or disclosing trade secrets; and ordering the return of plaintiff's confidential information); *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1209-10 (E.D. Cal. 2020) (granting injunctive relief to limit disclosure but "declin[ing] to issue the broad injunction … prevent[ing] *Lutronic* from directing the Former *Cutera* Employees to perform their current duties" to "avoid undermining the public interest in promoting the mobility of employees"); *Bank of Am., N.A. v. Immel*, No. C 10-02483, 2010 WL 2380877, at *3 (N.D. Cal. June 11, 2010) (injunction seeking "only the return of [Plaintiff's] confidential information and a prohibition on the use of that information").

unnecessary in light of Dr. Li's extensive cooperation with xAI's requests to date. xAI's second bucket violates the DTSA and California policy and is neither narrow nor carefully tailored.

### 1. xAI's First Bucket of Proposed Relief is Overbroad and Unnecessary

xAI's proposed injunction seeks to limit Dr. Li's access to his own devices and accounts that may contain allegedly confidential information as well as prohibit disclosure and use of that information.[27] xAI contended at filing that this relief was necessary because it "must be able to recover its intellectual property and ensure that it is no longer in Li's possession." (Mot. at 17-18.)

Here, this request, which shut down Dr. Li's access to his own digital life, has now been mooted by the months of Dr. Li's extensive cooperation with xAI's forensic work. xAI has already had ample opportunity to perform its forensic examination and all remediation and/or deletion needed to ensure the xAI Material is no longer in Dr. Li's possession. It is not only unnecessary to continue restricting any of Dr. Li's access to his personal devices and accounts, but also fundamentally prejudicial. (Dkt. 8-2, ¶ 1.) Moreover, xAI's proposed injunction broadly refers to "Confidential Information"—not limited to specifically identified trade secrets. To the extent is broadly referring to any "Confidential Information" that may be within Dr. Li's knowledge, such a claim relies an inevitable disclosure theory and is thus improper.[28] (*See supra*, Section I.B.2.)

### 2. xAI's Second Bucket of Proposed Relief Violates the DTSA and California's Strong Public Policy of Employee Mobility

xAI's second bucket seeks to preclude Dr. Li from "having any role or responsibility" with any "competitor of xAI pertaining to generative AI," or "having any communication on the subject of generative AI" with representatives of "any competitor of xAI." (Dkt. 8-2 at ¶¶ 8-9.) As discussed above, such provisions violate the DTSA and California's strong public policy in favor

[27] Specifically, the proposed injunction seeks to prevent Dr. Li from "controlling, logging into, or otherwise accessing" his own personal devices and accounts (Dkt. 8-2, ¶ 1); from "possessing, using, copying, reproducing, disclosing, transferring (including to a third party), disseminating, or otherwise exploiting, any of xAI's 'Confidential Information'" (*id.*, ¶ 2); from "destroying, deleting, changing, altering, or otherwise eliminating" information, devices, accounts and storage repositories storge systems accessible or used by Dr. Li since the start of his employment at xAI (*id.*, ¶¶ 3-6); and violating the terms of Dr. Li's employment agreement with xAI or the Termination Certificate (*id.*, ¶ 7).

[28] Additionally, the provisions referring to devices, accounts and storage repositories (*id.*, ¶¶ 3-6) are unnecessary in light of standard preservation obligations. Nonetheless, should the Court include these provisions in any preliminary injunction, they should be limited to preservation of information relating to the xAI Materials alleged to be trade secrets.

of open competition and employee mobility. (*See supra*, Section I.B.2; *see also* 18 U.S.C. § 1836(b)(3)(A)(i)(I) ("a court may grant an injunction … provided the order ***does not prevent a person from entering into an employment relationship***" (emphasis added)); *Perrin Bernard Supowitz, LLC v. Morales*, No. 23-55189, 2024 U.S. App. LEXIS 2513, at *4-5 (9th Cir. Oct. 19, 2023) (explaining California has a "settled legislative policy in favor of open competition and employee mobility" (citation omitted)).

Further, such a broad injunction is unprecedented and unsupported by xAI's cited case law. xAI claims that the *Waymo* court granted "granted Waymo similar relief against competitor Uber." (Mot. at 18). Not so. As an initial matter, the facts in *Waymo* stand in stark contrast to those of the present case. There, the former employee had not merely downloaded files, but the court found that those files "remain[ed] in [the former employee's] possession," there was a "total absence of any evidence that he returned or otherwise surrendered possession of the files," and "that nothing prevented him from" continuing to use those files with his current employer (and competitor of the plaintiff), Uber. *Waymo*, at *6. Despite those findings, Judge Alsup nonetheless ***allowed*** the employee to be employed by Uber. *See id.* at *12 (citations omitted). While the court issued an injunction, it specifically noted that any injunction must be "narrow and carefully-tailored," and thus prohibited working on a specific technology related to the allegedly misappropriated trade secrets. *Id.* at *13.

By contrast, not only is there zero evidence that xAI Material remains in Dr. Li's possession, but xAI's proposed injunction seeks to prevent Dr. Li from "having ***any role or responsibility*** at OpenAI or ***any other competitor of xAI*** pertaining to generative AI," or even have "any communication on the subject of generative AI." (Dkt. 8-2 at ¶¶ 8-9.) Such an injunction seeks to prevent Dr. Li from being employed—in any capacity—with xAI competitors, and it thus violates the DTSA. The language, "pertaining to generative AI," is not "narrow and carefully-tailored," as it is not tied to any specific allegedly misappropriated trade secrets. *Waymo*, 2017 WL 2123560, at *12. Indeed, xAI itself has already acknowledged that certain inventions in the "generative AI" space are "owned by [Dr. Li]" and "not … assigned to [xAI]." (*See* Dkt. 8-5, Ex. A.)

Moreover, the field of "generative AI" is a vast, multifaceted field, and an injunction

FENWICK & WEST LLP
ATTORNEYS AT LAW

prohibiting employment in *any* role, for *any* xAI competitor, relating in *any* way to "generative AI" is far too broad. The industry of "generative AI" encompasses far more than frontier models like Grok; it includes, for example, compute and hardware; cloud and AI infrastructure platforms; data platforms and tooling; industry-specific applications; integrators, services, and enterprise distribution; and safety, policy, standards, and research.[29] Moreover, the specific type of work that Dr. Li focused on for xAI is limited to a particular type of post-training for the Grok frontier model (i.e., language model behavior post-training), and there are many aspects of developing a frontier model that go beyond Dr. Li's former work, including, to name a few, pre-training, core Reinforcement Learning, tool use, automated research/scientist, synthetic data, multimodal, interpretability, and applications in expert domains.[30] xAI has no basis to extend the injunction to these unrelated sub-fields of the generative AI industry.

Finally, xAI's proposed timing limitation—i.e., enjoining employment and communications "until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted"—should likewise be rejected. Such a provision allows xAI to unilaterally determine the length of the injunction, which is particularly problematic given that xAI has delayed the forensic examination process with respect to certain devices and accounts and may continue to do so to extend the injunction. Moreover, due to the ongoing criminal investigation, certain devices are not in the parties' possession, and it is unclear when xAI will be able to confirm deletion of information on those devices. Regardless, the record reflects *Dr. Li* is no longer in possession of or has access to any xAI Material. The TRO should thus be vacated.

## V. CONCLUSION

For the foregoing reasons, Dr. Li respectfully requests the Court to deny xAI's request for a Preliminary Injunction.

---

[29] *See, e.g.*, Pat Grady & Sonya Huang, *Generative AI's Act Two*, SEQUOIA CAPITAL (June 6, 2023), *available at:* https://sequoiacap.com/article/generative-ai-act-two/ (last accessed on Nov. 22, 2025); *see also* Cong. Research Serv., *Data Centers and Cloud Computing: Information Technology Infrastructure for Artificial Intelligence* (2023); *AI Standards*, NAT'L INST. STANDARDS & TECH., https://www.nist.gov/artificial-intelligence/ai-standards (2021, updated 2025) (last accessed Nov. 10, 2025).

[30] *See generally Artificial Intelligence Index Report 2025*, STANFORD UNIV. HUMAN-CENTERED AI, https://hai.stanford.edu/assets/files/hai_ai_index_report_2025.pdf (last accessed Nov. 10, 2025).

Dated: November 24, 2025

FENWICK & WEST LLP

By: *\/s/ Benjamin S. Kingsley*

Benjamin S. Kingsley
bkingsley@fenwick.com
Jessica M. Kaempf
jkaempf@fenwick.com

Attorneys for Defendant
XUECHEN LI

FENWICK & WEST LLP
ATTORNEYS AT LAW